UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------x
UNITED STATES SECURITIES       :
AND EXCHANGE COMMISSION,     :
                               :
           Plaintiff,     :
                               :   No. 1:09-CV-01423 (GK)
       v.          :
                               :   *Pretrial Conference:*
ELAINE M. BROWN and        :   May 17, 2012 at 4 p.m.
GARY A. PRINCE,          :
                               :   **Oral Argument Requested**
          Defendants.    :
------------------------------------------------------x

## DEFENDANT GARY A. PRINCE'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Gary A. Prince, through undersigned counsel, hereby moves, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, for partial summary judgment with respect to Plaintiff the United States Securities and Exchange Commission's claims against him (i) for primary violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (Count II of the Complaint), and (ii) for violating a Commission Order pursuant to SEC Rule of Practice 102(e), dated June 24, 1997 (Count VII of the Complaint) and the relief sought therefrom – a permanent injunction to be ordered by the Court to enjoin any and all potential future violations of the 1997 Order (Relief Count V of the Complaint). The grounds for this motion are stated in greater detail in the accompanying Affidavit of Gary A. Prince, the Declaration of C. Evan Stewart, and the Memorandum of Law in Support of Defendant Gary A. Prince's Motion for Partial Summary Judgment, submitted herewith.

Dated: New York, New York
       January 27, 2012

Respectfully submitted,

ZUCKERMAN SPAEDER LLP

By: /s/ C. Evan Stewart
       C. Evan Stewart (admitted *pro hac vice*)
       Shawn P. Naunton (admitted *pro hac vice*)

1185 Avenue of the Americas, 31st Floor
New York, NY 10036
Telephone: (212) 704-9600
Fax: (212) 704-4256
E-mail: estewart@zuckerman.com
        snaunton@zuckerman.com

-and-

By: /s/ Roger E. Zuckerman
       Roger E. Zuckerman (I.D. No. 134346)

1800 M Street, N.W., Suite 1000
Washington, D.C. 20036-5802
Telephone: (202) 778-1800
Fax: (202) 822-8106
Email: rzuckerman@zuckerman.com

*Attorneys for Defendant Gary A. Prince*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------x

UNITED STATES SECURITIES             :
AND EXCHANGE COMMISSION,             :
                                     :
              Plaintiff,             :
                                     :        No. 1:09-CV-01423 (GK)
       v.                            :
                                     :
                                     :
ELAINE M. BROWN and                  :
GARY A. PRINCE,                      :
                                     :
              Defendants.            :
------------------------------------------------------x

**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANT GARY A. PRINCE'S
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

C. Evan Stewart
Shawn P. Naunton
ZUCKERMAN SPAEDER LLP
1185 Avenue of the Americas, 31st Floor
New York, New York 10036-4039

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF UNDISPUTED FACTS ............................................................. 5

   A.  Background ...................................................................................................... 5

   B.  Statement of Undisputed Facts Germane to the
      "Primary" Violator Claim ............................................................................ 6

   C.  Statement of Undisputed Facts Germane to the SEC's
      1997 Bar Order Claim .................................................................................. 8

LEGAL ARGUMENT ............................................................................................ 12

  I.  THE STANDARD FOR SUMMARY JUDGMENT ...................................... 12

 II.  AS A MATTER OF LAW AND INDISPUTABLE RECORD EVIDENCE,
      MR. PRINCE IS NOT A "PRIMARY" VIOLATOR OF SECTION 10(B) ............... 13

   A.  Mr. Prince Did Not "Make" Any Alleged Material Misstatement
      or Omission Under the Federal Securities Laws. ..................................... 13

   B.  Mr. Prince Did Not Have A Duty to Disclose or Clarify
      Any Alleged Material Omission By Integral. ............................................ 15

   C.  Mr. Prince Did Not Engage in Any Deceptive Acts
      In Connection With A Scheme to Defraud. ............................................... 16

III.  NEITHER LEGAL PRECEDENT, ACADEMIC COMMENTARIES,
      NOR THE INDISPUTABLE EVIDENTIARY RECORD SUPPORTS
      THE  SEC'S CHARGE THAT MR. PRINCE VIOLATED
      THE SEC'S BAR ORDER. ........................................................................ 19

IV.  THE EXPERT TESTIMONY SUBMITTED IN THIS CASE
      DEMONSTRATES BEYOND ANY DOUBT THAT  MR. PRINCE
      DID NOT VIOLATE THE SEC'S BAR ORDER. ...................................... 27

 V.  THERE IS ABSOLUTELY NO EVIDENCE OF ANY KIND TO
      SUPPORT THE NOTION THAT THERE IS A "REASONABLE
      LIKELIHOOD" THAT MR. PRINCE WILL VIOLATE THE SEC'S
      BAR ORDER IN THE FUTURE AND THUS THE INJUNCTIVE
      RELIEF SOUGHT BY THE SEC MUST BE REJECTED. ........................ 38

CONCLUSION ....................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

Cases                                                                                    Page(s)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 12

*Arrington v. United States*, 473 F.3d 329 (D.C. Cir. 2006) ......................................... 12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................... 12

\* *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ............................................................................................. 1, 14

*DiBella v. Hopkins*, No. 01 Civ. 11799 (DC), 2002 WL 31427362
    (S.D.N.Y. October 30, 2002) ............................................................................... 37

*EEOC v. Bloomberg L.P.*, 07 Civ. 8383, 2010 U.S. Dist. LEXIS 92511
    (S.D.N.Y. August 31, 2010) ................................................................................ 37

\* *Harris v. Koenig*, --- F. Supp. 2d ---- , 2011 WL 5176813
    (D.D.C. November 2, 2011) (Kessler, J.) ............................................................ 12

*Hawaii Ironworkers Annuity Trust Fund v. Cole*, 2011 WL 3862206
    (N.D. Ohio September 1, 2011) ............................................................................ 14

*In re Carter & Johnson*, Release No. 34-17595, 22 S.E.C. Docket 292, 1981
    WL 384414 (February 28, 1981) ......................................................................... 27

*In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61 (S.D.N.Y. 2001) ............... 37

*In Re Jerry M. Walker, CPA*, Release No. 34-42044, 70 S.E.C. Docket 2063,
    1999 WL 988090 (October 18, 1999) ............................................................ 21, 22

*In re Jethro J. Barlow, CPA, et al.*, Release No. 34-42420, 2000 WL 816863
    (February 14, 2000) ............................................................................................. 24

*In re Luis E. Gomez, CPA*, Release No. 34-43389, 73 S.E.C. Docket 1041,
    2000 WL 1448632 (September 29, 2000) ............................................................ 24

*In re Merck & Co. Sec., Deriv., & ERISA Litig.*, 2011 WL 34441999
    (D.N.J. August 8, 2011) ...................................................................................... 14

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531
    (S.D.N.Y. 2004) ................................................................................................... 37

*In re Robert W. Armstrong, III*, 2005 WL 1498425 ................................ 21, 22, 23, 25

\* *Janus Capital Group Inc. v. First Derivative Traders*,
    131 S. Ct. 2296 (2011) ................................................................................*passim*

*Kidder, Peabody & Co. v. AIG Int'l Group N.V.*, 14 F. Supp. 2d 391 (S.D.N.Y. 1998) .............. 37

*Pension Comm. of the U. of Montreal Pension Plan v. Bank of America Securities*,
 691 F. Supp. 2d 448 (S.D.N.Y. 2010) ................................................... 37

*Rowe Entertainment, Inc. v. William Morris Agencies, Inc.*, No. 98 Civ. 8272 (RPP),
 2003 U.S. Dist. LEXIS 15976 (S.D.N.Y. September 15, 2003) ................................ 37

*Scott v. Harris*, 550 U.S. 372 (2007) ................................................................ 12

\* *SEC v. Commonwealth*, 574 F.2d 90 (2d Cir. 1978) ................................................ 2, 38

\* *SEC v. Culpepper*, 270 F.2d 241 (2d Cir. 1959)..................................................... 2, 38

*SEC v. Druffner*, 353 F. Supp. 2d 141 (D. Mass. 2005) ............................................ 15

*SEC v. Johnson*, 595 F. Supp. 2d 40 (D.D.C 2009)................................................. 38

*SEC v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007).............................................. 2, 38

\* *SEC v. National Student Marketing*, 457 F. Supp. 682 (D.D.C. 1978) .................................. 2, 38

*SEC v. Patel*, 2009 WL 3151143, Civ. No. 07-CIV-39-SM (D.N.H. September 30, 2009) ........ 18

\* *SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) .......................................................... 2, 38

*Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006) ............................... 16

\* *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008)........... 1, 14

*Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223 (D. Mass. 2004) ............................. 18

*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999) ............................................ 37

## FEDERAL STATUTES AND REGULATIONS

17 C.F.R. § 102 ........................................................................... 20, 25

17 C.F.R. § 240.10b-5.................................................................... *passim*

15 U.S.C. § 78 ................................................................................. 1

15 U.S.C. § 78p(a) ........................................................................... 18

18 U.S.C. § 1001 .............................................................................. 9

18 U.S.C. § 371................................................................................. 9

Comm. R. Prac. 102(e) ................................................................. *passim*

Comm. R. Prac. 102(f) ................................................................................................. 25

## **RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 56(c) .................................................................................................... 12

## **OTHER AUTHORITIES**

*Disciplinary Proceedings Against Accountants: The Need for a More Ascertainable*
   *Improper Professional Conduct Standard in the SEC's Rule 2(e)*, comment,
   53 Fordham L. Rev. 351 (1984) ............................................................................... 20

*Disclosure in Management's Discussion and Analysis about the Application of*
   *Critical Accounting Policies*, Release No. 22-8098 (May 10, 2002) ....................... 25

Marie L. Coppolino, *Checkovsky, Rule 2(e) and the Auditor: How Should the*
   *Securities and Exchange Commission Define Its Standard of Improper*
   *Professional Conduct?*, 63 Fordham L. Rev. 2227 (1995)........................................ 20

Norman S. Johnson and Ross A. Albert, "*Déjà Vu All Over Again:*" *The Securities*
   *and Exchange Commission Once More Attempts to Regulate the Accounting*
   *Profession Through Rule 102(e) Of Its Rules of Practice*,
   1999 Utah L. Rev. 553, 554 (1999) ......................................................................... 20

Todd J. Flagel, *SEC Must Clarigy Its Position As To The Level of Culpability*
   *That Must Be Shown to Constitute a Rule 2(e)(1)(II) Violation by*
   *Accountants*, 20 U. Dayton L. Rev. 1083 (1995) .................................................... 20

Defendant Gary A. Prince respectfully submits the Memorandum of Law in support of his Motion, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, for an Order dismissing the United States Securities and Exchange Commission's (the "SEC" or the "Commission") claims against Mr. Prince (i) for primary violations of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78, and Rule 10b-5, and (ii) for violating a Commission order pursuant to SEC Rule 102(e), dated June 24, 1997, and the relief sought therefrom—a permanent injunction to be ordered by the Court to enjoin any and all potential future violations of the 1997 order.[1]

## PRELIMINARY STATEMENT

In 2009, the SEC charged Gary A. Prince with fraud and other serious violations of the federal securities law; and the SEC has asked this Court to impose significant civil penalties on Mr. Prince, including permanent injunctive relief.  Now, after three years of discovery, two things are clear beyond a shadow of a doubt:  (1) Mr. Prince was not, and cannot be made out to be, a "primary" violator of the federal securities law, *see Janus Capital Group Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011); *Stoneridge Investment Partners, LLC v. Scientific Atlanta, Inc.*, 552 U.S. 148 (2008); *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994); and (2) with respect to the Commission's 1997 accounting bar order issued pursuant to SEC's Rule 102(e): (i) the Commission's evidentiary record of any violation of said order is lacking—even the extraordinarily tenuous "evidence" cited by the SEC

---

[1] Submitted herewith in support of Mr. Prince's motion are (i) the Affidavit of Gary A. Prince In Support of His Motion for Partial Summary Judgment (the "Prince Aff."), and (ii) the Declaration of C. Evan Stewart In Support of Defendant Gary A. Prince's Motion for Partial Summary Judgment (the "Stewart Decl."). The Stewart Decl. includes as exhibits (i) excerpts of deposition testimony relevant to this motion, and (ii) true and correct copies of deposition exhibits relevant to this motion. Deposition testimony is referred to herein as "Ex. __ [Witness] __ ." Deposition exhibits are referred to herein as "Dep. Ex. __ ."

in support of this charge has been refuted by **every** fact witness; (ii) the expert testimony put forward by both parties on this precise issue weighs decisively in favor of Mr. Prince—as a matter of record evidence, law, logic, and public policy; and (iii) irrespective of what may have occurred during the relevant time period at issue in this litigation (*i.e.*, Mr. Prince's tenure at Integral Systems, Inc. ("ISI") from 1998 to 2006), there is absolutely **no evidence** whatever that Mr. Prince has done anything to violate the 1997 order since 2006 and **no evidence** whatever that there is any "reasonable likelihood" that Mr. Prince will violate the 1997 order in the future. *See, e.g., SEC v. Patel*, 61 F.3d 137, 141-42 (2d Cir. 1995); *SEC v. Commonwealth*, 574 F.2d 90, 99 (2d Cir. 1978); *SEC v. Culpepper*, 270 F.2d 241, 250 (2d Cir. 1959); *SEC v. Jones*, 476 F. Supp. 2d 374, 383-84 (S.D.N.Y. 2007); *SEC v. National Student Marketing*, 457 F. Supp. 682 (D.D.C. 1978). Thus, the relief sought by the SEC on this claim should be summarily rejected.

Based upon the record evidence that has been developed over the past three years, the following are indisputable as a matter of fact and law with respect to the "primary" violation claim:

- Mr. Prince signed **none** of the corporate documents which the SEC alleges contained fraudulent information disseminated to the investing public and **none** of those corporate documents contain any statements attributed to Mr. Prince.

- Mr. Prince had **no** corporate authority to sign any corporate documents which the SEC alleges contained fraudulent information disseminated to the investing public and **no** corporate authority to make any statement contained therein.

- Mr. Prince can have **no** primary liability for corporate documents for which Integral's Chief Financial Officer or Integral's Chief Financial Officer had corporate responsibility.

- The SEC has failed to develop **any** record evidence that **any** corporate document to which Mr. Prince "contributed" contained **any** fraudulent information disseminated to the investing public.

- The SEC has failed to develop **any** record evidence that the investing public was injured **in any way**—let alone in a monetary fashion—by **anything** allegedly done by Mr. Prince.

With respect to the Commission's 1997 order pursuant to SEC Rule 102(e), the following is equally clear as matter of fact and law:

- The SEC's "best" evidence that Mr. Prince violated the 1997 SEC Rule 102(e) order while employed at ISI is a single e-mail which indisputably has been taken out of context and contorted to support the SEC's position.  **Every** fact witness (without contradiction or challenge) has repudiated the SEC's "interpretation" of this one email.

- **Every** fact witness (without contradiction or challenge) has testified that ISI hired Mr. Prince with full knowledge of the 1997 SEC Rule 102(e) order and structured his duties (after consultation with the Venable law firm) to ensure he would not violate the order.

- **Every** fact witness (without contradiction or challenge) has testified that Mr. Prince did not in fact violate the 1997 SEC Rule 102(e) order while employed at ISI.

- The Venable law firm advised the ISI Board of Directors in 2006 that Mr. Prince was not violating the 1997 SEC Rule 102(e) order.

- With respect to the expert witnesses proffered on this issue, the SEC's expert's work—as will be demonstrated herein—is not only seriously flawed in numerous respects (and thus is subject to legal challenge under Fed. R. Evid. 702), but the SEC's expert has also put forward theories that are, in some instances, without sufficient basis, and in others, simply baseless.  On the other hand, the work of Mr. Prince's expert—one of the nation's leading corporate securities professors at the Yale Law School—fully supports that Mr. Prince's activities during the relevant period did not violate the 1997 SEC Rule 102(e) order.

- Finally, the relief sought by the Commission for the alleged violation of the 1997 order is a permanent injunction to enforce the SEC's own order.  Not only is such relief superfluous (*i.e.*, the 1997 SEC Rule 102(e) order is self-enforcing), but the SEC has simply failed to develop **any** record evidence that there is a "reasonable likelihood" that Mr. Prince will violate the 1997 SEC Rule 102(e) order at some point in the future.  As such, as a matter of law, this entire claim and the relief sought in support thereof should be dismissed from the case.

Not only is summary judgment appropriate as a matter of law on these two claims interposed by the SEC, dismissal of them at this stage will significantly narrow the issues(s) left for trial and make this proceeding far more efficient, both for the Court and the litigants.[2]

## STATEMENT OF UNDISPUTED FACTS

### A.   Background

Integral Systems, Inc. makes and sells satellite ground systems, including satellite communications systems and software products for satellite command and control.  (Compl. ¶ 17)  Mr. Prince was hired in 1982 by the then-Chief Executive Officer of Integral, Steven R. Chamberlain, to perform part-time accounting services for the company.  (*Id*. ¶ 2)  In 1992, Mr. Prince was appointed Integral's Vice President and Chief Financial Officer.  (*Id*.)  Mr. Prince resigned his position as Integral's CFO in 1995, shortly before pleading guilty to conspiracy to commit fraud and making false statements to the Commission in connection with his employment at another public company.  (*Id*.)  Mr. Prince also agreed to a permanent bar order with the SEC in 1997 pursuant to SEC Rule 102(e) that prohibits Mr. Prince from "practicing before the Commission as an accountant."  (*Id*. ¶ 5)

---

[2] Essentially what would be left for trial is whether Mr. Prince was a *de facto* officer of ISI during the relevant period and whether ISI's non-disclosure thereof was appropriate.  Critical to the resolution of that issue will be the ongoing advice and counsel given to ISI executives and the ISI Board of Directors by the Venable law firm, which in fact was knowledgeable as to Mr. Prince's duties and responsibilities over the course of the relevant period and in 2006 gave a written opinion to the SEC that the law firm "**strongly believe[d]** that Mr. Prince was not an executive officer during this period [1998-2006]." (emphasis added)   (Dep. Ex. 56)  Notwithstanding the clear and indisputable written evidentiary record of Venable's knowledge and advice to ISI on these matters during the relevant period, Mr. Prince is not moving for summary judgment on this part of the case.  Given the incredible deposition testimony of numerous current and former Venable attorneys, who appear to have forgotten that ISI was a client of their firm, it will be necessary for this Court to evaluate those lawyers' credibility at trial vis-à-vis the clear, contemporaneous evidentiary record that exists as to their knowledge of and advice to their client, ISI.

Mr. Chamberlain later rehired Mr. Prince to work at Integral in December 1998.  (*Id*. ¶ 3)

Mr. Prince held various non-officer titles after his rehiring, including Director of Mergers and

Acquisitions, Director of Strategic and Financial Planning, and Managing Director of

Operations.  (*Id*. ¶ 16)  In August 2006, Integral filed a Form 8-K stating that Mr. Prince had

been "appointed Executive Vice President and Managing Director of Operations for the

Company" and disclosing Mr. Prince's legal background.[3]  (*Id*. ¶ 31)  Integral terminated Mr.

Prince in March 2007, after the Commission's Enforcement Division commenced the

investigation that led to this proceeding.  (*Id*. ¶ 16)

The Commission's allegations in this case relate to an almost eight year period between

Integral's rehiring of Mr. Prince in December 1998 and Integral's disclosure of Mr. Prince's

appointment as an executive office of the company in August 2006.  (*Id*. ¶ 1)  The Commission

has charged that throughout all of that time, notwithstanding his titles, Mr. Prince "functioned as

an executive officer" at Integral.  (*Id*. ¶¶ 3, 7)  As a result, the Commission has alleged that

Integral should have identified Mr. Prince as an executive officer in the company's public filings

and should have disclosed his legal history.  (*Id*. ¶ 7)  The Commission has also alleged that

throughout the relevant time period Mr. Prince "perform[ed] accounting and financial disclosure

duties" for Integral in violation of his bar order.  (*Id*. ¶ 37)

**B.      Statement of Undisputed Facts Germane to the "Primary" Violator Claim**

In its Complaint, the Commission did not even allege that Mr. Prince "made" a material

misstatement or omission, or that any such misstatement or omission was attributed to Mr. Prince

at the time of public dissemination.  Nothing developed over the past three years would permit

the Commission to amend its pleading on these matters.  In fact, it is indisputable that:  (i) Mr.

---

[3] After this public filing, Integral's stock price increased.

Prince did **not** sign any of the Integral disclosures which the SEC alleges contained fraudulent information; (ii) Mr. Prince did **not** have the authority to sign any Integral disclosures; and (iii) **no** statements in any Integral disclosures during the time period at issue were ever attributed to Mr. Prince.

To be sure, the Commission has alleged that Mr. Prince "reviewed, commented on, and approved [Integral's] draft annual reports, including the financial results" which were later "incorporated into the Company's proxy statements," and that Mr. Prince "created and prepared **internal** quarterly financial results and forecasts which were incorporated into the Company's financial disclosures." (*Id*. ¶ 39 (emphasis added))  And record evidence developed over the past three years does support those allegations.  However, there can be no dispute that (i) such activities were open and notorious—not only within ISI, but were known by Venable, and (ii) such activities do **not** rise to the level of conduct considered to be "primary" violator level as a matter of law under *Janus*, 131 S. Ct. at 2296.  Indeed, the record demonstrates beyond dispute that it was widely known within Integral and Venable that Mr. Prince reviewed and commented on Integral's draft public filings (Dep. Exs. 180, 205); prepared internal financial results and forecasts that were incorporated into Integral's public filings (Dep. Exs. 240, 242, 245, 250, 256-258); and drafted the MD&A portion of Integral's public disclosures.  (Dep. Exs. 178, 179, 243) Furthermore, the Commission cannot dispute that all of the internal financial results and forecasts prepared by Mr. Prince that were later incorporated into Integral's public filings were **in all respects accurate** and were **not** false or misleading **in any way**.

The Commission also alleges that Mr. Prince committed a primary violation by engaging in a scheme to conceal his role at Integral from the investing public.  (Compl. ¶ 1)  However, there is **no** evidence in the record that Mr. Prince took any steps to conceal his role at Integral.

7

To the contrary, undisputed evidence demonstrates that Mr. Prince's roles and responsibilities at Integral were not concealed in any way, and were widely known within the company and at Venable.  *(See* Stewart Decl. Ex. C (Wachtel) 198-200; Ex. E (Gaffney) 62-123; Ex. F (Gough) 14-24, 79-97, 102-107, 111-114, 118-126, 130-139, 145-168; Ex. G (Alderete) 119-122; Ex. H (Flaherty) 106-107, 109-111, 114-115; Ex. I (Christner) 82-85, 346-347)  In addition to the testimony cited above and the documents cited in the preceding paragraph, it is indisputable that Mr. Prince (i) regularly attended Integral Board of Directors meetings, with Venable in attendance (Dep. Exs. 7, 9, 12, 46, 72-80, 182, 249); (ii) regularly gave presentations at Integral Board of Directors meetings, with Venable in attendance (Dep. Exs. 73, 75, 77); (iii) managed the companies acquired by Integral as subsidiaries, and in so doing was advised by Venable (Dep. Exs. 184, 195, 199, 200, 202, 203, 207, 213, 215, 254, 259); (iv) was a close advisor to CEO Steven Chamberlain and a member of a policy setting group with other members of Integral senior management known as the "G-6" or "G-7" (Dep. Ex. 111); and (v) worked with other members of Integral senior management in his capacity as head of Integral's Contracts Department.  (Dep. Exs. 262, 283)

**C.**     **Statement of Undisputed Facts Germane to the SEC's 1997 Bar Order Claim**

At the same time Mr. Prince was providing services to ISI in the early 1990s, he also had business dealings and relationships with other business entities.  (Compl. ¶ 16)  One of those entities, Financial News Network ("FNN"), became the subject of investigations by the Justice Department and the SEC relating to financial improprieties.  (*Id*.)  On June 28, 1993, the SEC filed a complaint against several FNN officials, including Mr. Prince.  (*Id*. ¶ 19)  On August 10, 1994, Mr. Prince executed a civil injunction with the SEC.  (*Id*.)

On March 31, 1995, Mr. Prince resigned as an officer and director of ISI.  (*Id.* ¶ 2)
Thereafter, on April 5, 1995, Mr. Prince executed a plea agreement with the Justice Department.
(*Id.* ¶ 19)  On or about September 1, 1995, a criminal information was filed in federal court in
California (C.D. Cal.) against Mr. Prince, charging conspiracy to commit fraud (18 U.S.C. § 371)
and making false statements to the Commission (18 U.S.C. § 1001).  (*Id.*)  On September 6,
1995, Mr. Prince entered a guilty plea to the criminal information.  (*Id.*)

Pursuant to his plea agreement, Mr. Prince cooperated with the Justice Department's
investigation and later appeared as a witness at the 1996 criminal trial of two FNN executives.
Both men were convicted of (or pled guilty to) felonies after Mr. Prince's testimony.

On June 22, 1997, Mr. Prince agreed to a permanent bar order with the SEC pursuant to
SEC Rule 102(e); that order prohibited him from appearing or practicing before the Commission
as an accountant.  (*Id.* ¶ 20)  That order was entered by the Commission two days later.  (*Id.*)

In December 1998, Mr. Prince had discussions with ISI's then-Chief Executive Officer
(Steven Chamberlain) about rejoining ISI, this time as a full-time employee.  (*Id.* ¶ 3)  Mr.
Chamberlain, fully knowledgeable about **all** of Mr. Prince's legal problems (including the 1997
SEC Rule 102(e) order) was desirous of hiring Mr. Prince, but wanted to do so (i) without having
to disclose Mr. Prince in SEC filings, and (ii) without having Mr. Prince violate the 1997 SEC
Rule 102(e) order.  *(See* Stewart Decl. Ex. B (McComas) 49; Ex. C (Wachtel) 334; Ex. G
(Alderete) 116-117; Ex. H (Flaherty) 105)  To ensure that both goals could be achieved well

within the letter and spirit of applicable law, Mr. Chamberlain consulted with the Venable law firm.  (*See id.*)[4]

Based upon those consultations and Venable's advice, Mr. Prince was brought on as a full-time employee with numerous restrictions relating to his job functions, responsibilities, and title.  *(See* Stewart Decl. Ex. B (McComas) 49; Ex. C (Wachtel) 334; Ex. G (Alderete) 116-117; Ex. H (Flaherty) 105-106; Ex. E (Gaffney) 14-15; Ex. F (Gough) 11-13)  Most relevant for this motion, Mr. Prince (i) was not given authority over the CFO or the accounting department, (ii) was electronically permitted "read-only" rights to ISI's accounting books and records, and (iii) was not permitted to make any entry in ISI's interactive accounting systems.  *(See* Stewart Decl. Ex. D (Leimkuhler) 230-231; Ex. E (Gaffney) 15-16, 32; Ex. F (Gough) 97-98; Ex. G (Alderete) 117-118; Ex. H (Flaherty) 106, 114-115)

The SEC's principal focus with respect to its claim that Mr. Prince violated his 1997 SEC Rule 102(e) order relates to his performing the following functions at ISI between 1998 and 2006:

- drafting the textual portion of ISI's Management Division and Analysis ("MD&A") section of ISI's Form 10-Ks and Form 10-Qs filed with the SEC (Compl. ¶ 39);

- supervising the preparation and filing of two ISI periodic reports (ISI's Form 10-K for the fiscal year ending September 30, 2004 and Form 10-Q for the quarterly period ending

---

[4] Mr. Chamberlain, who was a named defendant in this case but died shortly after its commencement, gave an investigatory deposition to the SEC on July 11, 2007, in which he testified on Mr. Prince's hiring and his consultation with the Venable firm to ensure full legal compliance with the twin goals referenced above.

December 31, 2004) while ISI's then-CFO, Elaine M. Brown, was on maternity leave (*id.*);

- reviewing and commenting on ISI's draft annual reports and other public filings (*id.*); and

- commenting on, reviewing, and for a period, preparing internal quarterly financial results (called "Financial Highlights Memoranda") that were presented to the ISI Board of Directors and incorporated into ISI's financial disclosures contained in its periodic reports filed with the SEC.[5]  (*Id.*)

During the years Mr. Prince was indisputably involved in those listed activities, his conduct was well known within ISI and was also known by numerous lawyers at the Venable law firm.  (*See supra* at 6-8)  From 1998 up to and including 2006, **no one** ever suggested that Mr. Prince's activities or conduct were in violation of the 1997 SEC Rule 102(e) order.

On August 2, 2006, the ISI Board of Directors had a meeting at which the Board named Mr. Prince an executive officer of the company.  (Dep. Ex. 7)  It did so, however, only after having been advised by a partner in the Venable law firm about the nature of the 1997 SEC Rule 102(e) order and that Mr. Prince was not in violation of that order.  (*Id.*)

---

[5] The SEC's expert embellished this list in late 2011, arguing for the first time (for example) that (i) Mr. Prince's mere attendance at ISI Board of Directors meetings constituted appearing or practicing before the SEC as an accountant, and (ii) Mr. Prince's involvement in the submission of documents to the Department of Defense constituted appearing or practicing before the SEC as an accountant.  (*See* Stewart Decl. Ex. S (Turner) ¶¶ 107-109, 115-120; Ex. T (Turner) ¶ 18)  As demonstrated *infra* at 29-36, there is no basis in law, evidence, or logic to support such fanciful contentions.

**LEGAL ARGUMENT**

**I.   THE STANDARD FOR SUMMARY JUDGMENT**

Summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Harris v. Koenig*, --- F. Supp. 2d ---- , 2011 WL 5176813, *2-3 (D.D.C. November 2, 2011) (Kessler, J.) (citing Fed. R. Civ. P. 56(c)). "In other words, the moving party must satisfy two requirements: first, that there is no 'genuine' factual dispute and, second, if there is, that it is not 'material' to the case. 'A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id*. (citing *Arrington v. U.S*., 473 F.3d 329, 333 (D.C. Cir. 2006). A fact is "material" if it might affect the outcome of the case under the substantive governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

As the Supreme Court stated in *Celotex Corp. v. Catrett*, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. 317, 322 (1986). The Supreme Court has further explained: "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial' . . . '[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Liberty Lobby*, 477 U.S. at 247–48) (emphasis in original).

12

**II.     AS A MATTER OF LAW AND INDISPUTABLE RECORD EVIDENCE,
MR. PRINCE IS NOT A "PRIMARY" VIOLATOR OF SECTION 10(B).**

Mr. Prince is entitled to summary judgment on the Commission's claims against him for

"primary" violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.[6]   The

record is clear that Mr. Prince did not "make" any of the alleged material misstatements or

omissions at issue under the standard recently articulated by the Supreme Court in *Janus Capital

Group Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011), nor did Mr. Prince have a

duty to clarify any alleged material omissions by Integral.   *See infra* §§ A, B; 17 C.F.R.

§ 240.10b-5(b).   In addition, there is **no** evidence that Mr. Prince engaged in any deceptive acts

in connection with an alleged scheme to defraud.   *See infra* § C; 17 C.F.R. §§ 240.10b-5(a) and

(c).

**A.     Mr. Prince Did Not "Make" Any Alleged Material Misstatement or
Omission Under the Federal Securities Laws.**

In its widely anticipated recent decision in *Janus*, the Supreme Court held that "[f]or

purposes of Rule 10b-5(b), the maker of a statement is the person or entity with ultimate

authority over the statement, including its content and whether and how to communicate it."

*Janus*, 131 S. Ct. 2296, 2302 (2011).   In narrowly defining "maker," the Court held that "one

who prepares or publishes a statement on behalf of another **is not its maker**," and noted that

ordinarily, "attribution within a statement or implicit from surrounding circumstances is strong

---

[6] Section 10(b) of the Exchange Act makes it unlawful to utilize manipulative or deceptive
devices in connection with the purchase or sale of securities.  Rule 10b-5 specifically provides
that it is unlawful for any person, in connection with the purchase or sale of any security:  "(a)
To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of
material fact or to omit to state a material fact necessary in order to make the statements made,
in the light of the circumstances under which they were made, not misleading, or (c) To engage
in any act, practice, or course of business which operates or would operate as a fraud or deceit
upon any person, in connection with the purchase or sale of any security."   17 C.F.R. §
240.10b-5.

evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.* (emphasis added).

The Court noted that its adoption of a bright line rule limiting primary liability to actual makers of misstatements, and not to secondary actors who may have been involved in the misstatements, follows from its seminal decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). In *Central Bank*, the Court established that only persons who "make" false or misleading statements or omissions—and not those who aid and abet such statements or omissions—can be held primarily liable under the federal securities laws. *Central Bank*, 511 U.S. at 177; *see also Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) (reaffirming the holding of *Central Bank* in rejecting primary liability claims against secondary actors who had participated in fraudulent scheme).

Since *Janus*, district courts have implemented its bright line rule by looking to who had ultimate authority over a statement to determine its "maker." *See, e.g., Hawaii Ironworkers Annuity Trust Fund v. Cole*, 2011 WL 3862206, at \*4 (N.D. Ohio September 1, 2011) (dismissing claims against two senior corporate officers for falsifying company's financial results where the company's CEO and CFO had ultimate authority over the alleged misstatements). Essentially, "*Janus* restricts liability for Rule 10b-5 claims against corporate officers to instances in which . . . those officers—as opposed to the corporation itself—had 'ultimate authority' over the statement." *In re Merck & Co. Sec., Deriv., & ERISA Litig.*, 2011 WL 34441999, at \*26 (D.N.J. August 8, 2011).

In this case, there is **no** evidence that Mr. Prince had "ultimate authority" over any alleged misstatement or omission, which is required for primary liability to attach under *Janus*.

113 S. Ct. at 2296.  It is true that Mr. Prince reviewed and commented on Integral's public filings, drafted textual portions of the public filings, and prepared financial results that were incorporated in the company's financial disclosures.  But the undisputed record demonstrates that Mr. Prince **never** had ultimate authority over the corporate disclosures which the Commission alleges contained fraudulent information disseminated to the investing public.  Mr. Prince signed none of the allegedly fraudulent corporate disclosures.  Indeed, Mr. Prince had no corporate authority to sign any of the allegedly fraudulent corporate disclosures; this authority properly resided with Integral's Chief Executive Officer and Chief Financial Officer.  And none of the allegedly fraudulent corporate disclosures contain even a single statement attributed to Mr. Prince.

As recognized by the Supreme Court in *Janus*, absent this "ultimate authority," Mr. Prince could "merely suggest what to say, not 'make' a statement in [his] own right . . . And it is the speaker who takes credit—or blame—for what is ultimately said."  *Id*.  The Commission's inability to proffer any evidence demonstrating that Mr. Prince had "ultimate authority" over any alleged misstatement or omission mandates a grant of summary judgment.

### B. Mr. Prince Did Not Have A Duty to Disclose or Clarify Any Alleged Material Omission By Integral.

As this Court previously recognized in ruling on Mr. Prince's motion to dismiss, under Rule 10b-5(b) only the "maker" of a statement to the investing public has a duty to disclose or clarify an alleged material omission in the statement.  *See* Dkt. No. 56, Memorandum Op. at 42 ("Under Rule 10b-5, an individual who 'makes' a statement has a duty to correct any omission [ ].") (citing *SEC v. Druffner*, 353 F. Supp. 2d 141, 148 (D. Mass. 2005) ("The securities laws give rise to a duty to disclose any information necessary to make an individual's voluntary statements not misleading.")).  Here, Mr. Prince did not "make" any of the alleged material misstatements

or omissions at issue under the standard articulated in *Janus*, 113 S. Ct. at 2296. *See supra* § A. Consequently, Mr. Prince was under no duty to disclose or clarify any alleged material misstatement or omission by Integral. Summary judgment should be granted dismissing with prejudice the Commission's claims against Mr. Prince under Rule 10b-5(b).

**C.    Mr. Prince Did Not Engage in Any Deceptive Acts
In Connection With A Scheme to Defraud.**

Summary judgment also should be granted dismissing with prejudice the Commission's "scheme liability" claim against Mr. Prince under Rule10b-5(a) and (c). As this Court previously recognized, "scheme liability" may attach where an individual "engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *See* Dkt. No. 56, Memorandum Op. at 44 (citing *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006)). Here, the Commission alleges that Mr. Prince engaged in a scheme to conceal his role at Integral from the investing public. But the record is utterly devoid of **any** evidence demonstrating that Mr. Prince took any steps to conceal his role at Integral.

To the contrary, the undisputed documentary record demonstrates that Mr. Prince's conduct at Integral was not concealed in any way, and was widely known both within the company and to Integral's outside disclosure counsel at the Venable law firm. The documentary record demonstrates that Mr. Prince:

- regularly attended Integral Board of Directors meetings, with Venable in attendance (Dep. Exs. 7, 9, 12, 46, 72-80, 182, 249) ;

- regularly gave presentations at Integral Board of Directors meetings, with Venable in attendance (Dep. Exs. 73, 75, 77);

- managed the companies acquired by Integral as subsidiaries, and in so doing was advised by Venable (Dep. Exs. 184, 195, 199, 200, 202, 203, 207, 213, 215, 254, 259);

- was a close advisor to CEO Steven Chamberlain and a member of a policy setting group with other members of Integral senior management known as the "G-6" or "G-7" (Dep. Ex. 111);

- headed Integral's Contracts Department, and in so doing interacted with members of Integral senior management (Dep. Exs. 262, 283);

- prepared internal financial results and forecasts for Integral senior management (Dep. Exs. 240, 242, 245, 250, 256-258);

- drafted the MD&A portion of Integral's public disclosures, and in so doing was advised by Venable (Dep. Exs. 178, 179, 243); and

- reviewed and commented on Integral's public filings, and in so doing was advised by Venable (Dep. Exs. 180, 205)

In addition, the record is replete with testimony from multiple witnesses attesting to the fact that Mr. Prince's role at Integral was widely known both within the company and at Venable.[7]  These same witnesses also testified that they were not aware of **any** steps taken by Mr. Prince (or anyone else) to conceal Mr. Prince's role at the company.[8]  The Commission cannot point to any record testimony to the contrary, because none exists.  Indeed, far from

---

[7]  *See* Stewart Decl. Ex. C (Wachtel) 198-200, 246; Ex. E (Gaffney) 62-97, 105-123; Ex. F (Gough) 14, 21-24, 79-81, 87-98, 102-107, 111-115, 118-126, 130-139, 145-168; Ex. G (Alderete) 119-122; Ex. H (Flaherty) 106-107, 109-111, 114-115; Ex. I (Christner) 82-85, 346-347.

[8]  *See* Stewart Decl. Ex. C (Wachtel) 246, 290; Ex. E (Gaffney) 62-97, 105-123; Ex. F (Gough) 14, 21-24, 79-81, 102-107, 111-114, 118-126, 130-139, 145-168; Ex. G (Alderete) 122-124; Ex. H (Flaherty) 111.

concealing his role, the record demonstrates that Mr. Prince repeatedly and openly lobbied Integral's senior management and/or the Venable law firm to be named an officer of the company, and in so doing touted his roles and responsibilities at the company.  (*See* Stewart Decl. Ex. E (Gaffney) 26-27; Ex. F (Gough) 27-28; Dep. Ex. 261)  Mr. Prince's requests to be named an officer of Integral were repeatedly denied.  (*See id*.)

In ruling on Mr. Prince's motion to dismiss, the Court correctly observed that the Commission's "sole allegation that Mr. Prince engaged in deceptive conduct . . . is that he violated § 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), by failing to file the statements required under that section" due to his status as an officer of Integral.  Mr. Prince concedes that he never filed any statement under Section 16(a) disclosing his holdings and transactions in Integral securities because he did not believe he was obligated to do so.  But that is not enough for the Commission's scheme liability claim to go forward.  To establish scheme liability, the alleged deceptive conduct must be more than a reiteration of another stand-alone claim.  *See SEC v. Patel*, 2009 WL 3151143, Civ. No. 07-CIV-39-SM (D.N.H. September 30, 2009) (dismissing claim for scheme liability where alleged scheme consisted "simply of misleading statements and omissions"); *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 238-39 (D. Mass. 2004). Here, the Commission has raised a separate claim against Mr. Prince for violation of Section 16(a) of the Exchange Act, which the Court will rule upon at trial after determining whether or not Mr. Prince was a *de facto* officer of Integral and therefore subject to the requirements of Section 16(a).  The Commission cannot sustain its scheme liability claim against Mr. Prince by pointing to an independent claim that assumes, as its premise, the disputed issue which is at the heart of this proceeding.

18

### III.  NEITHER LEGAL PRECEDENT, ACADEMIC COMMENTARIES, NOR THE INDISPUTABLE EVIDENTIARY RECORD SUPPORTS THE SEC'S CHARGE THAT MR. PRINCE VIOLATED THE SEC'S BAR ORDER.

The Rule 102(e) bar order entered by the Commission on June 24, 1997 provides: "[Mr.] Prince is permanently denied the privilege of **appearing or practicing before the Commission as an accountant**." (emphasis added)  The SEC contends that Mr. Prince violated the bar order during the period from December 30, 1998 until August 2, 2006.  As a result, the SEC is asking this Court to issue a permanent injunction commanding Mr. Prince to comply with the Commission's 1997 Rule 102(e) bar order.

The SEC alleges that Mr. Prince "practic[ed] before the Commission as an accountant" principally by performing the following functions at ISI:

- reviewing and commenting on ISI's public filings (Compl. ¶¶ 38-39);

- supervising the filing of at least two ISI periodic reports—the Form 10-K for Fiscal Year ended September 30, 2004 and the Form 10-Q for the Quarterly Period ended December 31, 2004 (*id.*);

- drafting the textual portion of ISI's MD&A in Form 10-Ks and Form 10-Qs (*id.*); and

- reviewing, commenting on, and, for a time, co-authoring certain Financial Highlights memoranda that were presented to the ISI Board of Directors on February 10, 1999; May 19, 1999; August 4, 1999; December 8, 1999; February 16, 2000; and May 10, 2000. (*Id.*)

The Commission is wrong.   Neither relevant precedent, academic commentary, nor the uncontroverted evidentiary record supports the SEC's charge that Mr. Prince "practic[ed] before the Commission as an accountant."

As a threshold matter, there is virtually **no** guidance from the Commission or precedent as to what constitutes "practicing before the Commission as an accountant."[9]  The Commission's own Rules of Practice provide only that, *inter alia*, "practicing before the Commission shall include, but shall not be limited to . . . . (2) the preparation of any statement, opinion or other paper by any . . . accountant . . . filed with the Commission in any registration statement, notification, application, report or other document with the consent of such . . . accountant . . ." *See* Comm. R. Prac. 102(f), 60 FR 32738, 32747, 1995 WL 37082 (June 23, 1995).   As a consequence, it is not surprising that academic commentators have observed that Rules 102(e) and (f) "suffer[ ] from a fatal lack of clarity."   *See* Norman S. Johnson and Ross A. Albert, "*Déjà Vu All Over Again:"  The Securities and Exchange Commission Once More Attempts to Regulate the Accounting Profession Through Rule 102(e) Of Its Rules of Practice*, 1999 Utah L. Rev. 553, 554 (1999).[10]

Nonetheless, analysis of the limited guidance on the issue—including the very same authority relied upon by the SEC and its expert—makes plain that the functions performed by

---

[9] Professor Macey has also commented on the SEC's failure(s) in this regard.  *(See* Stewart Decl. Ex. P (Macey) ¶¶ 25-27)

[10] This has long been an issue.  *See* Comment, *Disciplinary Proceedings Against Accountants: The Need for a More Ascertainable Improper Professional Conduct Standard in the SEC's Rule 2(e)*, 53 Fordham L. Rev. 351 (1984); *see also* Todd J. Flagel, *SEC Must Clarify Its Position As To The Level of Culpability That Must Be Shown to Constitute a Rule 2(e)(1)(II) Violation by Accountants*, 20 U. Dayton L. Rev. 1083 (1995); Marie L. Coppolino, *Checkovsky, Rule 2(e) and the Auditor: How Should the Securities and Exchange Commission Define Its Standard of Improper Professional Conduct?*, 63 Fordham L. Rev. 2227 (1995.

Mr. Prince at ISI did **not** constitute practicing before the Commission as an accountant within the meaning of Rules 102(e) and (f).

The SEC and its expert rely principally upon two cases in concluding that Mr. Prince violated his Rule 102(e) bar order.  In the first case, *In re Robert W. Armstrong III*, Release No. 34-51920, 85 S.E.C. Docket 2321, 2055 WL 1498425 (June 24, 2005), the Commission determined that the respondent Mr. Armstrong, the former controller of a subsidiary of W.R. Grace & Co., engaged in the practice of accounting before the Commission within the meaning of Rule 102(f) "because he **computed the figures and provided the data**" included in materially false financial statements filed with the Commission by Grace and consented to the inclusion of this information in Grace's public filings.  *Id*. at *12 (emphasis added).   The Commission observed:

> Armstrong appeared and practiced before the Commission because he **computed the amounts of income needed to be held in reserve to achieve Grace's targeted growth rates, prepared the materially false financial reports based on these figures, and submitted this information to Grace knowing that Grace would incorporate it into its Commission filings**.  Armstrong consented to the inclusion of these figures because he reviewed Grace's draft financial statements containing these figures, confirmed that the figures reconciled with the numbers that he had submitted, and suggested changes to the numbers

*Id*. at *11 (emphasis added).

In the second case relied upon by the SEC and its expert, *In Re Jerry M. Walker, CPA*, Release No. 34-42044, 70 S.E.C. Docket 2063, 1999 WL 988090 (October 18, 1999), the Commission similarly found that respondent Mr. Walker, the former CEO of Unison HealthCare Corporation as well as its president and a member of its Board of Directors, practiced before the Commission within the meaning of Rule 102(f) by creating unsupported journal entries in

21

Unison's accounting records that "materially inflated Unison's net income for two consecutive quarters in 1996" in financial statements filed with the Commission. *Id.* at *1. The Commission noted that the journal entries "lacked support in the company's records" and that "the unsupported adjustments to net income enabled Unison to publicly report positive earnings in line with analysts' estimates for the second quarter of 1996 and its own announced estimates for the third quarter of 1996." *Id* at *2.

It states the obvious to note that the SEC's allegations against Mr. Prince are in no way comparable to the conduct engaged in by the respondents in *In re Robert W. Armstrong, III* and *In re Jerry M. Walker*. Indeed, there are no allegations in this case that **any** of ISI's public filings contained **any** false or inaccurate statements or financial information, or that those public filings misled the investing public in **any** way. *In re Robert W. Armstrong, III* and *In re Jerry M. Walker* thus provide no support for the SEC's request that this Court issue a contempt order commanding Mr. Prince to comply with the 1997 Rule 102(e) bar order.[11] In fact, *In re Robert W. Armstrong, III, In re Jerry M. Walker*, and other relevant precedent demonstrate beyond cavil that the functions performed by Mr. Prince at ISI did **not** constitute practicing before the Commission as an accountant within the meaning of Rules 102(e) and (f).

In alleging that Mr. Prince engaged in the practice of accounting before the Commission, the SEC has focused heavily on Mr. Prince's role in reviewing and commenting on ISI's public filings and supervising the filing of ISI's Form 10-K for the Fiscal Year ended September 30, 2004 and the Form 10-Q for the Quarterly Period ended December 31, 2004. The limited, prose-style drafting role performed by Mr. Prince in connection with the preparation of these public

---

[11] Professor Macey has also opined that the *Armstrong* and *Walker* cases constitute support for Mr. Prince's position in this litigation—not the SEC's. (*See* Stewart Decl. Ex. P (Macey) ¶¶ 40-44)

filings, however, does not constitute practicing as an accountant before the Commission. The evidentiary record is clear that Mr. Prince **never** provided any numbers or financial figures for inclusion in the filings; **never** made any substantive accounting judgments in connection with preparation of the filings; and **never** played any role in determining the appropriateness or accuracy of ISI's financial records as set forth in the filings. (*See* Stewart Decl., Ex. F (Gough) 108-110) All of these tasks were performed by ISI's professional accounting staff without any input from Mr. Prince. Indeed, it would have been impossible for Mr. Prince to play a substantive role in connection with the preparation of the filings because Mr. Prince was electronically permitted "read-only" rights to ISI's accounting software and thus was blocked from making any entries in ISI's accounting system. (*See* Stewart Decl. Ex. D (Leimkuhler) 230-231; Ex. E (Gaffney) 15-16, 32; Ex. F (Gough) 97-98; Ex. G (Alderete) 117-118; Ex. H (Flaherty) 106, 114-115) In other words, ISI's accounting function was electronically structured so that Mr. Prince could not enter any financial information or alter ISI's books or records in any fashion. In this same vein, Mr. Prince's so-called "supervision" of the filing of the Forms 10-K and 10-Q during Ms. Brown's maternity leave amounted to overseeing the various ISI personnel charged with completing the substantive work on the various components of the Forms 10-K and 10-Q, and monitoring the progress of this work to ensure that the filings were completed and filed with the Commission in a timely fashion. (*See* Prince Aff. ¶¶ 5-7)

While it is true that Mr. Prince reviewed ISI's public filings and sometimes provided comments on the filings, Commission precedent (and common sense) require that individuals play a much more direct and expansive role in preparing public filings in order to find that such involvement constitutes practicing accounting before the Commission. *See, e.g., In re Robert W. Armstrong, III*, 2005 WL 1498425 at *12 ("comput[ing] the figures and provid[ing] the data"

included in materially false financial statements constitutes practicing accounting before the Commission); *see also In re Jethro J. Barlow, CPA, et al.*, Release No. 34-42420, 2000 WL 816863, *1 (February 14, 2000) (signing company's public filings and compiling financial statements for inclusion in filings constitutes practicing accounting before the Commission); *In re Luis E. Gomez, CPA*, Release No. 34-43389, 73 S.E.C. Docket 1041, 2000 WL 1448632, *2 (September 29, 2000) (preparing fraudulent entries in company's books and assisting in the preparation of publicly filed false financial statements constitutes practicing accounting before the Commission).

The SEC has offered no support or authority for the notion that reviewing and commenting on public filings constitute practicing before the Commission as an accountant. Why?  Because there is none.  But if the Court were to adopt the SEC's (and its expert's) position, the Court would be establishing a dangerous and unworkable precedent, effectively deeming every corporate executive and corporate lawyer who reviewed or commented on a company's public filings to be engaged in practicing before the SEC as an accountant.  (*See infra* at 35-36)  Of course, that is not (and cannot be) the law.[12]

The SEC has also charged that Mr. Prince engaged in the practice of accounting before the Commission by drafting the MD&A section of ISI's Form 10-Ks and Form 10-Qs, and by reviewing, commenting on, and for a time co-authoring Financial Highlights memoranda presented to the ISI Board of Directors in 1999 and 2000.  (Compl. ¶¶ 38-39)  Here again, the SEC is wrong on both counts.  With respect to the MD&A, the Commission itself has stated that

---

[12] *See* Professor Macey's expert opinion on this critical point. (Stewart Decl. Ex. P (Macey) ¶¶ 31-36)  Incredibly, the SEC's expert testified at his deposition that that is *precisely* his view (of course, without any support cited to back up that preposterous position).  *(See infra* at 35-36)

the purpose of that section is to "provide a **narrative explanation** of a company's financial statements that enables investors to see the company through the eyes of management . . . and provide the context within which financial statements should be analyzed." *See Disclosure in Management's Discussion and Analysis about the Application of Critical Accounting Policies*, Release No. 22-8098 (May 10, 2002) (emphasis added).  It is thus not surprising that the SEC has offered no support for the notion that drafting **management's** narrative description of a company's financial statements and overall financial health is tantamount to practicing accounting before the Commission.  Likewise, the SEC's citation to Mr. Prince's participation (years ago) in the preparation of selected Financial Highlights memoranda—utilized internally at ISI, and never filed publicly with the Commission—amounts to practicing accounting "before the Commission" not only is wholly unsupported by relevant precedent, it flies in the face of the plain language of Rules 102(e) and (f).  *See* Comm. R. Prac. 102(f), 17 C.F.R. § 201.102(f) (2007) ("[P]racticing **before the Commission** shall include . . . the preparation of any statement, opinion or other paper . . . **filed with the Commission**") (emphasis added).

In addition to the complete absence of legal authority in support of the SEC's position, substantial policy considerations weigh heavily against the SEC's request that this Court issue a permanent injunction commanding Mr. Prince to comply with the 1997 Rule 102(e) bar order. The Commission itself has stated that Rule 102(e)'s "remedial purpose of protecting the integrity of the Commission's processes" is advanced by disciplining accountants who "effect[ ] a fraudulent scheme by computing the figures and providing the information incorporated into Commission filings." *In re Robert W. Armstrong, III*, 2005 WL 1498425 at *11.  But the SEC and its expert did not (and cannot) assert that any ISI public filings reviewed by Mr. Prince contained any false or inaccurate statements or financial information.

The SEC's request for a permanent injunction is misguided for the additional reason that the record in this case demonstrates beyond dispute that throughout the entire time period at issue (*i.e.*, December 1998 to August 2006), Mr. Prince, ISI's then-CEO Steve Chamberlain, and the ISI Board of Directors consulted with and relied in good faith on advice from Venable that the functions performed by Mr. Prince did not amount to "practicing before the Commission as an accountant."  As set forth above (*see supra* at 6-8), the record is clear that Venable was well aware at all times that Mr. Prince was performing the very functions the SEC charges violated the terms of the 1997 Rule 102(e) bar order.

Indeed, the documentary record demonstrates that Mr. Prince's role in reviewing and commenting on ISI's public filings; supervising the filing of ISI's Forms 10-K and 10-Q during Ms. Brown's maternity leave; drafting the MD&A section for inclusion in ISI's public filings; and participating in the preparation of the Financial Highlights memoranda all were well known to lawyers at the Venable firm.  (*See, e.g.*, Dep. Exs. 178-180, 205, 240, 242, 243, 245, 250, 256-258)  Equipped with this knowledge, no one at Venable ever suggested that Mr. Prince's actions constituted a violation of the 1997 Rule 102(e) bar order.  Moreover, when the ISI Board of Directors reviewed Mr. Prince's status in August 2006, Venable once again opined that Mr. Prince had not (and would not) violate the provisions of the accounting bar order.  (Dep. Ex. 7)

The evidentiary "cornerstone" of the SEC's case that Mr. Prince violated the 1997 Rule 102(e) bar order is a November 2005 email he wrote to a number of executives at ISI after he was informed that the ISI Board of Directors had significantly reduced his 2005 bonus.  (Dep. Ex. 153)  As set forth in greater detail in Mr. Prince's accompanying affidavit, not only are the SEC (and its expert) mischaracterizing this email and contorting out of context what Mr. Prince wrote, **all** of the deposition testimony from fact witnesses in this case supports the conclusion

that **nothing** in the email and **nothing** in any other part of the evidentiary record supports the notion that Mr. Prince did in fact violate the 1997 Rule 102(e) bar order while employed by ISI. *(See* Prince Aff. ¶¶ 3-8; Stewart Decl. Ex. E (Gaffney) 39-59; Ex. F (Gough) 47-72)

Against this backdrop, there is simply no evidentiary basis to support the SEC's charge that Mr. Prince (or anyone at ISI) knowingly failed to comply with the terms of the 1997 Rule 102(e) bar order.  To the contrary, at every turn Mr. Prince, Mr. Chamberlain and the ISI Board of Directors consulted with Venable and took steps to ensure that Mr. Prince's job function complied with both the letter and the spirit of the 1997 Rule 102(e) bar order.  Mr. Prince and ISI acted in good faith in seeking and relying upon Venable's advice with respect to the effect of the bar order.[13]

## IV.   THE EXPERT TESTIMONY SUBMITTED IN THIS CASE DEMONSTRATES BEYOND ANY DOUBT THAT MR. PRINCE DID NOT VIOLATE THE SEC'S BAR ORDER.

The work done by the two experts in this case stands in stark contrast.

*Professor Jonathan R. Macey.*  Professor Macey, the Sam Harris Professor of Corporate Law, Corporate Finance and Securities Law at the Yale Law School and a Professor in the Yale School of Management, is one of the nation's leading legal scholars, as well as one of its most

---

[13] The fact that (in the SEC's view) Venable may have answered questions regarding the scope of Mr. Prince's 1997 Rule 102(e) bar order incorrectly and therefore dispensed flawed advice to ISI and Mr. Prince is irrelevant to the SEC's prosecution in this case against Mr. Prince for his supposed violation of the 1997 Rule 102(e) bar order.  As the Commission staff made clear in *In re Carter & Johnson*, Release No. 34-17595, 22 S.E.C. Docket 292, 1981 WL 384414 (February 28, 1981), whether the lawyers get it right is not relevant.  In that seminal decision, the Commission declined to follow the SEC staff's recommended enforcement action against two experienced securities lawyers, rejecting, *inter alia*, the notion that lawyers' liability should be based upon their making "innocent—or even, in certain cases, careless—mistakes without fear of legal liability or loss of the ability to practice before the Commission." *Id.* at *25.

prolific.  (*See* Exs. 1 and 2 to the Macey Report dated October 14, 2011 (these documents are part of Ex. P to the Stewart Decl.)   After an exhaustive review of the evidentiary record, legal precedents, and relevant academic literature, Professor Macey initially weighed in with the following expert conclusions on October 14, 2011:

- As a matter of ordinary and customary corporate governance practice, *none* of the activities which the SEC claims constitute "appearing or practicing before the Commission as an accountant" are activities that are typically performed by accountants. (*See* Stewart Decl. Ex. P ¶¶ 14-18)

- The MD&A sections in the periodic reports Form 10-K and Form 10-Q are intended to reflect management's subjective views of the company's current and future business prospects; accountants do not involve themselves in such matters; indeed, it would be inappropriate for them to do so.  (*See id.* ¶¶ 15, 28-36)

- Mr. Prince's supervising and/or reviewing the work of others on accounting matters and with respect to draft periodic reports did not constitute "appearing or practicing before the Commission as an accountant;" rather, such work is a managerial function, often carried out by non-accountants.  (*See id.* ¶¶ 16, 37)

- Mr. Prince's involvement in helping to draft Financial Highlights memoranda to the ISI Board of Directors did not constitute "appearing or practicing before the Commission as an accountant;" rather, such work is a management function, not an accounting function. (*See id.* ¶¶ 17, 37)

- Professor Macey's review of the complete evidentiary record led him to state unequivocally:

> I am not aware of any evidence that Mr. Prince ever provided numbers for inclusion in ISI's public filings, or made determinations regarding the accuracy and appropriateness of ISI's public filings.  ISI employed a professional accounting staff to perform such tasks, and ISI's accounting staff utilized software to which Mr. Prince was only authorized "read-only" rights.  This meant that ISI's software prohibited Mr. Prince from entering or altering the company's accounting records.  In sum, the evidence I have reviewed leads me to conclude that Mr. Prince did not engage in the practice of accounting before the SEC as that term is generally understood by practitioners, academics, or industry experts.

> (*See id.* ¶ 18; s*ee also id.* at ¶¶ 38-39)

In his rebuttal report of November 14, 2011, Professor Macey offered the following additional expert conclusions, having had the benefit of reviewing the initial report submitted by Mr. Turner, the SEC's expert:

- Much of Mr. Turner's report addresses the issue of practicing accounting generally **versus** what constitutes practicing accounting before the SEC—the only issue in the litigation.  As such, much of Mr. Turner's initial report is irrelevant to the matter in dispute.  (*See* Stewart Decl. Ex. Q ¶¶ 2(A), 2-15, 28, 43)[14]

- "Mr. Turner's expert role in this action is peculiar in light of his former role at the SEC, and casts some doubt upon his independence, as well as his knowledge, skill, experience, and training (*see* Rule 702, Federal Rules of Evidence), for at least two reasons.  First as a matter of historical fact, the SEC rule that Mr. Turner opines about in his Report (Rule

---

[14] Mr. Turner's October 14, 2011 report is submitted herewith as Exhibit S to the Stewart Decl.

102(f)) has been subject to extensive criticism for being too vague.  When Mr. Turner was at the SEC, he chose to ignore it.  Only now, after being retained as a compensated expert, has Mr. Turner attempted to construe the rule he played a role in promulgating.  Second, it is not clear whether Mr. Turner's Report is based upon his personal experience at the SEC in connection with promulgation of the Rule, or on the basis of his personal knowledge of what the Commission itself thought when it adopted the Rule."  (*See id.* ¶ 2(B); *see also id.* ¶¶ 34-37, 43)

- To the extent Mr. Turner's report cited Mr. Prince's involvement with respect to ISI submissions to the Defense Contract Audit Authority, that discussion "is irrelevant and well beyond the scope of anything the SEC has ever claimed constitutes practicing before the Commission as an accountant.  Indeed, the SEC never raised the issue in this action prior to the submission of Mr. Turner's report."  (*See id.* ¶ 2(C); *see also id.* ¶¶ 38-41)

- Having previously criticized the SEC's overly-broad position on the policy ground that it would transform "the job of virtually every top manager of every U.S. company into an accounting function" (*see* Stewart Decl. Ex. P ¶ 31), Professor Macey took issue with Mr. Turner's *even more* expansive interpretation of what constitutes practicing accounting before the SEC, observing that "[t]aken to its logical extreme, [Mr. Turner's interpretation] would mean that all CEOs and all members of the audit committees of the boards of directors of public companies are practicing accounting—a role, again, that Mr. Turner argues is tantamount to practicing accounting before the Commission."  (*See* Stewart Decl. Ex. Q ¶ 11; *see also id.* ¶¶ 6-10, 12-13, 15-18, 20-23)

- Consistent with Professor Macey's conclusion in his initial report, Professor Macey observed that Mr. Turner did not cite to *any* evidence that "Mr. Prince ever provided specific numbers for inclusion in ISI's public filings, made substantive accounting determinations in connection with the preparation of ISI's public filings, or made determinations regarding the accuracy or appropriateness of ISI's public filings; *i.e.*, that Mr. Prince [practiced] before the Commission as an accountant." (*See id.* ¶ 44; *see also id.* ¶¶ 16-27, 29-33)

On December 8, 2011, Professor Macey was deposed by counsel for the SEC. All of the foregoing expert opinions were expressed without qualification. Professor Macey did not contradict or change any prior expert opinions, nor did he proffer any new opinions.

*Mr. Lynn E. Turner.* Mr. Turner's background is in public accounting and he served as Chief Accountant for the SEC from July 1998 to August 2001. As set forth above, Professor Macey identified major, substantive flaws in Mr. Turner's initial report of October 14, 2011.

With respect to Mr. Turner's rebuttal report,[15] it contains additional flaws which undercut whatever expertise he might be able to offer the Court, consistent with the standards of Rule 702 of the Federal Rules of Evidence. Those additional flaws include the following:

- Mr. Turner purported to evaluate and interpret various matters within the evidentiary

---

[15] Mr. Turner's November 14, 2011 rebuttal report is submitted herewith as Exhibit T to the Stewart Decl.

record developed in this case.  (*See* Stewart Decl. Ex. T ¶¶ 19-22, 24-28)[16]

- Mr. Turner, who is not a lawyer, purported to interpret legal precedent.  (*See id.* ¶¶ 34-35)

- Notwithstanding his initial report's repeatedly flawed equation of accounting (as a general proposition) with "appearing or practicing before the Commission as an accountant," Mr. Turner, if anything, more strongly equated those two wholly different concepts in his rebuttal report.  (*See id.* ¶¶ 11-23, 36-39)[17]

- In addition to repeating his earlier claim that Mr. Prince's involvement with Defense Contract Audit Authority Cost Submissions constituted "appearing or practicing before the Commission as an accountant" (*see* Stewart Decl. Ex. S ¶¶ 107-109; Ex. T ¶ 18)—an indicia *never* alleged in *any* legal pleading by the SEC at *any* time in this case, Mr. Turner also reiterated his earlier opinion that Mr. Prince's attendance at and participation in ISI Board of Directors' meetings constituted "appearing or practicing before the Commission as an accountant."  (*See* Stewart Decl. Ex. S ¶¶ 115-120; Ex. T ¶ 18)

---

[16] The most bizarre example of this consists of Mr. Turner's "interpretations" vis-à-vis the work done and opinions offered by the Venable law firm.  (*See* Stewart Decl. Ex. T ¶¶ 24-33) Notwithstanding the indisputable fact that Venable opined to the ISI Board of Directors on August 2, 2006 that Mr. Prince was not in violation of the SEC's bar order, Mr. Turner has opined that Venable's advice "lack[ed] an informed, independent analysis or assessment of Mr. Prince's activities." (*Id.* ¶ 28)  In support of that incredible assertion, Mr. Turner cited the deposition testimony of a Venable lawyer who did not give that advice to the ISI Directors, was not present at the Board meeting, and whose only work for ISI focused solely on the de-facto officer issue. (*Id.* ¶¶ 29-31)  *See also infra* at 33-34.

[17] Notwithstanding, at the end of his rebuttal report, Mr. Turner did for the first time acknowledge that "[i]t is important to clarify that Mr. Prince was barred from 'appearing or practicing before the SEC as an accountant.'  The Commission's Order did not bar Mr. Prince from appearing or practicing before the SEC as an 'auditor' or 'outside accountant' or some other limited role."  (*See* Stewart Decl. Ex. T ¶ 40)

On December 13, 2011, Mr. Turner was deposed by counsel for Mr. Prince.  Beyond the clear flaws identified above with respect to Mr. Turner's initial and rebuttal reports, additional problems with Mr. Turner's work, analysis, and conclusions were revealed under that questioning; those problems include:

- Mr. Turner testified that he (and the two colleagues who assisted him) did not review all of the evidentiary record.  (*See* Stewart Decl. Ex. U (Turner) 8, 92-112, 118-119, 186-213)

- Mr. Turner testified that he and his two colleagues did not review all of the evidence cited by Professor Macey in support of his analysis and conclusions.  (*See id.* at 186-213)

- Notwithstanding the very serious, substantive criticisms leveled at Mr. Turner by Professor Macey regarding his professional objectivity, his analysis, and the public policy ramifications of the positions he was espousing (*see supra* at 29-31), Mr. Turner professed to be unaware of them and was unprepared to address any of those criticisms. (*See id.* at 162-66)

- As he had in his two reports, Mr. Turner opined on legal issues.  (*See id.* at 87-92)

- As he had in his two reports, Mr. Turner opined on issues of fact.  (*See id.* at 186-213)

- Mr. Turner opined that he judged some evidence to be more reliable than others and some witnesses' testimony to be more credible than others.'  (*See id.*)  With respect to this very serious flaw in Mr. Turner's work product and testimony, his testimony with respect to the indisputable evidence that the partner at Venable (Mr. Christner) opined to the ISI Board of Directors in August of 2006 that Mr. Prince was not in violation of the

accounting bar order is perhaps the most problematic.   Set forth below is the entire

colloquy on that subject:

> "Q.   Okay.   And so you do not credit that opinion by the
> relationship partner, Mr. Christner, for purposes of your expert
> opinion expressed in paragraph 28.
>
> A.  I think that's true.  The things that we believed weighed
> most heavily on our opinion were the ones we cited.
>
> Q.   You cite the August 7, 2006 board meeting in which
> Mr. Christner is quoted as saying he is of the view that they're not
> violating the bar.
>
> A. Right.
>
> Q. And you're saying that conclusion by Mr. Christner was,
> quote, unquote – was not informed or an independent analysis.  Is
> that right?
>
> A.  I think that would be true.
>
> Q.   And what do you base that on, sir, that the conclusion
> that the advice given by the relationship partner to the board of
> directors of Integral was not informed, not independent, not an
> analysis, and not a correct assessment of what Mr. Prince did with
> respect to the accounting bar?
>
> A.   As I recall, I – as best recall at this point in time, there
> wasn't an independent investigation of the nature we're talking
> about here today, now, to go in and really find out if he was
> violating the bar or not.
>
> **Q.   But you don't even recall reading Mr. Christner's
> deposition, do you?**
>
> **A.  No, I – no, I didn't.  I don't – I don't recall one way
> or –**
>
> Q.   Did you make any effort to call up Mr. Christner before
> you wrote that a national law firm had made an uninformed,
> nonindependent nonanalysis and nonassessment of an issue to the
> board of directors of a public company –
>
> A.  No.
>
> Q.  You didn't think to contact the law firm?
>
> A.  No.
>
> **Q.  Okay.  So you thought Mr. Christner's advice to the
> Integral board was just wrong?**
>
> **A. Yes."**

(*See id*. at 206-08 (emphasis added))

- Going *even farther* beyond what Mr. Turner had previously expressed in his quest to sweep everything that takes place within a public company under the ambit of "appearing or practicing before the SEC as an accountant," Mr. Turner opined that corporate lawyers who play a role in a public company's litigation reserves are accountants with SEC exposure!  His incredible testimony on that score is set forth below:

> "Q.  Later on in that paragraph you talk about a sentence, last sentence, "Rather, they are typically made" – these are judgments.  "They are typically made with input from several of those involved with accounting for the transactions, including members of the accounting team who provide their views and counsel on the proper reporting of the transactions."
>
> Is it your expert opinion, Mr. Turner, that everyone at a public company who provides input on these judgments is practicing accounting before the SEC?
>
> A.   My experience has been that on these judgments, especially if they're critical judgments like you might have for booking revenues or contracts, expenses, that if – if – if you had people in the room who were influencing that decision that that could involve someone practicing as an accountant before the Commission.
>
> If, for example, a CEO had come to me as the CFO and said, I want you to book this amount as the reserve for something, then yes, I think that would have been practicing before the Commission even though that person is the – is the SEO.
>
> There could have been other people in discussions I've had that may – may have not had that type of influence on the decision.  And they may not have been involved with the process.  So I think – so I think it depends upon the facts and circumstances.
>
> Q.   Let's use your example.   Let's say the CFO is involved–
>
> A.  Yeah.
>
> Q. – at a meeting where, to use your term, these judgments are not made in a vacuum.  And the CEO's single input to you as the CFO is, make sure you do the right thing.  Is that practicing accounting before the Commission?
>
> A.  If that's all the CEO had told me and there's no wink or nods, he just simply says Lynn, just do whatever is the right thing as you're doing the financial statements, no, because that's not the same.

Q.  So it would be different if he told you, I want you to cook the books for this filing and report 2X as opposed to 1X. That would be practicing accounting if he gave you that directive?

A.  Yeah, I think so.

Q.  What if the general counsel is part of this non-vacuum group, we'll call it, and he's there because – he or she is there for their expertise about securities disclosure issues.  Is he or she practicing accounting before the Commission?  Because his judgment or her judgment is certainly part of that process.  Isn't that frequently the case?

A.  If it involved legal matters, then the GC very well might have been in on those situations.

Q.  Giving input, in this case, legal input about disclosure issues, is that practicing accounting before the Commission?

A.  Just in and of itself, providing legal input, no, I don't think it would be.

Again, if legal counsel was coming back and saying, though, we've got this type of litigation going against us, I want you to book a reserve for 500X, and that's what you need to go do, go do it, then I think, yes, then I think that is practicing before the Commission.

Q.  Okay, let's get this clear.

A.  If someone's having an influence on the numbers that are ending up in the financial statement, then I think you're starting to practice before the Commission.  Just saying do what is right – is right, I don't view that as actually having influence and participation in the process.

Q.  Have you completed your answer?

A.  Yes.

Q.  Okay.  Let's go back to your general counsel testimony just now.

Is it your position – because public companies are required to take reserves with respect to litigation.  You know that, don't you?

A.  Yeah.

Q.  You're very familiar with that, aren't you?

A.  Yes.

Q.  Is it your position that when general counsels talk to CFOs and say, here is our collective legal judgment in the company as to reserve for this, reserve for that, don't reserve for this, reserve for a million, reserve for 10 million, reserve for whatever, those are – that's practicing accounting before the Commission?

A.  I think if the general counsel is actually directing the amounts to be booked with respect to that matter, yes."

36

(*See id*. at 168-72)

\*                          \*                          \*                          \*

Besides the very serious flaws identified above in Mr. Turner's work, analysis, and conclusions, many of them should lead to his expert opinion being barred, as a matter of law. For example:

- Mr. Turner's work, analysis, and conclusions should be excluded because he has not read the entire record.  *See*, *e.g.*, *EEOC v. Bloomberg L.P.,* 07 Civ. 8383, 2010 U.S. Dist. LEXIS 92511, \*45 (S.D.N.Y. August 31, 2010); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 533 (S.D.N.Y. 2004); *Rowe Entertainment, Inc. v. William Morris Agencies, Inc.*, No. 98 Civ. 8272 (RPP), 2003 U.S. Dist. LEXIS 15976, \* at 7 (S.D.N.Y. September 15, 2003).

- Mr. Turner improperly opined on issues of fact.  *See*, *e.g.*, *DiBella v. Hopkins*, No. 01 Civ. 11799 (DC), 2002 WL 31427362, at \*4 (S.D.N.Y. October 30, 2002; *Kidder, Peabody & Co. v. AIG Int'l Group N.V.*, 14 F. Supp. 2d 391, 398 (S.D.N.Y. 1998).

- Mr. Turner improperly opined on legal issues.  *See, e.g., In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001); *Bloomberg L.P.*, 2010 U.S. Dist. LEXIS at \*16 -\*17.

- Mr. Turner improperly opined on credibility issues.  *See, e.g.*, *United States v. Lumpkin*, 192 F.3d 280, 289-90 (2d Cir. 1999); *Bloomberg L.P.*, 2010 U.S. Dist. LEXIS at \*49; *Pension Comm. of the U. of Montreal Pension Plan v. Bank of America Securities*, 691 F. Supp. 2d 448 (S.D.N.Y. 2010).

**V.   THERE IS ABSOLUTELY NO EVIDENCE OF ANY KIND TO
SUPPORT THE NOTION THAT THERE IS A "REASONABLE
LIKELIHOOD" THAT MR. PRINCE WILL VIOLATE THE SEC'S
BAR ORDER IN THE FUTURE AND THUS THE INJUNCTIVE
RELIEF SOUGHT BY THE SEC MUST BE REJECTED.**

As the Court is well aware, "a permanent injunction against future securities violations is a 'drastic remedy and not a mild prophylactic.'"  *SEC v. Johnson*, 595 F. Supp. 2d 40, 44 (D.D.C 2009) (citation omitted).  To justify such a drastic remedy, the SEC must *prove* that there is a "reasonable likelihood" that "unless enjoined, the violation will continue."  *Id.*

In this case, the SEC has not only *failed*—after three years of discovery—to come up with any evidence on this front, *every fact witness* (and even Mr. Turner) has testified that there is no evidence to support such a claim.  (*See* Stewart Decl. ¶¶ 9-10 (16 deponents' testimony collected); Exs. A-K, M-O, R, U)  Furthermore, the Court has the additional representations from Mr. Prince on this score.  (*See* Prince Aff. ¶ 3)

Accordingly, and as this Court and numerous others have ruled when the government has proffered no evidence to support such a "drastic remedy," injunctive relief is simply not justified as a matter of fact and law.[18]  As such, the SEC's Fifth Prayer for Relief should be rejected and dismissed.

---

[18] Besides this Court's rejection of such a remedy in *SEC v. Johnson*, *supra*, *see also SEC v. Patel*, 61 F.3d 137, 141-42 (2d Cir. 1995); *SEC v. Commonwealth*, 574 F.2d 90, 99 (2d Cir. 1978); *SEC v. Culpepper*, 270 F.2d 241, 250 (2d Cir. 1959); *SEC v. Jones*, 476 F. Supp. 2d 374, 383-84 (S.D.N.Y. 2007); *SEC v. National Student Marketing*, 457 F. Supp. 682 (D.D.C. 1978).

## CONCLUSION

For all of the foregoing reasons, Defendant Gary A. Prince asks that the Court grant summary judgment with respect to the Commission's claims against Mr. Prince (i) for primary violations of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and (ii) for violating the 1997 bar order issued pursuant to SEC Rule 102(e).

Dated: New York, New York
      January 27, 2012

Respectfully submitted,

ZUCKERMAN SPAEDER LLP

By: /s/ C. Evan Stewart
      C. Evan Stewart (admitted *pro hac vice*)
      Shawn P. Naunton (admitted *pro hac vice*)
1185 Avenue of the Americas
New York, NY 10036
Telephone: (212) 704-9600
Fax: (212) 704-4256
E-mail: estewart@zuckerman.com
      snaunton@zuckerman.com

- and –

By: /s/ Roger E. Zuckerman
      Roger E. Zuckerman (I.D. No. 134346)

1800 M Street, N.W., Suite 1000
Washington, D.C. 20036-5802
Telephone: (202) 778-1800
Fax: (202) 822-8106
Email: rzuckerman@zuckerman.com

*Attorneys for Defendant Gary A. Prince*