EXPERT REPORT OF LYNN E. TURNER

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

v.

ELAINE M. BROWN

and

GARY A. PRINCE

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Case Number: 1:09-cv-01423

## Scope of Engagement and Assignment

1.  I have been retained by the United States Securities and Exchange Commission ("SEC" or "Commission") to provide opinions regarding the activities of Gary A. Prince ("Prince") related to the accounting and public filings completed by Integral Systems, Inc. ("ISI" or "Company") from 1998 through 2005. In completing that work, I analyzed documents and information produced to the SEC, testimony transcripts, case law, accounting literature, ISI financial statements and disclosures publicly filed with the SEC, and other information.

2.  My work on this matter has been performed in accordance with the guidance provided by the American Institute of Certified Public Accountants' ("AICPA") Statement on Standards for Consulting Services. Colleagues working at my direction assisted me with completing my analysis and preparing this report. The compensation of my firm or me is not contingent on the opinions offered, outcome, or result of this matter. My current billing rate is $750 per hour.

3.  My opinions are based on the information available to me and the analysis completed to date. I may revise this report based on the receipt of additional documents or information, including documents and information produced in response to requests for information, interrogatories, or depositions.

4.  I may, at the request of the SEC, prepare demonstrative exhibits to graphically reflect the information described in this report.

## Qualifications and Expertise

5.  I have 35 years of business, regulatory, and academic experience, which includes five years in the Office of the Chief Accountant ("OCA") of the SEC. I was the Chief Accountant of the SEC from July 1998 to August 2001. As Chief Accountant, I was the principal advisor to the SEC chairman and Commission on auditing and financial reporting matters. I also advised the Commission on corporate governance matters. My responsibilities included the oversight and development of US auditing, accounting, and disclosure standards, as well as matters affecting Audit Committees of

public companies.  I oversaw the practice of accountants and auditors before the Commission and often interacted with them on filings submitted to the SEC.

6.   I was one of the authors of the SEC's Amendment to Rule 102 (e) *Suspension and Disbarment* 17 C.F.R. §201.102, effective November 25, 1998, regarding the practice of accounting before the Commission.  I oversaw the development of, and was one of the principal authors of, the SEC Staff Accounting Bulletin ("SAB") No. 99, which addresses materiality.

7.   Prior to serving as the Chief Accountant of the SEC, I worked in industry as a Vice President and Chief Financial Officer ("CFO") of a high technology semiconductor and storage systems manufacturing company from July 1996 to June 1998.  I oversaw and managed the financial reporting by the company.  This included the day to day accounting activities, budgeting and forecasting, cost and financial analysis, treasury and banking activities, investment banking, internal controls, implementation of new information technology systems and providing operational support for the business units.  It also included preparation of the monthly, quarterly and annual closes and preparation of financial and management reports.  I led the interaction with the independent auditors of the company.

8.   In addition, I worked closely with the CEO in the development of the company's strategic plan and management of operations.   I was responsible for the presentations to the Audit Committee and often other presentations made to the full board of directors on topics such as stock options.  I attended the meetings of the Board as a member of management.

9.   Prior to becoming a CFO, I spent 20 years with Coopers & Lybrand (now PricewaterhouseCoopers) in positions of increasing responsibility, including as an audit partner.  I completed a two year rotation in the firm's National technical office, was a national SEC review partner, and leader of its national high technology audit practice.  I reviewed filings companies made with the SEC and led audits of public companies.  I also audited government contractors and authored the firm's initial training materials for auditing these types of businesses.

10.   I was a professor at Colorado State University from 2001 through 2003.  I taught accounting, auditing, and executive MBA classes.  I helped start the internationally known financial and proxy research firm, Glass Lewis.  At Glass Lewis, I was a managing director and vice president who oversaw the research provided to customers such as large institutional asset managers and investors.  I also interacted with our Controller and auditor during the preparation of our audit reports.

11.   I have served on Boards of Directors, chaired the Audit Committees of two public companies, and have also been on the board of trustees and investment and audit committees of two institutional investors.

12.   A copy of my Curriculum Vitae describing my expertise and experience in greater detail is attached as Turner Exhibit 8.  A listing of my publications is attached as Turner Exhibit 9.  I have not provided trial or deposition testimony in the preceding five years.

## Information Considered

13.   The information I considered while preparing this report is listed in the attached Turner Exhibit 10.

## I.    Summary of Opinions

14.   I have formed the following opinions based on my analysis to date:

15.   Gary A. Prince appeared and practiced as an accountant before the SEC between December 1998 and December 2005.

16.   Prince performed tasks related to:

- Accounting and Financial Statements
- Management Discussion and Analysis
- Press Releases
- Defense Contract Audit Authority Cost Submissions
- Interactions with Auditors
- Participation in meetings of the Board of Directors

17.   Prince performed these tasks in relation to the public filings of ISI.

## II.   Background and Facts

### Relevant Timeframe

18.   This report considers the actions of Gary A. Prince from December 1998 through December 2005.  This period begins December 8, 1998, the date of a memorandum[1] from Prince to ISI's Chief Executive Officer ("CEO"), Steven R. Chamberlain ("Chamberlain"),[2] describing Prince's understanding of his proposed employment arrangement with ISI.  The end of this period is December 14, 2005, the date ISI filed Form 10-K for the fiscal year ended September 30, 2005 with the SEC.[3]

### Description of ISI

19.   ISI's Form 10-K for the period ended September 20, 2005 states:

> Integral Systems, Inc. (the "Company") builds satellite ground systems and equipment for command and control, integration and test, data processing, and simulation. Since its inception in 1982, the Company has provided ground systems for over 205 different satellite missions for communications, science, meteorology, and earth resource applications. The Company has an established domestic and international customer base that includes government and commercial satellite operators, spacecraft and payload manufacturers and aerospace systems integrators.[4]

20.   During this fiscal year, ISI had approximately 400 employees, revenue of $98 million, total assets of $150 million, and net income of $6 million.[5]

---

[1] Memorandum dated December 8, 1998, From: G. Prince, To: S. Chamberlain, Re: Full Time Employment with ISI, (Exhibit 62) p. 1.  Included as Turner Exhibit 4.
[2] ISI Organizational Chart, September 2005 (Exhibit 334).  Turner Exhibit 7 is a listing of relevant ISI employees and titles.
[3] Integral Systems, Inc. Form 10-K for fiscal year ended September 30, 2005.
[4] Integral Systems, Inc. Form 10-K for fiscal year ended September 30, 2005.
[5] Integral Systems, Inc. Form 10-K for fiscal year ended September 30, 2005, pp. 11, 22, F-5, and F-6.

**Prince's Role and History at ISI**

21.  I understand that Prince's history with ISI began in 1982 when he was hired by Chamberlain to perform part-time accounting services.[6]  Prince describes his involvement with ISI during this time as advising on financial and business matters in addition to keeping ISI's books and issuing financial statements.[7]  Prince continued in this capacity through ISI's public offering in 1988.[8]

22.  In 1992, Prince became ISI's Chief Financial Officer, until he resigned from this position in 1995.  Prince was a member of ISI's Board of Directors from 1982 through 1995.  He also resigned his Board position when he left ISI in 1995.[9]

23.  The reason for Prince's resignation was his involvement in financial improprieties while employed at an unrelated company, which is discussed below.[10]

24.  Just three years later, In December 1998, Prince rejoined ISI as the Director of Mergers and Acquisitions.[11]  Although his title suggested certain responsibilities, Prince acknowledged that ISI had little M&A activity at the time he was rehired.  Prince expected his role to include dealing with "financial planning and forecasting, financial strategies, financial analysis, and capital formation" including being available to assist with SEC filings.[12]

**Mission of Securities and Exchange Commission**

25.  The stated mission of the "U.S. Securities and Exchange Commission is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital

---

[6] *United States Securities Exchange Commission v. Steven R. Chamberlain, et al.,* complaint, July 30, 2009.
[7] Memorandum dated June 9, 2006, titled: Gary A. Prince – My Role at ISI (Exhibit 164) p. 1.
[8] Memorandum dated June 9, 2006, titled: Gary A. Prince – My Role at ISI (Exhibit 164) p. 1.
[9] Memorandum dated June 9, 2006, titled: Gary A. Prince – My Role at ISI (Exhibit 164) p. 1.
[10] Memorandum dated June 9, 2006, titled: Gary A. Prince – My Role at ISI (Exhibit 164) p. 1.
[11] Memorandum dated June 9, 2006, titled: Gary A. Prince – My Role at ISI (Exhibit 164) p. 1.
[12] Memorandum dated December 8, 1998, From: G. Prince, To: S. Chamberlain, Re: Full Time Employment with ISI, (Exhibit 62) p. 1.

formation."[13]  Specifically, the SEC was established with the Securities Exchange Act of

1934 ("1934 Act") which gave the Commission broad powers to regulate the securities

industry[14] and ensure that the objectives of the Securities Exchange Act of 1933

("1933 Act") are met.  Objectives of the 1933 Act include:

- requir[ing] that investors receive financial and other significant information concerning securities being offered for public sale; and
- prohibit[ing] deceit, misrepresentations, and other fraud in the sale of securities.[15]

26.     The broad powers of the Commission established with the 1934 Act were deemed

        necessary because:

> transactions in securities as commonly conducted upon securities
> exchanges and over-the-counter markets are effected with a national
> public interest which makes it necessary to provide for regulation and
> control of such transactions and of practices and matters related
> thereto,...
>
> to require appropriate reports, to remove impediments to and perfect
> the mechanisms of a national market system for securities...[16]

27.     The 1934 Act also requires issuers of securities to "file with the Commission, [such

        information, documents and reports] in accordance with such rules and regulations as

        the Commission may prescribe as necessary or appropriate for the proper protection

        of investors and to insure fair dealing in the security..."[17]

28.     In order to obtain accurate, properly presented information that supports the

        protection of investors, the SEC and investors rely upon the honesty, credibility, and

        integrity of the people that prepare and make public filings.

---

[13] http://www.sec.gov/about/whatwedo.shtml.
[14] http://www.sec.gov/about/laws.shtml.
[15] http://www.sec.gov/about/laws.shtml.
[16] Securities Exchange Act of 1934, Sec. 2.
[17] Securities Exchange Act of 1934, Sec. 13(a)-(b).

**Prince Permanently Barred from Appearing or Practicing Before the Commission**

29.   As a result of his activities at United Press International ("UPI") and Financial News Network ("FNN"), Prince was permanently barred from practicing or appearing as an accountant before the Commission.

*Allegations Against Prince Related to UPI and FNN*

30.   On June 28, 1993 the Commission filed the SEC v. Bolen, et al. action, which included a variety of allegations against Prince.

31.   These allegations include:[18]

- Prince helped facilitate a fraudulent scheme engineered by two of FNN's executive officers to inflate FNN's revenues and earnings for its fiscal year 1989 and during the first three quarters of its fiscal year 1990;
- Prince caused the overstatement of revenues FNN received from two related companies;
- Prince caused FNN to enter into numerous equipment sales/leaseback transactions in which the quantity, type and value of the equipment being sold, the identities of the sellers, and the disposition of the proceeds from the transactions were falsified;
- Upon appointment as Senior Vice President - Finance of FNN, Prince, who knew of or recklessly disregarded the fraudulent scheme, failed to take steps to cause FNN to restate any of its previously filed financial statements which he knew, or was reckless in not knowing, were false and misleading;
- During the audit of FNN's fiscal year 1990 financial statements, Prince provided certain documents and information to the auditors which were materially false or misleading.

*Prince Permanently Restrained and Enjoined*

32.   On August 10, 1994, Prince consented to the entry of a Final Judgment of Permanent Injunction and Other Equitable Relief in the SEC v. Bolen, et al. matter.

---

[18] *In the Matter of GARY A. PRINCE, CPA*, Administrative Proceeding File No. 3-9338, Accounting and Auditing Enforcement, Release No. 927, June 24, 1997, p. 2-3.  Included as Turner Exhibit 1.

33.   As the result of that consent, a Final Judgment was entered, which:

> permanently restrains and enjoins Prince from engaging in conduct
> violative of Section 10(b) of the Exchange Act and Rules 10b-5 and 13b2-2
> promulgated thereunder.[19]

*Prince Pled Guilty to Felony Counts*

34.   On September 6, 1995, Prince pled guilty to two felony counts in District Court for the Central District of California, related to his conduct and actions with respect to FNN and UPI.[20]

35.   Prince pled guilty to a general federal conspiracy in violation of 18 U.S.C. §371. He also pled guilty to filing a false statement with the Securities and Exchange Commission in violation of 18 U.S.C. §1001.[21]

*Prince Permanently Barred from Appearing or Practicing Before the Commission*

36.   Prince was "permanently denied the privilege of appearing or practicing before the Commission as an accountant" in a June 1997 Order by the Commission.[22]

37.   Prince's prohibition from practicing before the Commission resulted from his actions while employed by UPI and FNN. Prince was Senior Vice President and Chief Financial Officer of UPI from 1988 until July 1990. He then became Senior Vice President-Finance of FNN.[23]

---

[19] *In the Matter of GARY A. PRINCE, CPA*, Administrative Proceeding File No. 3-9338, Accounting and Auditing Enforcement, Release No. 927, June 24, 1997, p. 2.
[20] *In the Matter of GARY A. PRINCE, CPA*, Administrative Proceeding File No. 3-9338, Accounting and Auditing Enforcement, Release No. 927, June 24, 1997, p. 3.
[21] *In the Matter of GARY A. PRINCE, CPA*, Administrative Proceeding File No. 3-9338, Accounting and Auditing Enforcement, Release No. 927, June 24, 1997, p. 3.
[22] *In the Matter of GARY A. PRINCE, CPA*, Administrative Proceeding File No. 3-9338, Accounting and Auditing Enforcement, Release No. 927, June 24, 1997, p. 4.
[23] *In the Matter of GARY A. PRINCE, CPA*, Administrative Proceeding File No. 3-9338, Accounting and Auditing Enforcement, Release No. 927, June 24, 1997, p. 2.

**Significance of Permanent Bar**

38.   The decision to permanently bar Prince from appearing or practicing as an accountant before the Commission is significant and should not be overlooked.  A permanent bar is a measure that the Commission does not take lightly.  In many instances, a suspension is imposed on individuals that make mistakes, file inaccurate financial statements, or undertake actions I consider less egregious than Prince's.

39.   The Commission typically reserves a permanent bar for individuals who intentionally engage in fraudulent actions and show a lack of integrity.  Individuals with this type of history pose a major risk to the accuracy and reliability of the information that is distributed to the investing public.

40.   Allowing individuals that have been permanently barred from appearing or practicing before the Commission significantly increases the risk that the integrity of the information provided to investors is undermined and impedes the SEC's ability to effectively meet its objectives.  It can result in a lack of trust that would undermine investor confidence in the securities markets.

## III.   Practicing as an Accountant

**In General**

41.   The practice of accounting covers a broad spectrum of activities, that includes, but is not limited to: interpreting and deciding how to properly apply generally accepted accounting principles; providing advice or guidance on accounting for transactions; determining what information to disclose and how to disclose that information; preparing and processing individual transactions; and, designing, implementing, and overseeing internal controls.  Practicing as an accountant is not limited to individuals licensed as a Certified Public Accountant ("CPA") or corporate officers with financial responsibilities, such as a CFO.  Many individuals without accounting licenses or titles as corporate officers regularly practice accounting.

42.   To summarize, individuals with the responsibility to, or who actually, materially affect financial statements or related disclosures are practicing accounting.  If such financial

statements and related disclosures are public documents filed with the SEC, then these individuals are practicing accounting before the SEC.

### The American Institute of Certified Public Accountants ("AICPA")

43.  The American Institute of Certified Public Accountants ("AICPA") is:

> the world's largest association representing the accounting profession, with nearly 370,000 members in 128 countries. AICPA members represent many areas of practice, including business and industry, public practice, government, education and consulting; membership is also available to accounting students and CPA candidates. The AICPA sets ethical standards for the profession and U.S. auditing standards for audits of private companies, non-profit organizations, federal, state and local governments. It develops and grades the Uniform CPA Examination.[24]

44.  The AICPA website, www.aicpa.org, shows a variety of career paths that accountants can follow and lists a wide range of services that accountants provide to clients and employers.  These career paths range from roles in public accounting, to working within companies, to government and regulatory positions.

45.  Within public accounting, accountants can work for large, international CPA firms to small, local accounting practices.  Within these firms, accountants work in a variety of areas including audit, to tax, to management consulting, among others.

46.  The same is true in business and industry, where accountants can choose careers in companies of all sizes, working in diverse areas such as financial accounting and reporting, management accounting, budgeting and financial analysis, treasury, and cash management.  See Turner Exhibit 2 for the full listing of varied business and industry job titles and responsibilities presented at aicpa.org.[25]  This listing describes positions and responsibilities filled by accountants, such as: audit committee member, CFO and Controller, as well as other managerial, supervisory, and task oriented roles.

---

[24] www.aicpa.org/About/Pages/About.aspx
[25] http://www.aicpa.org/CAREER/CAREERPATHS/CORPORATEACCOUNTING/Pages/default.aspx.

47.   The description of a CFO included in Turner Exhibit 2 states:

> **Chief Financial Officer (CFO)** Advises the President or CEO of the organization with respect to financial reporting, financial stability, liquidity and growth, and financial strategy, design and execution. He or she directs and supervises the work of the Controller, Treasurer, and sometimes the Internal Auditing Manager. Other duties may include maintenance of relationships with stockholders, financial institutions and the investment community. Frequently, the CFO is a member of the Board of Directors and/or the Executive Committee and, as such, contributes to overall organization planning, policy development and implementation.

48.   The description of a Controller included in Turner Exhibit 2 states:

> **Controller** functions as the Chief Accounting Executive responsible for organizing, directing, and controlling the work of the accounting personnel in collecting, summarizing and interpreting financial data for the use of management, creditors, investors, and taxing authorities. As a member of the top management team, helps develop forecasts for proposed projects of the organization, measures actual performance against operating plans and standards, and interprets the results of operations for all levels of management.

49.   Prince's work at ISI, which is described later in this report, shows that he was performing roles that fit within the AICPA's descriptions of the work typically completed by a CFO or a Controller.

50.   Accountants can also work at the federal, state, or local level within government. They develop analyses create and provide information within government agencies and departments or fill regulatory roles much like they would in industry or business.

51.   As shown above, within public accounting, business and industry, and government entities, accountants have a wide range of responsibilities and fill a variety of roles. It is important to note that the practice of accounting covers many tasks and responsibilities and is not limited to work performed by those licensed as CPAs.

### Nature of Accounting

52.    Accounting text books are used to teach students the theory and practical application of accounting.  These books provide insight into the purpose, nature, and practice of accounting.  Both financial and management accounting are intended to accumulate and present useful information for decision makers inside and outside the organization.[26]  The basic concept of *what* accounting is can be seen in the excerpts below.

- "Accounting is a system that collects and processes (analyzes, measures, and records) financial information about an organization and reports that information to decision makers."[27]

- *Managerial Accounting* describes this concept further stating "financial accounting is concerned with providing information to stockholders, creditors, and others who are outside an organization" while "[m]anagerial accounting provides the essential data that are needed to run organizations."[28]

- *Accounting Ethics* describes the practice of accounting as the collection and provision of useful information about a company's operations and outlook which assists others in monitoring and assessing that company's performance.

    Accounting is a technique, and its practice is an art or craft developed to help people monitor their economic transactions.  Accounting gives people a financial picture of their affairs.  Its original – and enduring – fundamental purpose is to provide information about the economic dealings of a person or organization.[29]

---

[26] Robert Libby, Patricia A. Libby, Daniel G. Short, *Financial Accounting*, third edition, The McGraw-Hill Companies, Inc., (2001), p. 5.
[27] Robert Libby, Patricia A. Libby, Daniel G. Short, *Financial Accounting*, third edition, The McGraw-Hill Companies, Inc., (2001), p. 5.
[28] Ray H. Garrison, Eric W. Noreen, Peter C. Brewer, *Managerial Accounting*, eleventh edition, The McGraw-Hill Companies, (2006), p. 4.
[29] Ronald Duska, Brenda Shay Duska, Julie Anne Ragatz, *Accounting Ethics*, second edition, John Wiley & Sons (2011), p. 10.

…the accountant's role is to furnish various entities that have a legitimate right to know about an organization's affairs with useful information about those economic affairs.[30]

53.   To summarize, the role of an accountant is to accumulate and communicate information that is useful to the readers of financial statements.  Individuals who collect and prepare this type of information and have the ability to materially affect the numbers and related disclosures included within a set of financial statements are involved in the practice of accounting.

## IV.   Appearing or Practicing Before the Commission

### Introduction

54.   Simply put, appearing or practicing before the Commission includes preparing information that is included in public documents filed with the SEC.  SEC Rule 102, 17 C.F.R. §201.102, addresses Appearance and Practice Before the Commission.

### SEC Rule 102 (f)  *Practice Defined.*

55.   SEC Rule 102 (f) defines "Practice".  The text of Rule 102 (f) states:

(f)   *Practice Defined*.  For the purposes of these Rules of Practice, practicing before the Commission shall include, but shall not be limited to:

- transacting any business with the Commission; and
- the preparation of any statement, opinion or other paper by any attorney, accountant, engineer or other professional or expert, filed with the Commission in any registration statement, notification, application, report or other document with the consent of such attorney, accountant, engineer or other professional or expert.

---

[30] Ronald Duska, Brenda Shay Duska, Julie Anne Ragatz, *Accounting Ethics*, second edition, John Wiley & Sons (2011), p. 11.

56. <u>In the Matter of Robert W. Armstrong, III,</u> ("Armstrong") the Commission concluded that this definition is sufficiently broad and that to read it narrowly would allow accountants to escape discipline under Rule 102(e).[31]  The Commission noted that

> [t]he reliability of the disclosure process is equally impaired if [incompetent or unethical accountants] are permitted to participate in the preparation of financial statements certified and filed with the Commission.[32]

57. It is important the actual responsibility, role and work an employee carries out is considered, rather than just a title, when determining whether a person is practicing as an accountant before the Commission.  If one's title were the determining factor, it would be easy to circumvent and undermine the ability of the Commission to ensure the integrity of its processes, maintain confidence in the capital markets and protect investors.  For example, one could simply give a person in an influential financial and accounting role an operational title, even though they may well be providing managerial advice, review and oversight consistent with the role of someone such as a corporate controller, chief financial officer or director of financial reporting.  In that role the person could affect numbers and disclosures provided to investors and the Commission, but not be held accountable simply because a particular title was used.  Especially when the title did not necessarily encompass the actual responsibilities and duties performed.

### Section 102 (e)  *Suspension and Disbarment.*

58. SEC Rule 102(e), 17 C.F.R. §201.102 (e), provides the Commission with the means to discipline those who appear or practice before it.  Specifically, Rule 102(e) states:

---

[31] *In the Matter of Robert W. Armstrong, III*, Administrative Proceeding File No. 3-9793, Accounting and Auditing Enforcement Release No. 2264, June 24, 2005, p. 21.  Included as Turner Exhibit 3.

[32] *In the Matter of Robert W. Armstrong, III*, Administrative Proceeding File No. 3-9793, Accounting and Auditing Enforcement Release No. 2264, June 24, 2005, p. 22.

(e) *Suspension and disbarment—(1) Generally.*  The Commission may censure a person or deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found by the Commission after notice and opportunity for hearing in the matter:

(i) Not to possess the requisite qualifications to represent others; or

(ii) To be lacking in character or integrity or to have engaged in unethical or improper professional conduct; or

(iii) To have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

59.   The application of discipline under Rule 102(e) and its use by the Commission, such as Prince's permanent bar, have been described as ensuring the individuals coming before the Commission are fit to practice before it.  This includes ensuring such individuals have the requisite character and integrity as "[b]reaches of professional responsibility jeopardize the achievement of the objectives of the securities laws and can inflict great damage on public investors."[33]

60.   Such discipline as dispensed by the Commission was described in the <u>Touche Ross & Co.</u> matter as necessary to "protect the integrity of its own processes."[34]

> The Commission, through its Rule 2(e) proceeding, is merely attempting to preserve the integrity of its own procedures, by assuring the fitness of those professionals who represent others before the Commission. Indeed, the Commission has made it clear that its intent in promulgating Rule 2(e) was not to utilize the rule as an additional weapon in its enforcement arsenal, but rather to determine whether a person's professional qualifications, including his character and integrity, are such

---

[33] *Touche Ross & Co. v. SEC*, 609 F.2d 570, 581 (2d Cir. 1979).
[34] *Touche Ross & Co. v. SEC*, 609 F.2d 570, 581 (2d Cir. 1979).

that he is fit to appear and practice before the Commission. Securities Act Release No. 5088 at 1 (Sept. 24, 1970).[35]

**Criteria and Guidance from Armstrong**

61. In Armstrong, the Commission concluded that the term "preparation" of a document under Rule 102(f) "is…sufficiently" broad to encompass the preparation of data to be included in a document filed with the Commission, at least where…the data was prepared for the express purpose of being included in such a document."[36]

62. Armstrong provides insight about the Commission's views as to activities that constitute "practicing" which include:

- Preparing or editing of a document, including providing data that is known to be incorporated into a filing.[37]
- Rule 102(e) "recognizes that financial statements often incorporate information created, compiled, or edited by accountants who are not responsible for signing or filing the financial statements."[38]
- Computing figures and supplying data incorporated into Commission filings and consenting to their incorporation.[39]
- Reviewing drafts of disclosures included in financial statements.[40]

63. Armstrong also defines facts and circumstances which may not be used to support the position that an individual has not "practiced" before the Commission.  These include:

- Lack of signing a financial statement or other public filing.[41]

---

[35] *Touche Ross & Co. v. SEC*, 609 F.2d 570, 579 (2d Cir. 1979).
[36] *In the Matter of Robert W. Armstrong, III*, Administrative Proceeding File No. 3-9793, Accounting and Auditing Enforcement Release No. 2264, June 24, 2005, p. 21.
[37] *In the Matter of Robert W. Armstrong, III*, Administrative Proceeding File No. 3-9793, Accounting and Auditing Enforcement Release No. 2264, June 24, 2005, p. 21.
[38] *In the Matter of Robert W. Armstrong, III*, Administrative Proceeding File No. 3-9793, Accounting and Auditing Enforcement Release No. 2264, June 24, 2005, p. 21.
[39] *In the Matter of Robert W. Armstrong, III*, Administrative Proceeding File No. 3-9793, Accounting and Auditing Enforcement Release No. 2264, June 24, 2005, p. 13.
[40] *In the Matter of Robert W. Armstrong, III*, Administrative Proceeding File No. 3-9793, Accounting and Auditing Enforcement Release No. 2264, June 24, 2005, p. 21.
[41] *In the Matter of Robert W. Armstrong, III*, Administrative Proceeding File No. 3-9793, Accounting and Auditing Enforcement Release No. 2264, June 24, 2005, p. 21.

- Lack of a license to practice as an accountant.[42]
- Lack of position as an officer of a public company.[43]

64.    The Commission has used broad definitions when establishing rules for financial

reporting.  For example, in June 2003, the SEC adopted the final rule "**Management's
Reports on Internal Control Over Financial Reporting and Certification of Disclosure
in Exchange Act Periodic Reports.**"  The final rule defines "internal control over
financial reporting" as:

> A process designed by, or under the supervision of, the registrant's
> principal executive and principal financial officers, or persons performing
> similar functions, and effected by the registrant's board of directors,[50]
> management and other personnel, to provide reasonable assurance
> regarding the reliability of financial reporting and the preparation of
> financial statements for external purposes in accordance with generally
> accepted accounting principles and includes those policies and
> procedures that:
>
> (1) Pertain to the maintenance of records that in reasonable detail
>     accurately and fairly reflect the transactions and dispositions of the
>     assets of the registrant;
>
> (2) Provide reasonable assurance that transactions are recorded as
>     necessary to permit preparation of financial statements in accordance
>     with generally accepted accounting principles, and that receipts and
>     expenditures of the registrant are being made only in accordance
>     with authorizations of management and directors of the registrant;
>     and

---

[42] *In the Matter of Robert W. Armstrong, III*, Administrative Proceeding File No. 3-9793, Accounting and Auditing
Enforcement Release No. 2264, June 24, 2005, p. 24.
[43] *In the Matter of Robert W. Armstrong, III*, Administrative Proceeding File No. 3-9793, Accounting and Auditing
Enforcement Release No. 2264, June 24, 2005, p. 21.

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the registrant's assets that could have a material effect on the financial statements.

65.  The evidence cited, including Mr. Prince's own emails demonstrate he played an active and managerial role engaging in activities described above as part of the financial reporting process.  According, he was practicing as an accountant before the Commission.

## V.  Prince's Activities and Responsibilities at ISI

### Overview

66.  Prince filled a variety of roles and had various responsibilities within ISI.  These included: preparing Public Filings and Press Releases; assisting with Accounting and Financial Statements; drafting the Management Discussion and Analysis; completing or reviewing Defense Contract Audit Authority Cost Submissions; interacting with Auditors; and, participating in Board meetings, among other areas.  The following discussion provides representative examples of Prince's activities and is not intended to be an exhaustive listing of his work and responsibilities at ISI.  Additionally, Prince's employment arrangement provides further context for his role within ISI.

### Prince's Employment Arrangement

67.  In a December 1998 memorandum to Chamberlain, ISI's CEO, Prince describes his understanding of his proposed employment arrangement with ISI.  The memorandum indicates that Prince will join ISI's management team – the "Gang of Six."[44]

68.  The memorandum states that Prince's current responsibilities will continue:

---

[44] Memorandum dated December 8, 1998, From: G. Prince, To: S. Chamberlain, Re: Full Time Employment with ISI, (Exhibit 62) p. 1; Gang of Six, also "G6" or "G7", was the group the comprised ISI's top management team; Deposition of John Flaherty, August 3, 2011, pp. 45-46.

> While I understand that my future with the Company will perhaps be
> focused on M&A issues, I think until we actually acquire a business, that
> we should retain the division of responsibilities as they exist and have
> currently evolved.[45]

69.  Surprisingly, considering Prince's permanent bar, this memorandum also states that
Prince will continue to be involved in the preparation of ISI's SEC filings.

> Further, I believe that I should continue to be available to help Elaine
> [Parfitt (CFO)] oversee such projects as SEC filings (10-K, S-1s, etc.), DCAA
> submissions, tax returns, and other pressing financial assignments that
> will take some burden off of Elaine and her staff.[46]

70.  Examples of Prince's responsibilities and activities within ISI, including his involvement
with the Company's public filings, are discussed in further detail below.

**Public Filings**

71.  Communications authored by Prince clearly describe his involvement in the
preparation of ISI's public filings, financial statements, related notes, and press
releases.

72.  In a February 2003 email, Prince describes his frustration dealing with ISI's quarter end
financial statements.  The email with the subject line "Fwd:  MD&A" addressed to
Chamberlain, ISI's CEO, and copied to Gough, ISI's President, states:

> On a separate but related topic, I have been totally frustrated by Elaine's
> attempts to keep me out of the quarter end process…If you guys want to
> exclusively rely on Elaine for the financials, I will **bow out** for the next
> quarter.  On the other hand if you like a separate set of senior financial
> eyes looking at this material, we need to change the process from how it

---

[45] Memorandum dated December 8, 1998, From: G. Prince, To: S. Chamberlain, Re: Full Time Employment with ISI,
(Exhibit 62) p. 1.
[46] Memorandum dated December 8, 1998, From: G. Prince, To: S. Chamberlain, Re: Full Time Employment with ISI,
(Exhibit 62) p. 1.

> went this quarter. I need full uninhibited and timely access to all of the accounting records if I am to be involved…. (emphasis added)

> This is not an ultimatum, but I do not want to be even partially responsible for the numbers if I cannot have the same access to the files that people on Elaine's staff have.  It is not team ball.  Either I am on this team or I'm not.[47]

73.    The following examples highlight Prince's continued involvement with ISI's public filings.

74.    A February 2004 email from Prince to senior ISI personnel, including Tom Gough (President), Steve Chamberlain (CEO), Elaine Parfitt (CFO), Pete Gaffney (COO, EVP, Government Division), and Pat Woods (EVP Business Development), describes his extensive involvement in the preparation of the MD&A and numbers that ISI disseminated to the public, the SEC, and the Company's Board of Directors.

> As I believe everyone in this group understands, I write most of our original financial text including but not limited to the MD&A, the press release and the editorial section of the memo.  I believe I am also quite helpful in recommending adjustments to the numbers where appropriate (i.e. taking back the SCNC reserve for Q1 to name just one example).

> This is not to take away from what Elaine does, it is just to say that **I also have an integral involvement** in what we publish to the public and the Board with respect to our financials.[48] (emphasis added)

75.    A November 2005 email from Prince to other senior ISI personnel, including Tom Gough (President), Steve Chamberlain (CEO), Pete Gaffney (COO, EVP, Government Division), and Elaine Parfitt (CFO), identifies a variety of Prince's responsibilities, including his role in leading the drafting of the ISI Form 10-K for fiscal year 2004 and the Form 10-Q for the first quarter of fiscal year 2005.

---

[47] Email from GAP3436@aol.com (Prince), dated February 8, 2003, Subject: Fwd: MD&A (Exhibit 30).
[48] Email from Prince, dated February 3, 2004, Subject: Availability of Accounting Information (Exhibit 29).

The Board marveled how ISI was able to accurately and timely file its Form 10-K for FY04 during the first quarter of FY05 when Elaine was out on maternity leave.  Certainly Pat and Al stepped up, but I do not believe it could have been handled so smoothly (without impacting the rest of the Company) **had I not stepped in to lead that effort**.[49] (emphasis added)

Elaine did not fully return to work until this document was well underway.  Again, I think Pat and Al (and Elaine too for that matter) would tell you that **I ran this effort** [for the Q1FY05 10-Q] in Elaine's absence.[50] (emphasis added)

76.  In addition to Prince's own descriptions of his significant involvement in preparing information incorporated within ISI's public filings, financial statements, and related notes, testimony from other ISI employees corroborate Prince's perspective.

77.  In his deposition, John Flaherty (Senior Accountant) testifies that Prince's involvement in items such as ISI's MD&A was more than only "support and advisory."[51]

78.  The preceding examples show the active role Prince played in preparing ISI's public filings.

**Influence on Accounting and Financial Statements**

79.  Documents and communications support that Prince influenced and was involved in the preparation of various components of ISI's financial statements.  He also provided review and comments to ISI's senior personnel and accounting staff related to the information presented within the Company's public filings. The evidence, as further discussed below, highlights his involvement with accounting for research and development expenses, software development costs, stock options, and closing of accounting records.

---

[49] Email from Prince, dated November 9, 2005, Subject: RE: Compensation Committee Comments Regarding Bonuses for 2005 (Exhibit 48), p. 2.  Included as Turner Exhibit 6.
[50] Email from Prince, dated November 9, 2005, Subject: RE: Compensation Committee Comments Regarding Bonuses for 2005 (Exhibit 48), p. 3.
[51] Memorandum dated June 9, 2006, titled: Gary A. Prince – My Role at ISI (Exhibit 164) p. 2.

*Research and development expenses*

80.   In a November 2004 email to Integral personnel titled "RE:  10-K", Prince provided specific feedback regarding the schedules Al Smith, Assistant Controller, had provided as backup support for "IR&D," "Backlog report" for bookings and "Letters of Credit." His comments include providing accounting advice regarding IR&D expenses as well as a disclosure regarding increased bookings to highlight an increase from fiscal year 2003 to fiscal year 2004 in the "Commercial Division in the Ground Systems Segment."[52]

81.   Prince provides specific directions and accounting advice related to ISI's Research and Development expenses, which appear in the Company's financial statements.

> I believe in past 10-Ks we included capitalized software costs as part of R&D….Also (and as Mudd, Pete and I have previously discussed), I do not believe that all of the 'R&D' expenses at Newpoint, SAT and SkyLight are real R&D.  Some of these charges are really product maintenance expenses…
>
> Pete, we had talked about re-labeling non-R&D expenses on the Income Statement.  I think we should do so in this document.  If we do that, the R&D expenses on this disclosure will decrease…[53]

82.   Prince's communication shows his detailed involvement with the preparation of an individual financial statement line item and disclosure that is presented to investors. This is the type of input that might also be provided by a CFO, Controller, or Director of Financial Reporting.

---

[52] Email communications from Prince dated November 16, 2004, Subject: RE: 10-K, (Exhibit 341), pp. 1-2
[53] Email communications from Prince dated November 16, 2004, Subject: RE: 10-K, (Exhibit 341), pp. 1-2.

*Software development costs*

83.    A November 2003 email from Elaine Parfitt (CFO) to Pat Carey (Corporate Controller) titled "10-K Information for review" describes Prince's work related to accounting for software development costs.  The email states:

> I just talked to Gary…he's working on the FY04 s/w dev plan (updating the schedule that you or Al updated last year)[54] which relates to the amortization of the software development costs.

84.    In his deposition, John Flaherty (Senior Accountant) describes that this email relates to work being done on the FY 2003 financials for the period ending September 30.[55] When asked specifically what Ms. Parfitt was referring to when she states "s/w dev plan," Mr. Flaherty states that it was "amortization of the software development" and that "[t]he calculation would calculate the amount of amortization of the capitalized software development costs, so yes, it would end up as a line on the financial statements or go into the financial statements."[56]

*Accounting for Stock Options and Statement of Financial Accounting Standard ("FAS") 123 R*

85.    May 2005 email correspondence from Prince to senior ISI staff, as well as members of the accounting department, providing specific analysis of the impact of expensing options under the implementation of accounting standard FAS 123 R.[57]  This lengthy email from Prince also lays out Prince's suggestion to allow employees to "convert all outstanding/unvested options to restricted common stock" and that he has begun

---

[54] Email from Parfitt, dated November 11, 2003, Subject: RE 10-K Information for Review (Exhibit 325), p. 1.
[55] Deposition of John Flaherty, August 3, 2011, p. 69.
[56] Deposition of John Flaherty, August 3, 2011, p. 70; Note 7 to ISI's 2003 Form 10-K is a table of Software Development costs and accumulated amortization.  Software development costs are also found elsewhere in financial statements and notes, pp. F-4, F-7, F-17.
[57] Email from Prince included in correspondence ending May 16, 2005, Subject: RE: Stock Option Plan, (Exhibit 326).

talking to Grant Thornton, the Company's independent auditors as of this time, about this.[58]

86.   Prince writes:

> At one time we considered accelerating the vesting of the unvested
> options to avoid the ramifications of this new rule, but recently the SEC
> has issued a pronouncement that such an action would be frowned
> upon....So where are we?  Basically, starting in FY06, we must adopt this
> accounting practice (FAS123R) with the following anticipated effect...[59]

*ISI stock options and restricted stock*

87.   Prince discusses his interaction with the Grant Thornton independent auditors, in a
May 2005 email, regarding the valuation of the ISI's stock options and his suggested
plan to allow conversion of options to restricted stock.

> I don't believe that anyone in this group actually believes that our options
> are intrinsically worth $11/share.  To me, the Black Scholes model is a
> joke, and according to people at Grant Thornton, many other companies
> believe the same thing.[60]

> We have already begun talking to Grant Thornton about this plan [i.e.
> conversion of options to restricted stock] and Elaine has scheduled a call
> with Piper next Monday as well.[61]

88.   Prince then lays out four questions which he identifies need to be resolved by ISI's
auditors, Grant Thornton to proceed, including:[62]

---

[58] Email from Prince included in correspondence ending May 16, 2005, Subject: RE: Stock Option Plan, (Exhibit 326), p. 2.
[59] Email from Prince included in correspondence ending May 16, 2005, Subject: RE: Stock Option Plan, (Exhibit 326), p. 1.
[60] Email from Prince included in correspondence ending May 16, 2005, Subject: RE: Stock Option Plan, (Exhibit 326), p. 2.
[61] Email from Prince included in correspondence ending May 16, 2005, Subject: RE: Stock Option Plan, (Exhibit 326), p. 2.
[62] Email from Prince included in correspondence ending May 16, 2005, Subject: RE: Stock Option Plan, (Exhibit 326), pp. 2-3.

> 1.  What is the accounting for the conversion of options to restricted stock?
> 2.  If going forward we abandon stock options and just issue restricted stock, what is the accounting for that?
> 3.  What are the tax consequences for employees in Nos. 1 and 2 above?
> 4.  If the associated expenses with this program are in fact compensation expense (as stated in FAS123) are these expenses recoverable in our Govt. indirect rates.  If the answer to this question is in fact yes, then I think it's hilarious that the Govt. will ultimately end up picking up the tab for the implementation of this stupid rule.

*Closing financial statements*

89.   An email conversation from October 2002 titled "Closing Financial Statements" details Prince's involvement with the financial account balances.  This communication, provided as Turner Exhibit 5, describes Prince's review and discussion of ISI's accounts.  It includes Prince's interaction with Ernst & Young[63], the Company's independent auditors regarding accounting questions and his specific involvement in the journal entries pertaining to stock options.  Prince's statements include:

> If we did not book compensation expense associated with the NSO's, then why are retained earnings negative?  I think something may be amiss, but I think you'll still make your equity bogey.  I just want to get each account right before we finalize these numbers.[64]

> I'm not sure what APB25 says, but I am passing on guidance from our auditors at E&Y.  My understanding is that the stock is to be recorded at the amounts paid in only.  The IRS receivable then gets set up separately

---

[63] ISI's independent auditors were Rubino & McGeehin through January 4, 2002, Ernst & Young from then through December 30, 2003, and Grant Thornton for remainder of relevant timeframe, through December 14, 2005.
[64] Email from Prince included with correspondence ending October 29, 2002, Subject: RE: Closing Financial Statements, (Exhibit 25), p. 3.

with a credit entry going to Paid in Capital under the caption 'tax benefit from stock option exercise.[65]

90.   This email continues and Prince provides his feedback on seven specific journal entries proposed by Bryan Clark related to the "Closing Financial Statements," including:[66]

1.   "1.  Agree"
2.   "3.  Book credit to Paid in Capital and not RE"
3.   "4.  Do not book."
4.   "7.  Debit should flow thru FICA exp. And not RE."

91.   This correspondence shows Prince's active participation in ISI's accounting consistent with the role of a Controller or Director of Financial Reporting.

92.   The preceding examples show the variety of ways in which Prince was involved in the accounting and financial reporting of ISI.  Prince's hands-on involvement and participation with respect to ISI's financial statements is sufficient that it satisfies the notion that he had a significant role in, and impact on, the financial reporting of the Company and resulting numbers and disclosures provided to the SEC.  Accordingly, he was practicing accounting.

**Management Discussion and Analysis ("MD&A")**

93.   The information available, including communications written by Prince, shows that Prince had significant, likely primary, responsibility for writing portions of ISI's public disclosures, including MD&A.

94.   MD&A is an important component of a company's annual filings, and is required disclosure under Item 303 of Regulation S-K.[67]  The SEC explains the purpose of this disclosure requirement in its interpretive guidance.

---

[65] Email from Prince included with correspondence ending October 29, 2002, Subject: RE: Closing Financial Statements, (Exhibit 25), p. 2.
[66] Email from Prince included with correspondence ending October 29, 2002, Subject: RE: Closing Financial Statements, (Exhibit 25), p. 1.

> The purpose of MD&A is not complicated. It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations."[68] (citation omitted)

95. MD&A enables financial statement users to better understand the results of a company's operations.  It is an avenue for financial statement users to "get behind" the numbers presented in the basic financial statements.  Due to the importance of this information to investors, the SEC has a strong interest in ensuring that the individuals responsible for communicating this information "in a clear and straightforward manner"[69] have the requisite qualifications and integrity to complete this task.

96. SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures states:

> MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business.  The Item asks management to discuss the dynamics of the business and to analyze the financials...

> As the commission has stated, [i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company. (footnotes omitted)[70]

---

[67] Item 303 of Regulation S-K, 17 CFR 229.303.
[68] *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities and Exchange Commission*, Release Nos. 33-8350, 34-48960, FR-72, , Sec. I(B).
[69] *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities and Exchange Commission*, Release Nos. 33-8350, 34-48960, FR-72, Sec. I(A).
[70] *SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, Securities and Exchange Commission, Release Nos. 33-6835; 34-26831; IC-16961; FR-36.

97. It has been my experience, the CFO, practicing as an accountant, has a leading role, if not the leading role, in the drafting of MD&A.  While other executives also provide input and may participate in the drafting, the CFO is the executive in a business most likely to have access and control over the information that is presented in MD&A.

98. For example, as described in Item 303 of Regulation S-K, MD&A discusses a "…registrant's financial condition, changes in financial condition and results of operations."  In doing so, the drafter of the MD&A provides disclosure of the company's liquidity, capital resources, results operations, off balance sheet transactions and contractual obligations including:

- Identifying "… any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way. "

- Describing the company's "material commitments for capital expenditures" and indicating "... the general purpose of such commitments and the anticipated source of funds needed to fulfill such commitments… The discussion shall consider changes between equity, debt and any off-balance sheet financing arrangements."

- Describing "... any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected…describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations."

- Discussing the "… registrant's off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on the registrant's financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors."

- A tabular disclosure of contractual obligations including long term debt, capital and operating leases, purchase obligations and other long term liabilities recorded pursuant to generally accepted accounting principles.

99. Mr. Prince has stated he drafted the company's MDA.  In that capacity, as he prepared disclosures made to investors, which included very significant and material accounting and financial disclosures in the MD&A, he was practicing as an accountant before the SEC, in violation of the bar by the SEC.

100. My experience has been that in preparing MD&A that complies with the applicable regulations, it requires accounting and financial reporting expertise.  It cannot be done in a vacuum without intimate knowledge of the financial statements, what is behind the numbers in them, as well as the accompanying disclosures.  And while someone, such as general counsel may be involved with drafting of the MD&A, that person would require someone from the accounting and finance group to provide the necessary data, such as cash flow information, information about critical accounting policies, or newly issued accounting pronouncements and their potential impact on the company.  The person providing that information into the MD&A preparation process is certainly practicing as an accountant before the Commission.

101. However, in the instance at hand, the self-acknowledged drafter of the ISI MD&A was a trained accountant who had access to the relevant and necessary information.  He used that information in the preparation of the MD&A and accordingly, was practicing as an accountant before the Commission.

102. The examples below show Prince drafted, if not taking outright ownership of, ISI's MD&A.  As the self-acknowledged drafter of the document, he was functioning in the capacity of management and as an accountant.  As he drafted the MD&A for ISI, Prince provided disclosures which are clearly being done in his capacity as an accountant.  These include the following topic headings included in the MD&A section of ISI's Form 10-K for the fiscal year ended September 30, 2005: Contract Revenue, Backlog, Critical Accounting Policies, Recent Accounting Pronouncements, Outlook, and Liquidity and Capital Resources.

103. In November 2004, Prince sent an email titled "Re:  10-K" from his personal email account to ISI finance and accounting personnel, including Elaine Parfitt (CFO), Pat Carey (Corporate Controller), and Albert Alderete (Contracts Manager), that described his role in providing specific numbers and data incorporated into the Outlook section of ISI's MD&A.  "I have been responsible for the Outlook section of the MD&A and I plan to continue to be so now and in the future."[71]  The email continues and describes Prince's actions related to preparing and adjusting the guidance ISI provided to investors.

> Investor guidance reported publicly is not the same as the sum of all the budgets from the operating divisions for FY05.  We apply positive and negative factors at the Executive level to make sure we can meet guidance.  Last year for example we (SRC and I) subtracted $1.0MM at the corporate level to determine guidance for operating income and did not inform the operating divisions of this.[72]

104. In a November 2005 email, Prince explains that he writes ISI's MD&A each year:

> Accounting Disclosures:…Each and every year **I write** what most consider to be the toughest disclosures – the MD&A and the financial press releases.  Recall if you would that we used to pay a financial relations firm a couple hundred thousand a year to mostly write these same releases.  I am also the person responsible for our corporate forecasting and therefore the Chief Architect of the guidance we publish to the Street.[73] (emphasis added)

105. Prince's self-description as ISI's "Chief Architect of the guidance we publish to the Street" is significant.  Based on my experience as an auditor, CFO, and Chair of the Audit Committee of two public companies, this is not the kind of language typically

---

[71] Email from GAP3436@aol.com (Prince), dated November 15, 2004, Subject: RE: 10-K, (Exhibit 339).
[72] Email from GAP3436@aol.com (Prince), dated November 15, 2004, Subject: RE: 10-K, (Exhibit 339).
[73] Email from Prince, dated November 9, 2005, Subject: RE: Compensation Committee Comments Regarding Bonuses for 2005 (Exhibit 48), p. 2.

used to describe an individual with only a minor, advisory role.  This type of description is usually reserved for senior management and the person with ultimate responsibility, such as a CFO, who provides the voice of a public company.  The guidance provided to "the Street" is particularly significant as it directly affects the decisions of investors, and as a result the stock prices of publicly traded companies.

106. Additionally, ISI employees, such as Contracts Manager Albert Alderete, understood and testified that Prince had primary responsibility for drafting ISI's MD&A.[74]

> Q. And what's MD&A?
> A. Management discussion and analysis.
> Q. From your experience, was there anyone at ISI who was the principal draftsman of MD&A while you were there?
> A. Gary Prince.

**Defense Contract Audit Authority ("DCAA") Cost Submission**

107. According to Senior Accountant John Flaherty, a significant portion ("over 50 percent") of ISI's revenue was defense contracts.  As a result, the Company was required to provide Defense Contract Audit Agency (DCAA) cost submissions.[75]  Flaherty would collect the information from different people and provide it to Prince "for final review."[76]  Ultimately all cost proposals had to be signed off by Prince beginning in 2005.[77]

108. In his deposition, Mr. Flaherty explains how these DCAA calculations, after being reviewed by Prince, were ultimately shown in ISI's financial statements:[78]

---

[74] Deposition of Albert Alderete, August 4, 2011, p. 60.
[75] Deposition of John Flaherty, August 3, 2011, pp. 33-34.
[76] Deposition of John Flaherty, August 3, 2011, pp. 35-36.
[77] Email from Pete Gaffney, dated September 30, 2005, Subject: Contracts, (Exhibit 335).
[78] Deposition of John Flaherty, August 3, 2011, pp. 43-44.

Q. Okay. Now, incurred cost submissions, is that a calculation that is unique to DCAA, or is that a calculation that also has application to other public filings?

A. It -- what it does is the incurred cost submission basically is getting your indirect rates for the year, your overhead and G&A that you believe that should be charged on your jobs so you're putting in your bases and your pools and you're getting your overhead rates. In this submission, you're submitting these are our costs from the year and then from that come the rates which are then applied your overhead and G&A rates.

Q. Do those calculations -- are those calculations at all relevant in any way to 10-Ks or 10-Qs?

MS. WOOD: Objection to form.

MR. NAUNTON: Join.

A. It can be very important, because it -- on cost-plus jobs, it would lead to how much revenue would be calculated.

Q. Do you know whether the DCAA calculations were used in the preparation of 10-Ks?

A. The rates that were -- the rate -- the indirect rates were used in the job costs, which then were used in -- become part of the financial statements.

109. Cost accounting, including how job costing is done is a critical and key accounting and finance function for a contractor.  The responsibility for oversight and review of cost accounting is therefore an important role in the preparation of financial data, statements, and disclosures.

**Interaction with Auditors**

110. Prince interacted with ISI's various independent auditors, including Rubino & McGeehin ("R&M"), Ernst & Young ("E&Y"), and Grant Thornton ("GT"), on a variety of issues.  These interactions show that Prince was involved in decisions relevant to ISI's accounting and that he actively participated in, and affected, the Company's accounting.

111. A memo from R&M addressed to Gary Prince and Elaine Parfitt (CFO) details responses to their accounting questions which were raised at a lunch with R&M in September 1999 regarding a Financial Accounting Standards Board proposal to

"eliminate the pooling method of accounting for business combinations" and its impact.[79]  The memo also addresses questions regarding the accounting treatment of earn-outs and restricted stocks.[80]

112.   An October 2002 email string titled "Closing Financial Statements" details Prince's involvement with the financial account balances.  This communication shows his review and discussion of ISI's accounts, including Prince's interaction with E&Y auditors regarding accounting questions and his specific involvement in the journal entries pertaining to stock options.  Prince's statements:

> If we did not book compensation expense associated with the NSO's, then why are retained earnings negative?  I think something may be amiss, but I think you'll still make your equity bogey.  I just want to get each account right before we finalize these numbers.[81]

> I'm not sure what APB25 says, but I am passing on guidance from our auditors at E&Y.  My understanding is that the stock is to be recorded at the amounts paid in only.  The IRS receivable then gets set up separately with a credit entry going to Paid in Capital under the caption 'tax benefit from stock option exercise.[82]

113.   A November 2004 email from Prince details his involvement in setting a reserve on a job dispute and then including the numbers associated with this decision in the "package" to be sent to GT.

> … I have discussed the matter and although we have some defenses, after reading the Lockheed letter, and considering the contract documentation, we do not believe that we can reasonably defend the

---

[79] Memorandum dated September 9, 1999, From: Bob Gray (Rubino & McGeehin), To: Gary Prince and Elaine Parfitt, Re: Purchase Accounting Questions, (Exhibit 105), p. 1.
[80] Memorandum dated September 9, 1999, From: Bob Gray (Rubino & McGeehin), To: Gary Prince and Elaine Parfitt, Re: Purchase Accounting Questions, (Exhibit 105), p. 1.
[81] Email from Prince included with correspondence ending October 29, 2002, Subject: RE: Closing Financial Statements (Exhibit 25), p. 3.
[82] Email from Prince included with correspondence ending October 29, 2002, Subject: RE: Closing Financial Statements (Exhibit 25), p. 2.

$460K presently on the books.  It is our collective judgment that we should reserve $260K of the $460K leaving us with a $200K 'exposed' receivable for this job.  In round numbers, this will lower quarterly and annual EPS by $.02…

Stuart plans to have Albert write a letter to Lockheed, protesting their position and requesting a face to face session with them in the next 30 days…

Anyhow, unless someone has heartburn with what we are doing, we will redo the numbers and present a revised package to Grant Thornton.[83]

114. Correspondence from May 2005 indicates that Prince consulted with GT about ISI's stock options and Prince's suggested plan for ISI to allow conversion of options to restricted stock.[84]  In a November 2005 email to senior ISI personnel, including Tom Gough (President), Steve Chamberlain (CEO), Pete Gaffney (COO, EVP, Government Division), and Elaine Parfitt (CFO), Prince describes his work developing and personally presenting information to ISI's auditors, GT.[85]

**Board Meeting Participation**

115. A corporate Board of Directors is responsible for oversight of management.  Typically, meetings of the Board are attended by senior levels of management.  In fulfilling their fiduciary obligations, Board members regularly rely on information presented by management.

116. Prince attended numerous Board meetings and presented a variety of information to ISI's Board of Directors.  For example:

- May 10, 2000 – Prince:

---

[83] Email from GAP3436@aol.com (Prince), dated November 2, 2004, Subject: Fwd: FW: Preliminary results for Q4FY04, (Exhibit 114).

[84] Email from Prince included in correspondence ending May 16, 2005, Subject: RE: Stock Option Plan, (Exhibit 326), pp. 2-3.

[85] Email from Prince, dated November 9, 2005, Subject: RE: Compensation Committee Comments Regarding Bonuses for 2005 (Exhibit 48), p. 3.

- o Was present at meeting by invitation.[86]
- February 6, 2002 – Prince:
    - o Discussed acquisition of Newpoint
    - o Requested approval of option grants to Newpoint employees
    - o Reported that "SAT's receivable…from a company called SSP/Litronics (Litronics) was being paid in installments."[87]
- August 7, 2002 – Prince:
    - o Provided analysis of proposed "stock buyback program" and effect of program on earnings.[88]
- December 4, 2002 – Prince:
    - o Reported acquisition of RT Logic closed in October 2002.
    - o Reported ISI was not actively pursuing any other companies at this time.
- May 8, 2003 – Prince:
    - o Discussed status of SAT and Newpoint Technologies.[89]
- July 1, 2003 – Prince:
    - o Discussed proposed purchase of Jackson & Tull assets.[90]
- December 1, 2004 – Prince:
    - o discussed M&A Activities.[91]
- November 30, 2005 – Prince:
    - o Presented profitability analysis of "core business"
    - o Presented "forecast for fiscal year 2006."[92]

117.  The August 7, 2002 Board minutes describe Prince providing analysis of the various scenarios for the stock buyback program discussed by Chamberlain (CEO) at the Board meeting, including its impact on ISI's earnings.

> Mr. Chamberlain reported that the Company would be eligible to buyback its common stock effective August 30, 2002…Mr. Prince

---

[86] Minutes of ISI Board of Directors meeting, May 10, 2000 (Exhibit 9), p. 1.
[87] Minutes of ISI Board of Directors meeting, February 6, 2002 (Exhibit 10), pp. 2-3.
[88] Minutes of ISI Board of Directors meeting, August 17, 2002 (Exhibit 12), p. 2.
[89] Minutes of ISI Board of Directors meeting, May 8, 2003 (Exhibit 13), p. 3.
[90] Minutes of ISI Board of Directors meeting, July 1, 2003 (Exhibit 14), pp. 1-2.
[91] Minutes of ISI Board of Directors meeting, December 1, 2004 (Exhibit 6), p. 2.
[92] Minutes of ISI Board of Directors meeting, November 30, 2005 (Exhibit 15), p. 2.

presented an analysis illustrating various scenarios where the stock buyback program would be accretive to FY03 earnings.[93]

118.   In addition to attending meetings of the Board of Directors, Prince responded directly to inquiries from Board members.  In a September 2005 email, Prince responded directly to Board member Bonnie Wachtel (cc'ing other Board members) regarding her questions concerning the Lumistar asset acquisition.  His communication includes the following:

> As I read the numbers Lumistar is slightly behind plan for FY05 at 9/30/05.  However, John Reeser still believes he will make plan for the year.  Although, Lumistar's margins continue to be quite healthy ($1.4 million pretax on $4.5 million of revenue) we did require Lumistar to make a number of adjusting entries (pre-acquisition), which negatively impacted profitability, to get their numbers in conformance with GAAP.[94]

119.   Prince discusses other matters including earnouts and employment contracts and closes by stating "I guess we can discuss all of this further in the telecom tomorrow."[95]

120.   The preceding examples further illustrate Prince's significant responsibilities within ISI.  Prince was clearly involved in a variety of areas related to ISI's financial statements and public filings.

## VI.   Summary of Observations

121.   As described above, practicing or appearing before the SEC is broadly defined and includes preparing information included in public documents filed with the SEC.  Activities considered to be preparing information include, but are not limited to: editing documents; creating, compiling, or providing data to be incorporated into

---

[93] Minutes of ISI Board of Directors meeting, August 7, 2002 (Exhibit 12), p. 2.
[94] Email from Gary Prince, included within correspondence ending September 27, 2005, Subject: RE: Lumistar, (Exhibit 83), p. 1.
[95] Email from Gary Prince, included within correspondence ending September 27, 2005, Subject: RE: Lumistar, (Exhibit 83), p. 1.

public filings; computing figures and supplying information that is incorporated into public filings; and reviewing drafts of disclosures included in financial statements.

122. Prince's responsibilities at ISI between December 1998 and December 2005 included many of these tasks.  As described above, Prince prepared Public Filings and Press Releases; assisted with Accounting and Financial Statements; drafted Management Discussion and Analysis; completed and reviewed Defense Contract Audit Authority Cost Submissions; interacted with Auditors; and, participated in Board meetings

## VII.   Conclusion

123. I have formed the following opinions based on my analysis to date:

124. Gary A. Prince appeared and practiced as an accountant before the SEC between December 1998 and December 2005.

125. Prince performed tasks related to:

- Accounting and Financial Statements
- Management Discussion and Analysis
- Press Releases
- Defense Contract Audit Authority Cost Submissions
- Interactions with Auditors
- Participation in meetings of the Board of Directors

126. Prince performed these tasks in relation to the public filings of ISI.


Dated this 14th day of October 2001



_____

Lynn E. Turner

UNITES STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

Securities Exchange Act of 1934
Release No. 38765 / June 24, 1997

Accounting and Auditing Enforcement
Release No.  927 / June 24, 1997

Administrative Proceeding
File No. 3-9338

In the Matter of

GARY A. PRINCE, CPA

ORDER INSTITUTING PROCEEDINGS AND OPINION AND ORDER PURSUANT TO RULE 102(e)
OF THE COMMISSION'S RULES OF PRACTICE

I.

    The Securities and Exchange Commission ("Commission") deems it
appropriate and in the public interest to institute proceedings against
Gary A. Prince ("Prince") pursuant to Rule 102(e) of the Commission's Rules
of Practice.

    Accordingly, IT IS HEREBY ORDERED that said proceedings be, and hereby
are, instituted.

II. OFFER

    Simultaneous with the institution of this proceeding, Prince has
submitted an Offer of Settlement ("Offer") solely for the purpose of this
proceeding and any other proceeding brought by or on behalf of the
Commission, or to which the Commission is a party.  Under the terms of the
Offer, which the Commission has determined to accept, Prince, without
admitting or denying the factual assertions, findings or conclusions set
forth herein, except that he admits the jurisdiction of the Commission over
him and over the subject matter of this proceeding, consents to the entry
of this Order Instituting Proceedings and Opinion and Order Pursuant to
Rule 102(e) of the Commission's Rules of Practice.

III. FINDINGS

    The Commission makes the following findings:

    Prince is a certified public accountant whose license in the State of

Maryland lapsed in 1986.  From 1988 until July 1990, Prince served as Senior Vice President and Chief Financial Officer of United Press International ("UPI").  He then became Senior Vice President - Finance of Financial News Network ("FNN").  He has practiced before the Commission within the meaning of Rule 102(f) of the Commission's Rules of Practice in connection with the preparation of FNN's financial statements and other documents and by his conduct during the independent accountants' 1990 audit of FNN's financial statements.

UPI was a privately-held Delaware corporation engaged in the business of gathering and disseminating news reports and photographs.

FNN was a California corporation operating a cable television network that reported financial news and information.  FNN's common stock was registered with the Commission pursuant to Section 12 of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. □ 78l) and quoted on the National Association of Securities Dealers, Inc. Automated Quotation system.

On June 28, 1993, the Commission filed a complaint in the United States District Court for the District of Columbia against Prince and others, captioned SEC v. Bolen, et al., 93 Civ. 1331 (CRR) (D.D.C.).  On August 10, 1994, Prince consented to the entry of a Final Judgment of Permanent Injunction and Other Equitable Relief ("Final Judgment"), without admitting or denying the allegations in the complaint, except as to subject matter jurisdiction, which he admitted.  On August 18, 1994, the Honorable Charles R. Richey, United States District Judge for the District of Columbia, entered the Final Judgment, which:

permanently restrains and enjoins Prince from engaging in   conduct violative of Section 10(b) of the Exchange Act and     Rules 10b-5 and 13b2-2 promulgated thereunder.

The complaint in SEC v. Bolen alleges, among other things, that Prince, while he was UPI's chief financial officer, helped facilitate a fraudulent scheme engineered by two of FNN's executive officers to inflate FNN's revenues and earnings for its fiscal year 1989 and during the first three quarters of its fiscal year 1990 by causing, among other things:  (1) an overstatement of revenues FNN received from two related companies, including UPI; and (2) causing FNN to enter into numerous equipment sales/leaseback transactions in which the quantity, type and value of the equipment being sold, the identities of the sellers and the disposition of the proceeds from the transactions were falsified.

As set forth in the complaint, as a result of this fraudulent scheme, FNN's financial statements for its fiscal year ended 1989 were materially misleading in that they overstated total revenues by approximately 17%,

======END OF PAGE 2======

□

pretax income from continuing operations by 96%; total current assets by 24.5%, and total assets by 8%, and understated the loss from FNN's discontinued operations by 46%.  FNN's quarterly statements for the first three quarters of its fiscal year ended 1990 were also materially

misleading as follows:  in the first quarter, FNN overstated revenues by approximately 42.5% and pretax income by 382%; in the second quarter, FNN overstated revenues by approximately 40% and pretax income by 421%; and in the third quarter, FNN overstated revenues by approximately 44%, pretax income by 483%, total current assets by 28% and total assets by 12%.

     In addition, the complaint alleges that upon appointment as Senior Vice President - Finance of FNN, Prince, who knew of or recklessly disregarded the fraudulent scheme, failed to take steps to cause FNN to restate any of its previously filed financial statements which he knew, or was reckless in not knowing, were false and misleading.

     Finally, the complaint alleges that during the audit of FNN's fiscal year 1990 financial statements, Prince provided certain documents and information to the auditors which were materially false or misleading.

     Based on the foregoing, the Commission finds that Prince willfully violated Rule 13b2-2 promulgated under the Exchange Act.

     As a further consequence of the alleged conduct set forth above, Prince was named as a defendant in a criminal information and on September 6, 1995 pled guilty to two felony counts in the District Court for the Central District of California.  The counts to which Prince entered a plea were general federal conspiracy in violation of 18 U.S.C. ☐ 371 and filing a false statement with the Securities and Exchange Commission in violation of 18 U.S.C. ☐ 1001.  Prince's sentencing is pending the outcome of related criminal proceedings in which he is a cooperating government witness against the remaining indicted defendants.


                    ======END OF PAGE 3======
☐



                              IV.

     In view of the foregoing, the Commission finds that it is appropriate

and in the public interest to impose the sanction that is consented to in the Offer submitted by Prince.

Accordingly, IT IS HEREBY ORDERED that:

Prince is permanently denied the privilege of appearing or practicing before the Commission as an accountant.

By the Commission.


                              Jonathan G. Katz
                                 Secretary


======END OF PAGE 4======

**Turner Exhibit 2**

**AICPA**
**American Institute of CPAs**

**Positions in Corporate Accounting**

CPAs in business and industry work for companies ranging from family-owned businesses to Fortune 500 companies. They are considered strategic business partners of their organizations and work in a variety of different areas including the positions listed below.

**Staff-Financial Accounting & Reporting (1-3 years)** works under the direction of a Senior Accountant performing detailed work assignments in one or several of the following areas: receivables, payables, payroll, property, general ledger and financial statements.

**Staff-Management Accounting (1-3 years)** works under the direction of a Senior or Manager in collecting detailed cost data. May be responsible for preliminary cost analyses and report preparation.

**Staff-Tax Accounting (1-3 years)** works under the direction of a Senior or Manager in preparing returns or various schedules for review.

**Staff-Internal Audit (1-3 years)** works under the direction of a Senior or Manager in conducting compliance audits and tests internal controls and information systems.

--------------------------------------------------------------------------------

**Senior-Financial Accounting & Reporting (3-6 years)** supervises the work performed in one or more of the general accounting areas such as receivables, payables and financial reporting. May also be responsible for special reports and analyses involving financial data.

**Senior-Management Accounting (3-6 years)** is typically responsible for a segment of the overall management accounting system and is often assigned special or project cost studies.

**Senior-Tax Accounting (3-6 years)** is responsible for one or more of the following areas: federal, state, and local income taxes; sales tax, property tax, or payroll tax.

**Senior-Internal Audit (3-6 years)** supervises the testing of internal control and accounting information systems. Frequently conducts statistical samples of document approval, performs special tests to uncover defalcations and performs operational audits for profit improvement recommendations.

Source:  www.aicpa.org/CAREER/CAREERPATHS/CORPORATEACCOUNTING/Pages/default.aspx.

--------------------------------------------------------------------------------

**Financial Accounting & Reporting Manager (6+ years)** assists the Controller and is often charged with responsibility for one of the functional areas such as financial accounting or budgetary planning and control. Will coordinate and direct the work of personnel involved in detailed accounting entries, internal financial reporting and financial statements.

**Management Accounting Manager (6+ years)** directs staff responsible for developing and modifying the management accounting system. Develops product costing techniques, institutes cost control measures, insures timely and accurate labor, material, and overhead reports, supervises the undertaking of special cost studies and periodically reviews allocation of overhead costs.

**Tax Manager (6+ years)** reports to the Controller and directs the staff responsible for determining the organization's liability to various taxing authorities for income tax, licenses, sales tax, property tax and payroll tax. Also analyzes the effect of tax accounting alternatives and studies laws and regulations to ensure correct application of new tax measures.

**Internal Audit Manager (6+ years)** directs the staff responsible for systematically sampling the adequacy and the reliability of the internal control systems. Makes recommendations for changes as needed, and ensures that company policies and procedures are followed and establishes the proper techniques to discover and prevent fraud. Also selects areas of concern for operational auditing.

--------------------------------------------------------------------------------

**Assistant Controller** reports to the Controller and assists in the supervision of day-to-day collection and interpretation of accounting data. Oversees statutory and management reporting functions, though scope varies with firm size. Prepares detailed journal entries and account analyses. May assist in tax return and financial statement preparation.

**Controller** functions as the Chief Accounting Executive responsible for organizing, directing, and controlling the work of the accounting personnel in collecting, summarizing and interpreting financial data for the use of management, creditors, investors, and taxing authorities. As a member of the top management team, helps develop forecasts for proposed projects of the organization, measures actual performance against operating plans and standards, and interprets the results of operations for all levels of management.

--------------------------------------------------------------------------------

Source:  www.aicpa.org/CAREER/CAREERPATHS/CORPORATEACCOUNTING/Pages/default.aspx.

**Chief Financial Officer (CFO)** Advises the President or CEO of the organization with respect to financial reporting, financial stability, liquidity and growth, and financial strategy, design and execution. He or she directs and supervises the work of the Controller, Treasurer, and sometimes the Internal Auditing Manager. Other duties may include maintenance of relationships with stockholders, financial institutions and the investment community. Frequently, the CFO is a member of the Board of Directors and/or the Executive Committee and, as such, contributes to overall organization planning, policy development and implementation.

--------------------------------------------------------------------------------

**Audit Committees**

Positions are available as an Audit Committee Chair or Audit Committee Member for public companies, private companies and not-for-profit organizations.

Source:  www.aicpa.org/CAREER/CAREERPATHS/CORPORATEACCOUNTING/Pages/default.aspx.

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.

SECURITIES EXCHANGE ACT OF 1934
Rel. No. 51920 / June 24, 2005

ACCOUNTING AND AUDITING ENFORCEMENT
Rel. No. 2264 / June 24, 2005

Admin. Proc. File No. 3-9793

---

In the Matter of

ROBERT W. ARMSTRONG, III

---

OPINION OF THE COMMISSION

CEASE-AND-DESIST AND RULE 102(e) PROCEEDINGS

Grounds for Remedial Action

Violations of Antifraud, Reporting, and Recordkeeping Provisions

Accountant for subsidiary computed and supplied figures necessary to execute parent company's scheme to achieve predetermined growth rates and convey false appearance of a smooth growth trend.  Accountant willfully violated and was a cause of violations of the antifraud, reporting, and recordkeeping provisions of the federal securities laws and rules.  Held, it is in the public interest to order that accountant cease and desist from committing or causing any violations or future violations of the applicable laws and rules.

APPEARANCES:

Marc B. Dorfman and Bryan B. House, of Foley & Lardner LLP, for Robert W. Armstrong, III.

Robert K. Levenson, for the Division of Enforcement.

Appeal filed: April 27, 2004
Last brief received: July 2, 2004
Oral argument: March 29, 2005

2

I.

Robert W. Armstrong, III and the Division of Enforcement each appeal from the decision of an administrative law judge. The law judge found that Armstrong, formerly controller of National Medical Care, Inc. ("NMC"), a subsidiary of W.R. Grace & Co. ("Grace"), participated in a scheme to manipulate Grace's reported earnings to achieve predetermined targets. The scheme involved improperly recording excess earnings as reserves and later using the excess reserves to bolster earnings, thereby creating the false impression that Grace had a steady, consistent growth in income over a period of several years. The law judge found that Armstrong willfully violated Section 10(b) of the Securities Exchange Act of 1934 1/ and Exchange Act Rule 10b-5 2/ and that he was a cause of Grace's violations of those provisions.

The law judge also concluded that, as a result of the scheme to manipulate Grace's earnings, Grace's periodic reports during the relevant period included financial statements that were not in accordance with Generally Accepted Accounting Principles ("GAAP") and that were materially misleading in violation of the periodic reporting requirements contained in Exchange Act Section 13(a) 3/ and Exchange Act Rules 12b-20, 13a-1, and 13a-13. 4/ The law judge found that Armstrong was a cause of these violations. The law judge further found that the scheme resulted in Armstrong violating the recordkeeping requirements of Exchange Act Section 13(b)(5) 5/ and Exchange Act Rule 13b2-1, 6/ and causing Grace's violation of these provisions and of Exchange Act Section 13(b)(2). 7/ The law judge imposed a cease-and-desist order on Armstrong.

The law judge dismissed the charges brought pursuant to Commission Rule of Practice 102(e). 8/ The law judge recognized that Armstrong had willfully violated the federal securities laws and the Commission's rules within the meaning of Rule 102(e)(1)(iii), but held that Rule 102(e) applied only to persons appearing or practicing before the Commission. She concluded

---

1/        15 U.S.C. § 78j.

2/        17 C.F.R. § 240.10b-5.

3/        15 U.S.C. § 78m(a).

4/        17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13.

5/        15 U.S.C. § 78m(b)(5).

6/        17 C.F.R. § 240.13b2-1.

7/        15 U.S.C. § 78m(b)(2).

8/        17 C.F.R. § 201.102(e).

3

that Armstrong had not been appearing or practicing before the Commission and dismissed the Rule 102(e)(1)(iii) charges on this basis.  9/

Armstrong argues that the law judge erred when she concluded that he violated and caused Grace's violations of the federal securities laws and the Commission's rules.  Armstrong contends that he was in no position to assess whether Grace's financial statements complied with GAAP because he had no responsibility for Grace's statements and did not know the details of how Grace prepared those statements.  Armstrong maintains that there is no basis in the public interest for the imposition of a cease-and-desist order.

The Division argues that the law judge erred when she implicitly concluded that Rule 102(e)(1)(iii) requires that a person be appearing or practicing before the Commission at the time of the violative conduct.  The Division maintains that, in any event, Armstrong was appearing and practicing before the Commission within the meaning of Rule 102(e)(1)(iii) when he committed the alleged violations.  The Division seeks to deny permanently to Armstrong the privilege of appearing or practicing before the Commission.  We base our findings on an independent review of the record, except with respect to those findings not challenged on appeal.

II.

A.  The Participants

Armstrong

Armstrong was vice president and controller of NMC from January 1985 until his resignation in May 1997.  During this time, he was NMC's chief accounting officer and was responsible for NMC's financial reporting on a monthly, quarterly, and annual basis.  Armstrong was also responsible for supervising NMC's internal audit department and for supervising the preparation and consolidation of the financial reports of NMC's operating subsidiaries.  10/

---

9/  The law judge also dismissed the charges brought by the Division pursuant to Rule 102(e)(1)(ii) on the basis that the Division failed to establish the professional standards to which Armstrong was subject under that Rule.  The Division has not appealed this ruling.

10/  Armstrong was a certified public accountant ("CPA") in Massachusetts from 1977 through 1983 at which time he allowed his license to expire.  Armstrong worked as an auditor and supervisor at Touche Ross & Company, a major accounting firm, from 1975 until 1980.  Armstrong joined NMC in 1980 and held several positions, including managing the audit department and directing financial reporting and budgeting.  In 1983, Armstrong briefly left NMC, but he rejoined the company in 1985 as vice president and controller.

4

After leaving NMC in 1997, Armstrong continued to work as a financial executive, holding positions as a chief financial officer, an accounting officer, and a consultant for large public and private companies.  Since 2002, Armstrong has been the chief financial officer of a privately-held manufacturing company.  He intends to continue working as a corporate financial executive in the future.

NMC

NMC was founded in 1968.  NMC first became a subsidiary of Grace in 1984 and was a non-reporting wholly-owned subsidiary of Grace throughout the period at issue in this proceeding.  NMC's principal business was kidney dialysis services, but it also had divisions engaged in manufacturing specialized medical products and providing home health care services.

Constantine Hampers co-founded NMC.  He was NMC's chief executive officer from 1973 through 1996, and he was a Grace director from 1985 through 1996.  11/  Miles Nogelo was a vice president and chief financial officer of NMC from 1984 until September 1995. 12/ Armstrong reported to Nogelo.

Grace

Grace was a multinational public corporation with a variety of businesses.  It had revenues of $5 to $6 billion during the relevant period. As a public corporation, Grace was required to file, and did file, quarterly and annual periodic reports with the Commission.  Jean-Paul Bolduc was Grace's president and chief executive officer from 1991 through early 1995. 13/

---

11/    On August 12, 2003, the Commission issued an order in which Hampers consented to cease and desist from committing or causing violations of the securities laws requiring the maintenance of accurate books and records and prohibiting false filings.  Jean-Paul Bolduc, et al., Exchange Act Rel. No. 48325 (Aug. 12, 2003), 80 SEC Docket 3111.

12/    On August 12, 2003, the Commission issued an order in which Nogelo consented to cease and desist from committing or causing violations of the securities laws requiring the maintenance of accurate books and records.  Jean-Paul Bolduc, et al., Exchange Act Rel. No. 48326 (Aug. 12, 2003), 80 SEC Docket 3115.

13/    On February 27, 2003, the Commission issued an order in which Bolduc consented to cease and desist from committing or causing violations of the antifraud provisions of the federal securities laws.  Jean-Paul Bolduc, et al., Exchange Act Rel. No. 47416 (Feb. 27, 2003), 79 SEC Docket 2576.

5

Brian J. Smith was Grace's chief financial officer until August 1995. 14/  Richard Sukenik was Grace's controller.  15/  Phillip J. Ryan, III was Grace's assistant controller.  16/

One of Grace's core businesses was its Health Care Group.  Grace reported the Health Care Group as a separate business segment in its consolidated financial statements.  The Health Care Group was Grace's fastest growing division; in 1991 and 1992 it contributed approximately 40 percent of Grace's revenue and 60 percent of its profit.  Many analysts regarded the Health Care Group as the driving force behind Grace's stock price.  Grace executives also publicly touted the significance of the Health Care Group's contributions to Grace's income.

NMC was Grace's main health care subsidiary.  17/  NMC submitted monthly, quarterly, and annual reports to Grace's financial reporting division.  These reports included revenues, cost of revenues, operating expenses, and balance sheets.  Armstrong directed the preparation of NMC's monthly, quarterly, and annual financial results.  He also prepared and reviewed the Health Care Group's financial results at the end of each quarter during the relevant period.

Price Waterhouse

Price Waterhouse LLP was Grace's auditor at the time of the events in question in this proceeding.  Accountants in Price Waterhouse's Boston office ("Price Waterhouse NMC") did not perform full scope audits on NMC's books and records from 1991 through the first part of

---

14/     On July 15, 2002, the Commission issued an order in which Smith consented to cease and desist from committing or causing violations of the antifraud provisions of the federal securities laws.  Jean-Paul Bolduc, et al., Exchange Act Rel. No. 46205 (July 15, 2002), 78 SEC Docket 60.

15/     On March 28, 2003, the Commission issued an order in which Sukenik consented to cease and desist from committing or causing violations of the antifraud, reporting, and recordkeeping provisions of the federal securities laws.  Jean-Paul Bolduc, et al., Exchange Act Rel. No. 47597 (Mar. 28, 2003), 79 SEC Docket 3541.

16/     On July 15, 2002, the Commission issued an order dismissing the cease-and-desist proceedings against Ryan subject to certain conditions under which the Commission could reinstate the proceedings and impose a cease-and-desist order.  Jean-Paul Bolduc, et al., Exchange Act Rel. No. 46206 (July 15, 2002), 78 SEC Docket 65.

17/     Hampers testified that "It [NMC] was the healthcare group."  Nogelo testified that NMC constituted most of the Health Care Group and that "it was well over 90 percent" of the Health Care Group.  Ryan testified that "[i]f you looked at it from a revenue perspective, it [NMC] was all of the revenue [of the Health Care Group].  There were no sales and revenues reported from the other three components.  And in terms of income, be it measured net income or pre-tax income, it was probably greater than 100 percent of the healthcare group given that two of those three components were expenses . . . ."

6

1995, but they did conduct certain reviews of NMC's financial statements during this period at the instructions of Price Waterhouse accountants auditing Grace.  18/  George Jamieson was the Price Waterhouse partner who oversaw the reviews of NMC's financial statements.  Accountants in Price Waterhouse's New York and Fort Lauderdale offices ("Price Waterhouse Grace") audited Grace's consolidated financial statements.  Price Waterhouse Grace provided unqualified opinions on Grace's consolidated financial statements throughout the relevant period.  Eugene Gaughan was the Price Waterhouse partner who oversaw the audits of Grace's consolidated financial statements from 1989 through 1994.  19/  Thomas Scanlon became the lead Price Waterhouse partner on the Grace audit for 1995.  20/

B.  The Scheme

          The facts underlying the scheme to defraud are not in dispute.  Neither is Armstrong's conduct as part of the scheme.  21/

Decision to Record Excess Income as Reserves

          Beginning in late 1990 or early 1991, NMC began to realize income in excess of budgeted amounts ("excess income") due to changes in Medicare reimbursement for treatment of dialysis patients.  NMC recorded this increased revenue in the physicians' compensation accrual account ("Compensation Account") within the dialysis services division.  22/  This account represented a reserve account for NMC's potential obligations under its incentive compensation

---

18/     Armstrong testified that Price Waterhouse NMC conducted "a level two examination or review, which is where they would go in and review certain balance sheet accounts in certain areas . . . ."  Warren Barnes, a Price Waterhouse NMC accountant, described the review as "agreed-upon procedures based on instructions from [the] PW Grace audit team."  These procedures focused on examining revenues and receivables.

19/     On June 30, 1999, Gaughan consented to the entry of an order directing him to cease and desist from committing or causing violations of the securities laws relating to the maintenance of books and records and false filings with the Commission.  Eugene F. Gaughan, C.P.A., Exchange Act Rel. No. 41580 (June 30, 1999), 70 SEC Docket 177.

20/     On June 30, 1999, Scanlon consented to the entry of an order directing him to cease and desist from committing or causing violations of the securities laws relating to the maintenance of books and records and false filings with the Commission.  Thomas J. Scanlon, C.P.A., Exchange Act Rel. No. 51481 (June 30, 1999), 70 SEC Docket 184.

21/     As discussed infra, no one disputes that the accounting treatment of the income at issue violated GAAP or that the use of the income to manipulate growth rates constituted fraud.  Rather, the sole issue in this case is Armstrong's legal liability for his admitted conduct.

22/     NMC did not indicate the source of these deposits on its books and records.

agreements with the physicians who managed NMC's dialysis clinics, and the excess income recorded in this reserve account was in addition to amounts projected as necessary to cover potential obligations ("excess reserves").   Hampers, Armstrong, and other managers at NMC decided not to report the excess amounts as revenue to Grace until the dialysis services division determined how much additional revenue NMC might earn and for how long.

By August 1991, at least $10 million in excess income had accumulated in the Compensation Account, and the dialysis services division determined that the account would continue to accumulate excess income at a rate of $4 million to $5 million per month. Armstrong concluded that the excess reserves would cause a material misstatement of NMC's financial statements if they were not reported as revenue and discussed this fact with Hampers and Nogelo.  Hampers then instructed Armstrong and Nogelo to disclose the existence of the additional revenue and excess reserves to Smith, Grace's chief financial officer.

In approximately September 1991, Armstrong and Nogelo called Smith and told him about the excess income.  Smith ordered Armstrong and Nogelo to report only enough income to establish the Health Care Group's earnings at a 24 percent growth rate for 1991 and to record any revenue that would result in a growth rate above 24 percent as reserves in the Compensation Account.  According to Armstrong, Smith told him and Nogelo that "Grace would not get credit for additional growth rate beyond that 24 percent."  Nogelo testified that Smith wanted earnings that were not needed to achieve that growth rate put into reserves to be used to achieve future growth rate targets.  Ryan testified that Smith did not believe that NMC's extraordinary growth rate in the early 1990s could be sustained, and that Smith was concerned about a future drop in earnings.  Nogelo said that Smith "wanted to report consistent earnings for Grace and the healthcare segment rather than have volatile earnings," and that Smith "felt that Wall Street and investors valued consistency."

Armstrong's Role in Implementing the Scheme

Armstrong executed Smith's instruction to meet the 24 percent growth rate target.  He calculated the amount to be held in excess reserves and instructed his staff accordingly. Armstrong then supplied Grace with NMC financial reports that contained these misstated income figures.  Armstrong knew that Grace used the numbers that he submitted with respect to NMC's earnings to compile drafts of Grace's public filings related to the Health Care Group. Armstrong reviewed drafts of the Health Care Group's disclosures that were included in Grace's financial statements and confirmed that the financial results included in those disclosures reflected the numbers he had submitted to Grace.

The excess reserves in the Compensation Account reached approximately $22 million by the end of 1991.  Without diverting the revenue to the reserve account, the Health Care Group would have reported enough revenue to show a 35 percent growth rate in 1991 rather than the 24 percent growth rate targeted by Smith.

8

Armstrong's Communications with Price Waterhouse Concerning the Excess Reserves

In approximately November 1991, Price Waterhouse NMC discovered the excess reserves in the Compensation Account while reviewing NMC's books and records. At the conclusion of its review, Price Waterhouse NMC prepared a net effects schedule containing all accounting entries in NMC's financial statements with which it disagreed. 23/ The 1991 NMC net effects schedule contained an entry noting that the excess reserves should be eliminated from the Compensation Account. 24/ George Jamieson discussed this schedule at a meeting with Armstrong, Nogelo, and Hampers, and Armstrong admits that he knew that Price Waterhouse NMC had indicated that the excess reserves should be eliminated. Neither Hampers, Nogelo, nor Armstrong effectuated the change recommended by Price Waterhouse NMC. Consequently, the results that NMC sent to Grace, Grace's consolidated financial statements, and the segment disclosure for the Health Care Group in Grace's financial statements contained the targeted income figures achieved by diverting actual income to the Compensation Account. 25/

Armstrong Continues to Record Excess Reserves

Smith continued to instruct Armstrong to manipulate reported income in 1992. Smith directed NMC to report a growth rate of between 27 and 28 percent for the Health Care Group's income for 1992. To comply with Smith's directive, Armstrong increased the excess reserves in the Compensation Account to $48.7 million. Armstrong and other NMC officers also recorded

23/    A net effects schedule documents the significant accounting issues uncovered by the auditor during its review of a client's books and records and lists proposed adjustments.

24/    The parties agree that the applicable accounting standards are contained in Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Standards No. 5 ("FAS 5"). FAS 5 permits the non-recognition of revenue or the accrual of income in a reserve account when two conditions related to a future contingency are met: the contingency is both probable and reasonably estimable. Armstrong admitted that no probable or reasonably estimable liabilities justified accruing the excess income in the Compensation Account and that he could not justify the excess reserves in that account on the basis of any actual contingencies.

25/    Price Waterhouse NMC informed Price Waterhouse Grace about the excess reserves. In November of 1991, Eugene Gaughan, the Price Waterhouse partner in charge of the audit of Grace's financial statements, first relayed to Smith his concerns that the excess reserves were not justified under GAAP. In early 1992, Gaughan and Thomas Scanlon, another Price Waterhouse accountant, met with Smith and Bolduc and told them that the reserves were not justified under GAAP and should be reported as income. Price Waterhouse Grace ultimately concluded, however, that the total effects of the excess reserves were not material to Grace's financial statements and issued an unqualified audit opinion. Armstrong knew Price Waterhouse Grace issued clean opinions but did not know Price Waterhouse Grace's rationale for allowing the reserves.

9

an additional $7.1 million of excess reserves in NMC's home care division, resulting in total excess reserves of almost $56 million.  As a result, Grace reported a 27 percent growth rate for the Health Care Group in 1992 as Smith had directed.

During 1992, Price Waterhouse NMC continued to express concern over the excess reserves.  In July 1992, Jamieson met with Armstrong and Nogelo and told them that the excess reserves would be a problem if they were significantly higher than in 1991.  When Jamieson became aware that the 1992 excess reserves were almost $56 million, he told Armstrong and Nogelo that the excess reserves were so large that he would be unable to issue an audit report containing an unqualified opinion on NMC's stand-alone financials were he required to do so.  26/ Price Waterhouse NMC again made entries on its year-end net effects schedule noting that it believed the excess reserves were improper and should be eliminated.  27/

Beginning in 1993, the excess reserves were used from time to time pursuant to Smith's instructions to bolster earnings.  28/  For example, NMC and Grace took $2.5 million from the excess reserves and recorded it as income in each of the second, third, and fourth quarters of 1993.  In addition, Grace and NMC used an additional $6 million in excess reserves during that year to mask revenue shortfalls.  As a result of the excess reserves being added to income, the Health Care Group was able to report a growth rate of 34.6 percent in 1993 instead of a growth rate of 14 percent.  29/

---

26/   No audit opinion was required because NMC was a wholly-owned subsidiary of Grace and not itself a reporting company.

27/   Gaughan and Scanlon, the lead Price Waterhouse Grace accountants, continued to object to the excess reserves.  Nevertheless, the Price Waterhouse audit team issued audit reports containing unqualified opinions that Grace's consolidated financial statements were in accordance with generally accepted auditing standards ("GAAS") and GAAP. Gaughan and Scanlon each consented to entry of an order directing them to cease and desist from committing or causing violations or future violations of the securities laws relating to maintenance of books and records and false filings with the Commission.  See supra notes 19 and 20.

28/   Accordingly, the amount of excess reserves in the Compensation Account remained relatively steady from 1993 to the first quarter of 1995, increasing in some quarters and decreasing in others, but generally remaining at approximately $50 million.  The excess reserves totaled $49.9 million at the end of 1993 and $48.9 million at the end of 1994.

29/   The use of the reserves to bolster earnings was effectuated by Armstrong instructing his staff to make entries reducing the amount of the excess reserves by the amount of additional income Grace said it required to meet its target.  The record is not entirely clear about where the income was recorded, but it indicates that Armstrong would also instruct his staff to make entries increasing the income of the Health Care Group.

10

In this way, Smith was able to use the excess reserves to reduce the fluctuations in the Health Care Group's reported earnings and to present a picture of a steadier earnings trend.  From 1991 through 1995, Grace reported income growth for the Health Care Group of 22.7 percent to 37.1 percent.  Without using the reserves to adjust income, the Group's income would have ranged from a loss of 7.9 percent to a gain of 60.5 percent.

Armstrong voiced concerns to Price Waterhouse NMC accountants and his superiors at NMC and Grace about the excess reserves throughout the period at issue.  30/  Armstrong did not believe that the reserves were recorded in accordance with GAAP or with FAS 5, and he would not have recorded the reserves had Smith not instructed him to do so.  He nevertheless achieved the required earnings targets by determining the amount of revenues that should be recorded as reserves and instructing his staff accordingly.  He did so even though he believed that no probable or reasonably estimable liabilities or exposures justified those reserves in the Compensation Account.  Armstrong was aware that Smith's only reason for recording the excess reserves was to achieve a targeted growth rate.

III.

The Division alleges that Armstrong participated in Grace's scheme to manipulate reported earnings by preparing books and records that falsely reported NMC's income and by providing these false figures to Grace.  The Division contends that Armstrong violated, and was a cause of Grace's violations of, the antifraud provisions of the federal securities laws as a result of this conduct.  It further contends that through this conduct Armstrong violated or was a cause of Grace's violations of various recordkeeping requirements and of Grace's periodic reporting requirements.  The Division asks that we enter a cease-and-desist order against Armstrong.  It also seeks an order denying Armstrong the privilege of appearing or practicing before the Commission pursuant to Rule of Practice 102(e)(1)(iii) on the basis of Armstrong's alleged willful violations of the federal securities laws.

A.    Violations of the Antifraud Provisions

Exchange Act Section 10(b) authorizes the Commission to prescribe rules, "as necessary or appropriate in the public interest or for the protection of investors," making it "unlawful for any person, directly or indirectly," to "use or employ in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance."  31/  Consistent with Section 10(b), Exchange Act Rule 10b-5(a) makes it unlawful for "any person," "directly or indirectly," to "employ any device, scheme, or artifice to defraud."  Rule 10b-5(c) makes it

---

30/     In 1995, NMC filed a Form 10 with the Commission in connection with Grace's plan to spin off NMC.  The Form 10 contained stand-alone financial statements for NMC for the previous three years.  The excess reserves were returned to income in the financial statements filed with the Form 10 at Armstrong's insistence.

31/     15 U.S.C. § 78j.

11

unlawful for "any person," "directly or indirectly," to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . ." 32/

The Supreme Court has stated that Section 10(b) encompasses deceptive "practices," 33/ deceptive "conduct," 34/ and deceptive "acts," 35/ and that its prohibition against employing "any manipulative or deceptive device or contrivance" includes a scheme to defraud. 36/ A person's conduct as part of a scheme constitutes a primary violation when the person directly or indirectly

---

32/    17 C.F.R. § 240.10b-5.

33/    Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 475-76 (1977).

34/    United States v. O'Hagan, 521 U.S. 642, 659 (1997).

35/    Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 173
       (1994).

36/    Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 n.20 (1976); see also Cooper v. Pickett,
       137 F.3d 616, 624-25 (9th Cir. 1997) (holding that plaintiffs could allege primary liability
       through a scheme to defraud because Rule 10b-5(a) makes it unlawful to employ any
       device, scheme, or artifice to defraud); Greenberg v. Bear Stearns & Co., 220 F.3d 22, 28
       (2d Cir. 2000) ("Knowing participation in a fraudulent scheme may render a participant
       liable under Section 10(b).").

       Armstrong contends that misrepresentation cases must allege that a defendant made a
       material misstatement or omission while market manipulation cases can be proved by a
       showing that a person participated in a fraudulent scheme, citing Thomson Kernaghan &
       Co. v. Global Intellicom, Inc., 2000 WL 640653 at *4-5 (S.D.N.Y.), an unreported
       decision. The significance of this assertion is unclear. A plaintiff may state a claim for a
       fraudulent scheme under subsections (a) and (c) of Rule 10b-5 even when not alleging
       "market manipulation." See In re Global Crossing Ltd. Sec. Litig., 322 F. Supp. 2d 319,
       336-37 (S.D.N.Y. 2004). Subsections (a) and (c) encompass much more than the illegal
       trading activity typically involved in a manipulation of the market for a stock:  they
       encompass the use of "*any* device, scheme or artifice," or "*any* act, practice, or course of
       business" used to perpetrate a fraud on investors. Id. at 336 (emphasis original).
       Schemes used to artificially inflate the price of stocks by creating phantom revenue fall
       squarely within both the language of section 10(b) and its broad purpose, to "prevent
       practices that impair the function of stock markets in enabling people to buy and sell
       securities at prices that reflect undistorted (though not necessarily accurate) estimates of
       the underlying economic value of the securities traded," and nothing in the language of
       section 10(b) or Rule 10b-5 or in the case law interpreting them shields a defendant from
       liability for direct participation in such a scheme. Id. at 337 (citations omitted).

12

engages in a manipulative or deceptive act as part of the scheme.  37/  Accordingly, a person may be primarily liable for violating Section 10(b) and Rule 10b-5 when he (1) engages in a manipulative or deceptive act as part of a scheme to defraud (2) with scienter.  38/

1.      Fraudulent scheme

Allocating a portion of NMC's income to excess reserves in 1991 to 1992 and using the reserves to inflate falsely and materially 39/ Grace's stated income in 1993, 1994, and the first

---

37/     See, e.g., Cooper, 137 F.3d at 624 (stating that Central Bank does not preclude liability based on allegations that a group of defendants acted together to violate the securities laws, as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme); In re Enron Corp. Sec. Litig., 258 F. Supp. 2d 576, 627 n.56 (S.D. Tex. 2003) (holding that a plaintiff must allege that each defendant in a scheme committed a manipulative or deceptive act in furtherance of the scheme to state a claim against that defendant); In re Lernout & Hauspie Sec. Litig., 236 F. Supp.2d 161, 173 (D. Mass. 2003) (authorizing primary liability for "any person who substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device . . . intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market").

38/     See, e.g., In re Global Crossing Ltd. Sec. Litig., 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004); Brown v. Kinross Gold, U.S.A., 343 F. Supp. 2d 957, 963 (D. Nev. 2004); see also In re Enron Corp. Sec. Litig., 235 F. Supp. 2d 549, 592 (S.D. Tex. 2002) ("If a plaintiff meets the requirements of pleading primary liability as to each defendant, i.e., alleges with factual specificity (1) that each defendant made a material misstatement (or omission) or committed a manipulative or deceptive act in furtherance of the alleged scheme to defraud, (2) scienter, and (3) reliance, that plaintiff can plead a scheme to defraud and still satisfy Central Bank.").  The Division is not required to prove reliance. SEC v. North American Research and Development Corp., 424 F.2d 63, 84 (2d Cir. 1970); SEC v. Blavin, 760 F.2d 706, 711 (6th Cir. 1985); SEC v. Rana Research, Inc., 8 F.3d 1358, 1363-64 (9th Cir. 1993).

39/     A fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).  A reasonable investor would have considered the true volatility of Grace's earnings to be important.  The Division's expert testified that the value of a corporation's shares depends heavily on its growth rate and the smoothness of the trend of that growth rate.  As a result of the false income figures Armstrong submitted to Grace, Grace reported income growth for the Health Care Group of 22.7 percent to 37.1 percent from 1991 through 1995, but would have reported a loss of 7.9 percent to a gain of 60.5 percent without using the

(continued...)

13

quarter of 1995 constituted a fraudulent scheme.  The purpose of the scheme was to create publicly-filed financial statements that deceived analysts and investors by portraying the Health Care Group's rate of income growth as steadier than in reality, and as consistent with analyst expectations.

Armstrong is primarily liable for his role in this deception.  It was Armstrong who calculated the amounts of income necessary to be held as excess reserves in order to achieve the falsified earnings and who recorded the excess reserves on NMC's financial statements.  Armstrong then directed his staff to make entries booking the necessary reserve amounts when NMC's income exceeded Grace's targets.  Later, he also instructed his staff to reduce reserves and increase income for the Health Care Group by the necessary amounts when Grace needed to use the reserves to meet earnings targets.  Finally, Armstrong submitted this inaccurate revenue information to Grace knowing that Grace would incorporate it into its financial statements and that the incorporation of this information would materially alter Grace's revenue as stated in its public filings.  Armstrong's conduct in thus falsifying NMC's revenues was the mechanism by which Grace achieved its goal of deceiving investors and analysts as to its income stream.  The principal purpose of these actions, reporting figures with respect to NMC's revenues and earnings that Armstrong knew to be false, was to create the false appearance that Grace had steady, consistent growth in income over a period of several years.  Armstrong also reviewed drafts of the Health Care Group's disclosures that were included in Grace's financial statements and confirmed that the financial results included in those disclosures conformed with the false and misleading numbers he had submitted to Grace.  The materially misleading revenue amounts reported in Grace's financial statements were caused entirely by the false figures reported by Armstrong.  We conclude that Armstrong engaged in deceptive acts as part of a scheme to defraud.  40/

---

39/   (...continued)
      excess reserves.  Armstrong does not contest the materiality of this information to Grace's
      financial statements.

40/   See, e.g., Cooper, 137 F. 2d at 624 (holding that plaintiffs stated a claim against company
      and analysts for primary liability under Section 10(b) where company made false
      statements to analysts and analysts issued reports based on statements that they knew
      were false as part of scheme to defraud company's shareholders by falsely presenting the
      company's current and future business prospects); Cf. Global Crossing, 322 F. Supp. 2d at
      336 (holding that plaintiffs stated a claim against accounting firm for primary liability
      under Section 10(b) where accounting firm directed misleading accounting scheme and
      sham swap transactions used to circumvent GAAP and inflate companies' revenues,
      actively participated in structuring each swap, and directly participated in the creation of
      misleading numbers that concealed these practices from investors); Lernout & Hauspie,
      236 F. Supp. 2d at 172-74 (holding that plaintiffs stated a claim against defendants for
      primary liability under Section 10(b) where defendants participated in scheme to hide
      research and development expenses, create fictitious revenue, and ultimately overstate
                                                                              (continued...)

14

Armstrong contends, relying principally on Wright v. Ernst & Young LLP 41/ and Shapiro v. Cantor 42/, that the Division's case against him fails because the Division did not establish that Armstrong directly made a false or misleading statement to Grace's investors.  The Supreme Court has rejected the contention that Section 10(b) "covers only deceptive statements or omissions." 43/  Since Wright and Shapiro are limited to analyses of culpability for misleading statements and do not address liability with respect to a fraudulent scheme, they are of limited relevance here.  44/

Moreover, even if Armstrong's liability were examined under Rule 10b-5(b) – which makes it unlawful for any person to "directly or indirectly" "make any untrue statement of a material fact" "in connection with the purchase of sale of a security" – Wright and Shapiro offer little to further his argument.  In Wright, the court held that an accounting firm was not primarily liable under Section 10(b) for misstatements in its client's press release when the firm had done nothing more than orally assure the company that its financial results were accurate.  The court held that the press release disseminating those financial results attributed no assurances to the accounting firm and explicitly stated that the results were unaudited.  Here, Armstrong actually calculated the false data, recorded it, and submitted it to Grace knowing that it would be incorporated into Grace's financial statements and make them materially false and misleading, and he reviewed drafts of documents included in Grace's financial statements and confirmed that

---

40/     (...continued)
        profits by setting up, funding, and operating shell companies knowing that these
        companies were designed solely to inflate profits artificially).

41/     152 F.3d 169 (2d Cir. 1998), cert. denied, 525 U.S. 1104 (1999).

42/     123 F.3d 717 (2d Cir. 1997).

43/     United States v. O'Hagan, 521 U.S. 642, 664 (1997); see also Affiliated Ute Citizens v.
        United States, 406 U.S. 128, 152-53 (1972) (stating that court of appeals erred when it
        held that there was no violation of Rule 10b-5 unless the record disclosed evidence of
        reliance on material fact misrepresentations because, although Rule 10b-5(b) requires the
        making of an untrue statement of material fact or the omission to state a material fact,
        Rule 10b-5(a) and (c), addressing schemes, devices, and courses of business, are not so
        restricted).

44/     See SEC v. U.S Environmental, Inc., 155 F.3d 107, 112 (2d Cir. 1998) (distinguishing
        Shapiro and Central Bank and holding defendant primarily liable because he "participated
        in the fraudulent scheme" by "himself committ[ing] a manipulative act") (citations
        omitted).

15

those documents conformed with the false data he had previously submitted. 45/  In Shapiro, the court held that an accounting firm was not primarily liable for its client's failure to disclose the material information that one of the client's principals had been convicted of fraud.  The court held that the accounting firm had no duty to disclose such information, and that the only information prepared by the firm in the client's offering memoranda, the client's financial projections, did not include any material misstatements.  Again, this case is distinguishable from the instant case, where Armstrong calculated, recorded, and then submitted to Grace the materially false information that was incorporated into Grace's financial statements.  A person can be primarily liable under Section 10(b) and Rule 10b-5 for directly or indirectly making an untrue statement of fact if that person, acting alone or with others, creates a false statement that reaches investors.  46/

Armstrong further argues that he cannot be held liable for violating Section 10(b) or Rule 10b-5 because he merely followed Smith's directions to carry out the fraudulent acts.  Case law does not support Armstrong's claim.  Courts have repeatedly affirmed that someone who participates in a fraudulent scheme by following his superior's instructions to carry out fraudulent

---

45/     The Wright court's requirement that a false statement be publicly attributed to the defendant was motivated by a desire not to undermine the reliance element of a private action under Rule 10b-5(b).  As noted, see supra note 38, the Division, unlike a private plaintiff, is not required to prove reliance.  Thus, the principal basis for the attribution requirement in Wright is not present here.

46/     See, e.g., In re Enron Corp. Sec. Litig., 235 F. Supp. 2d 549, 588 (S.D. Tex. 2002) (adopting Commission's proposed test for liability under Rule 10b-5(b) that a person is primarily liability when he, acting alone or with others, creates a misrepresentation or writes misrepresentations for inclusion in a document to be given to investors); In re ZZZZ Best Sec. Litig., 864 F. Supp. 960, 970 (C.D. Cal. 1994) (holding that anyone intricately involved in the creation of misstatements and the resulting deception to investors should be liable under Rule 10b-5(b)); In re Software Toolworks, 50 F.3d 615, 628 n.3, 629 (9th Cir. 1994) (holding that accounting firm could be primarily liable under Section 10(b) when it reviews and plays a significant role in drafting and editing letters to the Commission containing misstatements);  Cashman v. Coopers & Lybrand, 877 F. Supp. 425, 432 (N.D. Ill. 1995) (holding that accounting firm may be primarily liable for its central role in the drafting and formation of misstatements incorporated into company's prospectus); McNamara v. Bre-X Minerals Ltd., 57 F. Supp. 2d 396, 429 (E.D. Tex. 1999) (stating that, in amending their complaint, plaintiffs will adequately state a claim against defendants who allegedly played a significant role in developing allegedly false statements made by issuer).  In this case, Armstrong, by communicating the false information to Grace, was, if not directly, at least indirectly, making the false statements that appear in Grace's financial statements.

16

acts can be liable as a primary violator under Section 10(b) and Rule 10b-5. 47/  Armstrong carried out Smith's instructions to make fraudulent entries in NMC's books and records.  As discussed above, Armstrong's calculation of the false figures constituted deceptive acts as part of a fraudulent scheme.

Armstrong suggests that finding him liable will result in horrific consequences since any individual who discovers misstatements and investigates or inquires about them but fails to prevent their publication will henceforth be liable for antifraud violations.  Armstrong ignores a critical distinction between this hypothetical conduct and his own.  Armstrong did not merely discover potential misstatements; he determined the amounts necessary to be held in reserve, he prepared NMC's fraudulent financial results, and he provided these figures to Grace.  He also reviewed Grace's financial statements and confirmed that the fraudulent results he had submitted were included in the Health Care Group segment disclosures.  Thus, Armstrong was an active participant in the fraudulent scheme rather than an innocent bystander.

2.    <u>Scienter</u>

Scienter is a necessary element of a violation of Exchange Act Section 10(b) and Exchange Act Rule 10b-5. 48/  Scienter has been defined by the United States Supreme Court as a "mental state embracing intent to deceive, manipulate or defraud." 49/  The record contains abundant undisputed evidence that Armstrong acted with scienter.  Armstrong testified that he knew that Smith's sole reason for establishing the NMC excess reserves was to create the appearance of a growth rate for Grace's income that was different from Grace's true rate.  50/

---

47/    <u>See</u> <u>SEC v. U.S. Environmental, Inc.</u>, 155 F.3d at 112 (holding that someone who participates in a fraudulent scheme by committing manipulative acts may be liable as a primary violator despite the fact that someone else directed the scheme); <u>see also</u> <u>In re Enron Corp. Sec. Litig.</u>, 235 F.Supp. 2d at 588 (holding that a person can be a primary violator provided the person writes misrepresentations for inclusion in a document to be given to investors even if the person did not initiate the misrepresentations and the idea for the misrepresentations came from someone else).

48/    <u>See</u> <u>Aaron v. SEC</u>, 446 U.S. 680, 695, 697 (1980); <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 (1976); <u>Steadman v. SEC</u>, 603 F.2d 1126, 1134 (5th Cir. 1979), <u>aff'd</u>, 450 U.S. 91 (1981).

49/    <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. at 193.  Reckless behavior satisfies the scienter requirement.  <u>See, e.g.</u>, <u>SEC v. Dain Rauscher, Inc.</u>, 254 F.3d 852, 856 (9th Cir. 2001); <u>C.E. Carlson, Inc. v. SEC</u>, 859 F.2d 1429, 1435 (10th Cir. 1988); <u>see also</u> <u>SEC v. U.S. Environmental</u>, 155 F.2d at 111.

50/    For this reason, we find disingenuous Armstrong's arguments that he lacked scienter because he did not know NMC's false financial results would cause Grace's periodic

(continued...)

**Turner Exhibit 3**

17

Armstrong calculated the amounts to be allocated to the excess reserve accounts in order to achieve the income growth rate targeted by Smith and provided NMC's financial results to Grace knowing that they contained the falsely calculated income and reserve figures.  Armstrong conceded that no known contingencies justified the excess reserves and that the excess reserves did not accord with GAAP.  Armstrong also knew at the time he recorded the excess reserves that those reserves would be used to increase income artificially at some later point.  He was also aware that Grace used the NMC reports containing the misleading figures that he submitted to compile its financial statements and the Health Care Group segment disclosures in its Forms 10-K and 10-Q.  Armstrong reviewed Grace's draft Forms 10-K and 10-Q and confirmed that they contained the earnings numbers that NMC submitted to Grace.  He also knew that Price Waterhouse NMC believed that the excess reserves should be eliminated.  We conclude that Armstrong knowingly participated in the fraudulent scheme.

Armstrong argues that a finding that he acted with scienter is inappropriate because he repeatedly discussed his belief that the excess reserves did not accord with GAAP with his supervisors at NMC, senior management at Grace, Grace's internal audit staff, and Price Waterhouse NMC.  Armstrong's expressed concerns about the scheme, however, while establishing that he perhaps acted reluctantly, make clear that he acted knowingly.  51/ Armstrong's testimony about his conversations with others at NMC, Grace, and Price Waterhouse demonstrates that he knew that the excess reserves did not accord with GAAP but he nevertheless recorded the reserves and submitted reports to Grace that included these entries.

Armstrong next contends that he reasonably relied on the auditors at Price Waterhouse who issued unqualified audit opinions with respect to Grace's consolidated financial statements.  This argument is without merit.  When a respondent knows financial statements are false and misleading, he cannot "rely" in good faith on an auditor's willingness to issue an unqualified

---

50/     (...continued)
reports to contain material misstatements, he did not know what other liabilities existed for which the excess reserves might be needed, and he could reasonably assume that Grace's consolidation process would result in financial statements that did not contain material misstatements.  Armstrong knew that the principal purpose and effect of the scheme was to deceive investors by creating materially false financial statements.

51/     We also note that the record does not indicate that Armstrong ever raised his concerns specifically with Price Waterhouse Grace.

18

audit opinion with respect to those statements. 52/ Armstrong knew that the excess reserves did not accord with GAAP and that the excess reserves caused misstatements of the Health Care Group's results in Grace's financial statements. Armstrong also knew that Price Waterhouse NMC believed that the excess reserves did not accord with GAAP and wanted them removed and returned to earnings. 53/

Armstrong recorded the excess reserves and submitted them to Grace knowing that they did not accord with GAAP and that Grace desired the reserves for the purpose of earnings management. He also made entries reducing the reserves and increasing income when Grace instructed NMC to provide it with more income. Armstrong also knew that Grace used the numbers he submitted to compile drafts of its public filings related to the Health Care Group. He admits that he reviewed these drafts to confirm that the financial results included in those disclosures reflected the numbers he had reported to Grace. Finally, he acknowledges that he knew that the financial statements that Grace filed with the Commission reflected the excess reserves. Based on this extensive record evidence, we conclude that Armstrong participated with scienter in the fraudulent scheme to falsify Grace's earnings.

Armstrong committed deceptive acts as part of a scheme to defraud. He engaged in these acts with a high degree of scienter. Accordingly, we find that Armstrong willfully violated Section 10(b) of the Exchange Act and Rule 10b-5. 54/

---

52/    United States v. Erickson, 601 F.2d 296, 305-06 (7th Cir. 1979); see also Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1314 n.13 (C.D. Cal. 1996); SEC v. DCI Telecommunications, Inc., 122 F. Supp. 2d 495, 500 n.2 (S.D.N.Y. 2000); Cf. Howard v. SEC, 376 F.3d 1136, 1147 (D.C. Cir. 2004) (stating that where respondent can show that he relied reasonably on the advice of an attorney, this may be evidence that respondent acted in good faith).

53/    See, e.g., United States v. Evangelista, 122 F.3d 112, 117 (2d Cir. 1997) (rejecting good faith reliance defense in tax evasion case where defendant's conduct was contrary to accountant's advice).

54/    Armstrong acted willfully in violating the antifraud provisions. Acting willfully means intentionally committing the act that constitutes the violation. There is no requirement that the actor also be aware that he is violating one of the Rules or Acts. Arthur Lipper Corp. v. SEC, 547 F.2d 171, 180 (2d Cir. 1976) (quoting Tager v. SEC, 344 F.2d 5, 8 (2d Cir. 1965)); Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting Gearhart & Otis, Inc. v. SEC, 348 F.2d 798, 803 (D.C. Cir. 1965)); V.F. Minton Securities, Inc., 51 S.E.C. 346, 352 (1993), aff'd, 18 F.3d 937 (5th Cir. 1994) (Table). Armstrong acted willfully because he intentionally committed the deceptive acts.

19

B.      Causing Violations of the Antifraud Provisions

Armstrong also was a cause of violations of the antifraud provisions of the securities
laws.  An individual is a cause of a violation if 1) a primary violation occurred; 2) the individual
committed an act or omission that was a cause of the violation; and 3) the individual knew or
should have known that his conduct would contribute to the violation.  55/   Armstrong
participated in and caused a fraudulent scheme in violation of Section 10(b) of the Exchange Act
and Rule 10b-5, whereby Grace issued financial statements that contained material
misstatements.   Armstrong was a cause of these violations by calculating and providing Grace
with the figures that enabled it to report the fraudulent growth rates.  Armstrong knew that his
conduct would contribute to these violations because he knew that Grace incorporated these
figures into its financial statements.  As a result, Armstrong is liable as a cause of violations of
the antifraud provisions.

C.      Periodic Reporting Requirement Violations

Exchange Act Section 13(a) and Exchange Act Rules 13a-1 and 13a-13 require public
companies whose securities are registered pursuant to Exchange Act Section 12 to file annual
and quarterly reports with the Commission.  The obligation to file these reports includes an
obligation that the filings be accurate.  56/  The rules require that the reports comply with
Regulation S-X, which in turn requires that financial statements be prepared in conformity with
GAAP.  57/  Rule 12b-20 requires an issuer to provide any additional information in the reports
necessary in order to make the reports not misleading.  58/

Grace violated Exchange Act Section 13(a) and Rules 12b-20, 13a-1 and 13a-13 because
its Form 10-K and Form 10-Q filings included financial statements that were materially false and
misleading and that did not accord with GAAP.  Armstrong was a cause of these violations
because he calculated and recorded the excess reserves, submitted financial reports containing
the effect of the reserves to Grace and, through his subsequent review of Grace's financial
statements, ensured that his false figures had been incorporated into those statements.  Armstrong
knew that his conduct would contribute to the violations because he knew that Grace used these

---

55/     Robert M. Fuller, Exchange Act Rel. No. 48406 (Aug. 25, 2003), 80 SEC Docket 3539,
        3545.

56/     United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991).

57/     The Rockies Fund, Inc., Exchange Act Rel. No. 48590 (Oct. 2, 2003), 81 SEC Docket
        703, 729, reconsideration denied, Exchange Act Rel. No. 49788 (June 1, 2004), 82 SEC
        Docket 3764.

58/     See SEC v. Falstaff Brewing Corp., 629 F.2d 62, 72 (D.C. Cir.) (holding that company
        violated Rule 12b-20 by failing to update Form 10-K that did not disclose certain material
        facts related to litigation), cert. denied, 449 U.S. 1012 (1980).

statements in preparing its public filings.  As a result, we find that Armstrong was a cause of Grace's violations of its periodic reporting requirements.

D.      Recordkeeping Violations

        Exchange Act Section 13(b)(2)(A) requires issuers of securities registered pursuant to Exchange Act Section 12 to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer. 59/ Exchange Act Section 13(b)(5) provides that no person shall knowingly falsify any book, record, or account subject to Section 13(b)(2)(A).  Exchange Act Rule 13b2-1 provides that no person shall, directly or indirectly, falsify or cause to be falsified any book, record or account subject to Section 13(b)(2)(A).

        Grace violated Exchange Act Sections 13(b)(2)(A) and 13(b)(5) and Rule 13b2-1 by recording the false and misleading entries concerning the excess reserves on its books and records and therefore maintaining books and records that did not accurately and fairly reflect its transactions and assets.  Armstrong was a cause of Grace's violations of these provisions because he recorded the excess reserves on NMC's books knowing that they misstated NMC's financial results and transmitted these entries to Grace knowing that Grace would incorporate this information into its own books and records.  Armstrong himself violated Exchange Act Rule 13b2-1 because he caused Grace's books and records to be falsified as a result of these actions.

E.      Rule 102(e)

        Rule 102(e)(1)(iii) provides that the "Commission may censure a person or deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who . . . (iii) willfully violated . . . any provision of the Federal securities laws or the rules and regulations thereunder."  Armstrong contends that, even if he is found to have willfully violated the securities laws, the Rule is nevertheless inapplicable to his conduct in this matter. Armstrong argues (1) that the Rule requires that he appear or practice before the Commission at the time of the misconduct underlying the willful violations and that his actions did not constitute appearing or practicing before the Commission; and (2) that the Rule applies only to licensed accountants and that he was no longer licensed as an accountant at the time of the misconduct.

---

59/     The law judge cites both Exchange Act Section 13(b)(2)(A) and 13(b)(2)(B) before
        concluding that Armstrong caused violations of Section 13(b)(2).  Section 13(b)(2)(B) of
        the Exchange Act requires every reporting company to devise and maintain a system of
        internal accounting controls sufficient to provide reasonable assurances that transactions
        are recorded as necessary to permit the preparation of financial statements in conformity
        with GAAP.  The Order Instituting Proceedings charged Armstrong with being a cause of
        Grace's violations of Section 13(b)(2) generally, and the parties did not address whether
        Armstrong was a cause of a violation of Section 13(b)(2)(B).  Accordingly, we do not
        reach the issue of whether Armstrong caused a violation of Section 13(b)(2)(B).

21

1.    <u>Appearing and Practicing Before the Commission</u>

The law judge found that Armstrong did not appear or practice before the Commission and that such a finding is necessary in order for the Commission to deny a person the privilege of appearing or practicing before it pursuant to Rule 102(e)(1)(iii).  We reject that conclusion.

Even if Rule 102(e) is construed to require a person to have been appearing or practicing before the Commission while violating the securities laws, we reject the law judge's conclusion that Armstrong did not appear or practice because he was not an officer of a public company and did not prepare any of the reports that Grace filed with the Commission because he did not actually draft them.  Rule 102(f) provides that "practicing before the Commission" shall include, but not be limited to:

> (1) Transacting any business with the Commission; and

> (2) The preparation of any statement, opinion or other paper by any attorney, accountant, engineer or other professional or expert, filed with the Commission in any registration statement, notification, application, report or other document with the consent of such attorney, accountant, engineer or other professional or expert. <u>60</u>/

The text of the Rule does not specify that a person must sign a document filed with the Commission.  Moreover, the term "preparation" of a document is, we believe, sufficiently broad to encompass the preparation of data to be included in a document filed with the Commission, at least where, as here, the data was prepared for the express purpose of being included in such a document.

The law judge's holding would allow accountants to escape discipline under Rule 102(e) simply by instructing someone else to draft, sign, and file fraudulent documents.  The Rule, however, recognizes that financial statements often incorporate information created, compiled, or edited by accountants who are not responsible for signing or filing the financial statements.  Thus, practicing before the Commission includes computing the figures and supplying the data incorporated into Commission filings and consenting to their incorporation.  As a result, Armstrong appeared and practiced before the Commission because he computed the amounts of income needed to be held in reserve to achieve Grace's targeted growth rates, prepared the materially false financial reports based on these figures, and submitted this information to Grace knowing that Grace would incorporate it into its Commission filings.  Armstrong consented to the inclusion of these figures because he reviewed Grace's draft financial statements containing these figures, confirmed that the figures reconciled with the numbers that he had submitted, and suggested no changes to the numbers.

---

<u>60</u>/     17 C.F.R. § 201.102(f).

22

Our conclusion comports with the remedial purpose of Rule 102(e).  61/   The Commission disciplines professionals pursuant to Rule 102(e) in order to "protect the integrity of its own processes." 62/   The Rule "provides the Commission with the means to ensure that those professionals, on whom the Commission relies heavily in the performance of its statutory duties, perform their tasks diligently and with a reasonable degree of competence." 63/   The reliability of the disclosure process is impaired if incompetent or unethical accountants are permitted to certify financial statements.  64/   The reliability of the disclosure process is equally impaired if such accountants are permitted to participate in the preparation of financial statements certified and filed with the Commission.  As a result, disciplining accountants pursuant to Rule 102(e) for effecting a fraudulent scheme by computing the figures and providing the information incorporated into Commission filings furthers the Rule's remedial purpose of protecting the integrity of the Commission's processes.

This interpretation also accords with the settled cases in which we have denied the privilege of appearing or practicing before the Commission to accountants serving as officers of privately-held subsidiaries of public companies who participated in fraudulent schemes to misstate the parent company's financial statements by providing fraudulent figures that were

--------

61/     Congress embraced our application of Rule 102(e) by codifying the rule substantially verbatim in Section 4C of the Exchange Act as a result of the Sarbanes-Oxley Act of 2002.  It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the "congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 846 (1986) (citations omitted); see also Lorillard v. Pons, 434 U.S. 575, 581 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change[.]  So too, where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.") (citations omitted);  Cf. Herman & MacLean v. Huddleston, 459 U.S. 375, 384-85 (1983) (stating that Congress's decision to leave Section 10(b) intact while comprehensively revising the securities laws suggested that Congress ratified the well-established judicial interpretation of the implied private right of action under Section 10(b)); Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 813 (1989) ("When Congress codifies a judicially defined concept, it is presumed, absent an express statement to the contrary, that Congress intended to adopt the interpretation placed on that concept by the courts.").

62/     Touche Ross & Co. v. SEC, 609 F.2d 570, 582 (2d Cir. 1979).

63/     Id.

64/     Id. at 581.

23

incorporated into the parent company's reports filed with the Commission.  65/  Signing fraudulent statements filed with the Commission was not a prerequisite in any of these cases either for a person to have been appearing or practicing before the Commission or for a finding that discipline was warranted pursuant to Rule 102(e).  66/

In any event, the text of Rule 102(e) contains no requirement that a person must be appearing and practicing before the Commission at the time of the conduct on which the Commission's findings are based.  Rule 102(e)(1) provides that a person may be denied the privilege of appearing or practicing before the Commission once the Commission makes one of three findings:  (i) that the person does not possess the requisite qualifications to represent others; (ii) that the person lacks character or integrity or has engaged in unethical or improper professional conduct; or (iii) that the person has willfully violated or willfully aided and abetted

---

65/     Robert S. Barton, Exchange Act Rel. No. 41181 (Mar. 18, 1999), 69 SEC Docket 1053 (denying privilege of appearing and practicing before Commission to vice president of finance of a private, wholly-owned subsidiary of a public reporting company who recorded fictitious assets and entries on the subsidiary's books to meet earnings targets); Maria Mei Wenner, Exchange Act Rel. No. 40290 (July 31, 1998), 67 SEC Docket 2157 (denying privilege of appearing and practicing before Commission to chief financial officer of privately-held subsidiary of public reporting company who prepared and sent to parent company monthly and quarterly reports that included fraudulent entries); Gary A. Prince, Exchange Act Rel. No. 38765 (June 24, 1997), 64 SEC Docket 2154 (denying privilege of appearing or practicing before Commission to accountant whose license had lapsed who served as officer of privately-held subsidiary of public reporting company and who participated in fraudulent scheme to overstate parent company's revenues).

The facts of Maria Mei Wenner are very similar to those presented here.  Wenner was the chief financial officer of a privately-held subsidiary of a public reporting company who was responsible for compiling the subsidiary's sales and financial data which was then forwarded to the parent company.  Wenner participated in a fraudulent scheme, orchestrated by her superiors, to overstate the parent company's revenue by booking millions of dollars of fictitious sales.  She then prepared and sent to the parent company monthly reports and quarterly financial statements that included the fraudulent entries. The parent company's financial statements that were filed with the Commission included the effect of these fraudulent entries.  We held that Wenner violated the federal securities laws and denied her the privilege of appearing or practicing before us as an accountant.

66/     While the cited authorities are settled cases, they reflect the Commission's established view that officers of privately-held subsidiaries of public companies who provide fraudulent figures that are incorporated into public company reports filed with the Commission are subject to Rule 102(e).  See Herbert Moskowitz, Exchange Act Rel. No. 45609 (Mar. 21, 2002), 77 SEC Docket 481, 495-96 (rejecting respondent's suggestion that no precedent supported liability because settled cases reflected Commission's view that liability was appropriate in respondent's situation).

the violation of any provision of the federal securities laws or rules and regulations thereunder. Denying the person the privilege of appearing or practicing before the Commission is the authorized remedy once the Commission makes one of the findings specified in Rule 102(e)(1)(i)-(iii); appearing or practicing before the Commission at the time of the misconduct is not the precondition to imposing that remedy. Armstrong provides no compelling reason for imputing a requirement that a person must be appearing or practicing before the Commission at the time of the misconduct. Accordingly, we conclude that we have the authority to suspend Armstrong pursuant to Rule 102(e) because he willfully violated the federal securities laws.

We conclude that Armstrong in fact appeared or practiced before the Commission (assuming that Rule 102(e) imposes such a requirement) because he computed the figures and provided the data included in Grace's financial statements filed with the Commission and consented to the inclusion of this information. We further conclude that the Commission may discipline individuals pursuant to Rule 102(e) even if those individuals did not appear or practice before the Commission while committing willful violations of the securities laws.

2.   Definition of Accountant

Armstrong's contention that Rule 102(e)(1)(iii) is limited to persons licensed to practice as accountants is incorrect. The text of the Rule contains no such restriction. Rule 102(e)(1)(iii) provides that the Commission may censure "any person" or deny "any person" the privilege of appearing or practicing before it if it finds that such person willfully violated the federal securities laws. The Rule does not limit the definition of "any person" to a person licensed to practice accounting. The integrity of the Commission's processes would be threatened, moreover, if unlicensed accountants or accountants whose licenses lapsed could escape discipline for willfully violating the federal securities laws. These accountants often serve as corporate officers, and the integrity of the Commission's processes is threatened when they execute fraudulent schemes by providing falsified financial information just as when licensed accountants engage in this conduct. We find that Armstrong's request that we limit the Rule to persons licensed to practice as accountants contradicts the plain language and the purpose of Rule 102(e).

Armstrong argues that the reference in subsection (e)(1)(iv) to "persons licensed to practice as accountants" indicates that the Commission intended to limit Rule 102(e) to licensed accountants. That subsection, however, merely defines the term "improper professional conduct" for purposes of Rule 102(e)(1)(ii). This definition is inapplicable to Rule 102(e)(1)(iii).

Armstrong's suggested reading of Rule 102(e) is contrary to principles of statutory construction. Drafters are presumed to act intentionally and purposely in including particular language in one section of a statute or rule but omitting it in another section of the same statute or rule. 67/ Where one subsection of a statute contains a phrase limiting that subsection and other subsections do not, courts generally have been reluctant to limit the other subsections because the drafters could have included the phrase had they intended the other subsections to be

---

67/    See Duncan v. Walker, 533 U.S. 167, 173 (2001).

25

similarly circumscribed.  68/  Thus, the fact that the drafters of the Rule included the phrase "person licensed to practice as accountants" in one subsection, even assuming that phrase was meant to limit the meaning of accountants rather than delineate the application of "improper professional conduct," does not mean that other subsections should be similarly limited.  As a result, we reject Armstrong's contention that Rule 102(e)(1)(iii) applies only to persons licensed to practice as accountants and hold that he may be disciplined pursuant to that Rule.  69/  The Commission therefore has the ability to deny Armstrong the privilege of appearing or practicing before it pursuant to Rule 102(e).

IV.

Armstrong challenges our authority to decide this action on two grounds.  Armstrong first contends that the five-year statute of limitations provided in 28 U.S.C. § 2462 and applied in Johnson v. SEC precludes us from considering violations that occurred before December 22, 1993.  70/  He states that the Commission instituted this proceeding on December 22, 1998, but the fraudulent scheme began before December 22, 1993.  Armstrong's argument is without merit. We may consider acts outside the limitations period as evidence of a respondent's motive, intent, or knowledge in committing violations within the limitations period.  71/  The violations in this case were ongoing, and substantial portions of the misconduct underlying the findings of willful

---

68/ See Florida Public Telecommunications Ass'n, Inc. v. FCC, 54 F.3d 857, 860 (D.C. Cir. 1995) (refusing to circumscribe subsection's applicability where other subsections contained a phrase limiting those subsections because Congress could have included the same phrase had it intended to circumscribe similarly that subsection).

69/ This reading of the Rule also conforms with past settled cases in which we have suspended accountants under Rule 102(e)(1)(iii) who either were not licensed or who had allowed their licenses to lapse at the time of their misconduct.  James A. Terrano, Exchange Act Rel. No. 39485 (Dec. 23,1997), 66 SEC Docket 494 (lapsed license); Elliot Stumacher, Exchange Act Rel. No. 39124 (Sept. 24, 1997), 65 SEC Docket 1356 (not licensed); Gary A. Prince, 64 SEC Docket 2154 (lapsed license); Aura Systems, Inc., Securities Act Rel. No. 7352 (Oct. 2, 1996), 62 SEC Docket 2814 (lapsed license); Gerald M. Kudler, Exchange Act Rel. No. 36598 (Dec. 18, 1995), 60 SEC Docket 2871 (not licensed); Alan S. Goldstein, Exchange Act Rel. No. 34641 (Sept. 6, 1994), 57 SEC Docket 1544 (lapsed license).

70/ Section 2462 provides a five-year statute of limitations for "an action, suit, or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise."  In Johnson v. SEC, the D.C. Circuit held that Section 2462 applied to a Commission administrative proceeding imposing a censure and suspension.  87 F.3d 484 (D.C. Cir. 1996).

71/ See Sharon M. Graham, 53 S.E.C. 1072, 1089 n.47 (1998), aff'd, 222 F.3d 994 (D.C. Cir. 2000).

26

violations occurred within the limitations period.  72/  In fact, the misconduct occurring within the limitations period resulted in the deception of investors by grossly inflating Grace's income. As a result, Armstrong committed willful violations within the limitations period, and neither the cease-and-desist nor Rule 102(e) proceedings are time barred.  73/

Armstrong next argues that the Commission should dismiss this proceeding because it has not been decided within a "reasonable period of time" as required by Section 555(b) of the Administrative Procedure Act ("APA").  74/  He contends that the two and a half year delay occasioned by the Commission's interlocutory review of the law judge's dismissal of the Rule 102(e) charges constituted unreasonable delay.  Armstrong contends erroneously that the interlocutory review served no purpose.  The Commission's order directing the law judge to reinstate the Rule 102(e) charges avoided a subsequent second hearing on those charges after the conclusion of the initial hearing and the appeal therefrom.  Armstrong's reliance on Section 555(b), moreover, is misplaced.  75/  The requirement that agencies act within a reasonable period of time is enforced through Section 706(1) of the APA which permits courts to compel

---

72/    The pre-1994 conduct may be used to establish Armstrong's motive, intent, and knowledge.  Moreover, Rule 102(e) proceedings and cease-and-desist proceedings are remedial in nature.  See, e.g., McCurdy v. SEC, 396 F.3d 1258, 1264-65 (D.C. Cir. 2005); Herbert Moskowitz, Exchange Act Rel. No. 45609 (Mar. 21, 2002), 77 SEC Docket 481, 500.  Such proceedings are not subject to Section 2462.  See Johnson, 87 F.3d at 489-90.

73/    Armstrong observes that the Commission recently dismissed charges against a respondent based on the potential applicability of Section 2462 to all but a brief period of respondent's conduct.  See Clarke T. Blizzard, Investment Advisers Act Rel. No. 2253 (June 23, 2004), 83 SEC Docket 362, 377-78.  In Blizzard, we exercised our equitable discretion and dismissed charges against one of the respondents because of the potential applicability of Section 2462 to all but one week of the alleged misconduct and because we concluded that the conduct that occurred during that week was insufficient to find the respondent liable.  Here, in contrast, at least a year of Armstrong's conduct occurred inside the limitations period and that period included some of Armstrong's most egregious misconduct in which he deceived investors by using excess reserves to inflate Grace's income.

74/    To the extent Armstrong is arguing that this proceeding is barred by laches, the defense of laches is not available against federal agencies acting to protect the public interest.  See United States v. Alvarado, 5 F.3d 1425, 1427 (11th Cir. 1993); David Disner, 52 S.E.C. 1217, 1223 (1997).  Armstrong would also be required to establish prejudice if laches applied.  See Danjac LLC v. Sony Corp., 263 F.3d 942, 954-56 (9th Cir. 2001).

75/    Section 555(b) provides that "[w]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it."  5 U.S.C. § 555(b).

agency action.  76/  These provisions typically are used to ensure agency action in rulemaking proceedings.  77/  Section 555(b) may not authorize dismissing enforcement proceedings.  78/

In any event, Armstrong has not made the required showing of prejudice resulting from a delay.  79/  Neither Armstrong's claim that the proceeding's pendency harmed his career  80/ nor his generalization that the long delay rendered witnesses unavailable and caused memory lapses establishes prejudice.  81/  Armstrong specifies three witnesses who became unavailable due to death or disability.  He alleges that their testimony that Grace's senior management and auditors vetted the reserves would have bolstered his defense.  Our finding that Armstrong acted with

---

76/ Section 706(1) provides that a court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

77/ See, e.g., In re International Chemical Workers Union, 958 F.2d 1144 (D.C. Cir. 1992) (ordering OSHA to issue rule); see also Public Citizen Health Research Group v. Comm'r, Food and Drug Administration, 740 F.2d 21, 32 (D.C. Cir. 1984) ("These provisions give courts authority to review ongoing agency proceedings to ensure that they resolve the questions in issue within a reasonable time."), disapproved on other grounds, TRAC v. FCC, 750 F.2d 70 (D.C. Cir. 1984).

78/ See United States v. Popovich, 820 F.2d 134, 138 (5th Cir.) (stating that the plain language of the APA indicates that Section 555 and 706 may be used to compel but may not be used to dismiss agency action unreasonably delayed), cert. denied, 484 U.S. 976 (1978).  But see Kenneth Sebren, 1998 EPA ALJ Lexis 116 (Oct. 7, 1998) (dismissing enforcement action for violating Section 555(b)); Health Care Products, 1996 EPA ALJ Lexis 142 (June 13, 1996) (same).

79/ Panhandle Coop. Ass'n v. EPA, 771 F.2d 1149, 1153 (8th Cir. 1985).

80/ See Feeley & Willcox Asset Management Corp. and Michael J. Feeley, Order Denying Motion for Reconsideration, Securities Act Rel. No. 8303 (Oct. 9, 2003), 81 SEC Docket 919, 923 n.15 (finding no prejudice from respondent's assertion that years-long delay rendered his professional livelihood and ability to continue making a living uncertain).

81/ See Anthony A. Adonnino and Thomas Cannizzaro, Exchange Act Rel. No. 48618 (Oct. 9, 2003), 81 SEC Docket 981, 997 (finding no prejudice despite applicants' claim that delay rendered witnesses unavailable and impaired memories because applicants did not identify witnesses who became unavailable or point to specific instances of material memory lapses), aff'd, No. 03-41111 (2d Cir. 2004).  Armstrong cites one witness's faded memory but fails to show that this lapse prejudiced his case.  See Jacob Wonsover, Exchange Act Rel. No. 41123 (Mar. 1, 1999), 69 SEC Docket 694, 715 ("'[N]ot every loss, and particularly not every loss of memory, will prejudice the defense of a case.'") (citation omitted), petition denied, 205 F.3d 408 (D.C. Cir. 2000).

28

scienter despite any reliance on Grace's management or auditors belies this notion.  82/  As a result, dismissal is unwarranted because Armstrong demonstrates no prejudice from any alleged delay.

V.

The Commission has broad discretion to set sanctions in administrative proceedings. 83/ Armstrong maintains that there is no basis in the public interest for the imposition of a cease-and-desist order.  84/  He contends that he had no responsibility for Grace's financial statements and that he acted reasonably under the circumstances.  Conversely, the Division contends that the cease-and-desist order imposed by the law judge is warranted and that we should also deny Armstrong the privilege of appearing or practicing before the Commission.  The Division contends that Armstrong remains a threat to the integrity of the Commission's processes.

A.     Cease-and-Desist Order

In KMPG Peat Marwick LLP, we stated that the range of traditional factors relevant to a determination that a sanction is in the public interest guide our discretion in imposing a cease-and-desist order.  85/  These factors are:

> the seriousness of the violation, the isolated or recurrent nature of the violation, the respondent's state of mind, the sincerity of the respondent's assurances against future

---

82/     See Mark H. Love, Exchange Act Rel. No. 49248 (Feb. 13, 2004), 82 SEC Docket 686, 695-96 (finding no prejudice from death or infirmity of potential witnesses because NASD based its decision on undisputed facts and therefore these individuals' testimony was immaterial); Kingsley, Jennison, McNulty & Morse, Inc., 51 S.E.C. 904, 911 (1993) (finding no prejudice from death of key potential witness because Commission based its findings on other testimony).

83/     See, e.g., Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 188-89 (1973) ("The fashioning of an appropriate and reasonable remedy is for the Secretary [of Agriculture], not the court. The court may decide only whether under the pertinent statute and relevant facts, the secretary made 'an allowable judgement in [his] choice of the remedy.'") (quoting Jacob Siegel Co. v. FTC, 327 U.S. 608, 612 (1946)).

84/     Section 21C provides that the Commission may order any person who violated any provision of the Exchange Act or rule or regulation thereunder, or caused such violation, to cease and desist from committing or causing such violation and any future violation of the same provision, rule, or regulation.  15 U.S.C. § 78u-3(a).

85/     KPMG Peat Marwick LLP, Exchange Act Rel. No. 43862 (Jan. 19, 2001), 74 SEC Docket 384, 436, reconsideration denied, Exchange Act Rel. No. 44050 (Mar. 8, 2001), 74 SEC Docket 1351, petition denied, 289 F.3d 109 (D.C. Cir. 2002).

29

violations, the respondent's recognition of the wrongful nature of his or her conduct, and the respondent's opportunity to commit future violations. In addition, we consider whether the violation is recent, the degree of harm to investors or the marketplace resulting from the violation, and the remedial function to be served by the cease-and-desist order in the context of any other sanctions being sought in the same proceedings. This inquiry is a flexible one and no one factor is dispositive.  86/

Moreover, we held that, in imposing a cease-and-desist order, we must determine that there is some risk of future violation.  87/

Applying the above factors to Armstrong's violations, we find that most of them weigh in favor of a cease-and-desist order.  The principal purpose and effect of Armstrong's conduct was to deceive investors through the filing with the Commission of materially misstated financial statements for Grace for all of its required periodic filings from the end of 1991 until the first quarter of 1995.  88/  As discussed above in finding that Armstrong violated the antifraud provisions, he acted with the highest degree of scienter.  He knowingly engaged in conduct that he knew would result in materially false filings with the Commission.  He knew that the purpose of the fraudulent scheme was to mislead investors as to Grace's true income growth rates.

Armstrong has not offered any assurances against future violations.  In fact, his failure to recognize the wrongful nature of his conduct and his continued insistence that he acted appropriately raise troubling questions about his understanding of his obligations under the securities laws.  His occupation presents ample opportunities to commit future violations.

---

86/    Id.; see also Steadman v. SEC, 603 F.2d 1126, 1140 (5th Cir. 1979), aff'd, 450 U.S. 91 (1981).

87/    KPMG Peat Marwick LLP, 74 SEC Docket at 429.  The risk of future violations required to support a cease-and-desist order is significantly less than that required for an injunction.  Id. at 435.  We consider the entire record because 28 U.S.C. § 2462 does not apply to cease-and-desist proceedings.  See Edgar B. Alacan, Exchange Act Rel. No. 49970 (July 6, 2004), 83 SEC Docket 842, 870.

88/    See Geiger v. SEC, 363 F.3d 481, 489 (D.C. Cir. 2004) (affirming cease-and-desist order because respondent's egregious conduct justified inference that violation would be repeated and respondent's assertion that he did nothing wrong did little to dispel this inference).  In Geiger, respondent acted egregiously even though others devised the scheme because he participated despite numerous indicators suggesting an unregistered distribution.  See Charles F. Kirby, Exchange Act Rel. No. 47149 (Jan. 9, 2003), 79 SEC Docket 1081, 1104-06.  Similarly, Armstrong acted egregiously even though Grace directed the scheme because he created the fraudulent entries despite several indications that his conduct constituted growth rate manipulation.  See also Alacan, 83 SEC Docket at 868 (imposing cease-and-desist order based on respondent's egregious conduct raising a sufficient risk of future violation).

30

Armstrong currently works as a chief financial officer for a private company and intends to continue working as a financial executive.

The harm to investors and the marketplace when corporate officers misrepresent company earnings cannot be overstated.  89/  Investors who buy or sell stock based on the erroneous information are harmed greatly.  The public's confidence in the marketplace erodes when the fraudulent scheme is exposed.  90/

The only KPMG factor that militates against imposition of a cease-and-desist order is that Armstrong's violations are not recent.  We find, however, that this consideration is outweighed by the other factors previously discussed.  91/  An additional factor, not mentioned in KPMG, deserves consideration here.  While we disagree with Armstrong that his efforts to express his concerns about the impropriety of the excess reserves absolves him of liability for his participation in the scheme, there is no dispute that he did make such efforts.  Given, however,

---

89/  Dissemination of false or misleading information by companies to members of the investing public may distort the efficient workings of the securities markets and injure investors who rely on the accuracy and completeness of the company's public disclosures. SEC v. Dresser Indus., Inc., 628 F.2d 1368, 1377 (D.C. Cir.), cert. denied, 449 U.S. 993 (1980).  Indeed, in addition to the heavy sanctions obtained against the other corporate officers of both Grace and NMC, the Commission obtained a cease-and-desist order against Grace together with an order requiring Grace to establish a fund of $1 million to be used to further awareness and education relating to financial statements and generally accepted accounting principles.  W.R. Grace & Co., Exchange Act Rel. No. 41578 (June 30, 1999), 70 SEC Docket 170.

90/  Cf. Schellenbach v. SEC, 989 F.2d 907, 913 (9th Cir. 1993) ("An action brought by the Commission, however, unlike a private damage suit, need not include proof of harm. Securities regulations are designed to protect the general public.  Schellenbach's falsification of records exposed Brook's customers to undue risk and it deprived investors of the protections that Congress and the executive branch have put in place . . . . Thus, Schellenbach's depiction of his crime as a victimless offense is inaccurate.") (citations omitted).

91/  See, e.g., City of Miami, Florida, Exchange Act Rel. No. 47552 (Mar. 21, 2003), 79 SEC Docket 3362, 3382-83 (imposing cease and desist order despite age of the misconduct because cease-and-desist order helps prevent future violations where respondent made repeated misrepresentations in its financial statements, respondent's misstatements caused investors to purchase respondent's bonds without full information, and respondent shifted blame to others without taking any responsibility for its own conduct).

31

that no additional sanctions have been sought against Armstrong 92/ and the degree to which the other factors weigh in favor of a cease-and-desist order, we believe that the public interest warrants a cease-and-desist order.  93/

We conclude that Armstrong's misconduct demonstrates a sufficient risk of future violations and that it is in the public interest to order Armstrong to cease and desist from committing or causing any violations or future violations of the applicable provisions of the federal securities laws and the Commission's rules.

B.      Rule 102(e) suspension

These same factors could provide a basis for us to conclude that Armstrong should be disciplined pursuant to the Commission's Rule 102(e).  Rule 102(e) is designed to protect the integrity of the Commission's processes, and we fulfill this mandate by suspending accountants who violate the antifraud provisions of the securities laws.  Nonetheless, in light of the unique

---

92/     The Commission does not have the authority to seek additional sanctions against Armstrong in an administrative proceeding, see Exchange Act Section 15, 15 U.S.C. § 78o, but the Commission could have sought injunctive and further relief in court.  See Exchange Act Section 21, 15 U.S.C. § 78u.  Rule 102(e) is not used as an additional weapon in the Commission's enforcement arsenal but rather to determine whether a person's professional qualifications, including his character and integrity, are such that he is fit to appear and practice before the Commission.  Touche Ross, 609 F.2d at 579.

93/     See Charles K. Seavey, Advisers Act Rel. No. 2119 (Mar. 27, 2003), 79 SEC Docket 3455, aff'd, 111 Fed. Appx. 911 (9th Cir. 2004).  In Seavey, we imposed sanctions, including a cease-and-desist order, on a mutual fund manager who sent investors a letter knowing that the letter contained material misstatements and omissions.  We recognized that the respondent attempted to persuade his supervisors to disclose the problems with the fraudulent transaction and tried to undo the damage caused by the fraudulent scheme, but we imposed the sanctions because the respondent's arguments demonstrated a lack of appreciation for his responsibility as an associated person of an investment adviser.

**Turner Exhibit 3**

32

circumstances here, we have determined, as an exercise of our equitable discretion, not to impose any suspension pursuant to Rule 102(e)(1)(iii) here.

   An appropriate order will issue. 94/

   By the Commission (Chairman DONALDSON and Commissioners GLASSMAN, GOLDSCHMID, ATKINS, and CAMPOS).

Jonathan G. Katz
Secretary

---

94/   We have considered all of the parties' contentions.  We have rejected or sustained these contentions to the extent that they are inconsistent or in accord with the views expressed in this opinion.

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Rel. No.51920 / June 24, 2005

ACCOUNTING AND AUDITING ENFORCEMENT
Rel. No. 2264 / June 24, 2005

Admin. Proc. File No. 3-9793

---

In the Matter of

ROBERT W. ARMSTRONG, III

---

ORDER IMPOSING REMEDIAL SANCTIONS

On the basis of the Commission's opinion issued this day, it is

ORDERED that Robert W. Armstrong, III cease and desist from committing or causing any violations or future violations of Section 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5 and 13b2-1 thereunder; and from causing any violations or future violations of Sections 13(a), 13(b)(2), and 13(b)(5) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

By the Commission.

Jonathan G. Katz
Secretary

**Turner Exhibit 4**

December 8, 1998

Private and Confidential

To:          S. Chamberlain

From:        G. Prince

Subject:     Full Time Employment with ISI

      Based on our recent discussions, I am committed to joining ISI on a full time basis and ensuring my place in your "Gang of Six". Since most of the conversations we have had on this topic have occurred "under the influence", I thought that I should write down some of my understandings, ideas, and issues as to how such an arrangement would actually work. I am frankly concerned about Elaine's reaction to all of this, but at the same time, I personally do not want to structure my deal based solely on her perceptions and doubts. In any event, here is how I see this being structured.

<u>Job Responsibilities</u>

      I am a financial guy (O.K. a financial geek) plain and simple. Although I fully understand and support the notion that Elaine is ISI's CFO, there are certain aspects of that job that I believe I am better qualified to handle. For the most part these issues center around financial planning and forecasting, financial strategies, financial analysis and capital formation. I am reluctant to relinquish my roles in these areas because I think the Company is best served with my continued involvement. In fact, I would like to have these roles acknowledged in this deal to avoid potential conflict and confusion. Further, I believe that I should continue to be available to help Elaine oversee such projects as SEC filings (10-K's, S-1's etc.), DCAA submissions, tax returns, and other pressing financial assignments that will take some burden off Elaine and her staff. As discussed, I will limit my attendance at Elaine's staff meetings.

      While I understand that my future with the Company will perhaps be focused on M&A issues, I think that until we actually acquire a business, that we should retain the division of responsibilities as they exist and have currently evolved.

ISI 002560
Confidential Treatment
Requested

**Turner Exhibit 4**

For the record, I think that Elaine is quite capable in the role that she is in. She is an excellent financial operations person, and has admirably handled the added responsibilities of Human Resources and Contracts Administration. I think she is continually improving in her corporate presentation skills, and I think she has become an effective manager and delegator. I fully agree that Elaine needs to be the Company's financial representative to the public and outside contingencies.

All of this being said please find below my concepts of the deal particulars:

| | |
|---|---|
| Proposed Title: | Director of Financial Planning and Strategies (I'm not married to this title and am open to other suggestions) |
| Reporting To: | S. Chamberlain, CEO |
| Status: | Full Time Employee with option to telecommute 1 day per week from Fairfax |
| Tenure/ Benefits: | Full Benefits with an assumed 10 year tenure |
| Effective Date: | Approx. Feb. 1, 1999 (After minor prostate surgery) |
| Proposed Salary: | $155,000 per annum (Same as Woods and Kowal; less than Gough and Carchedi) |
| Proposed Bonus: | TBD per SRC (To avoid disclosure issues it should be less than the bonuses for Woods and Kowal) |
| Proposed Options: | TBD per SRC commensurate w/ other senior mgrs. |

In any event, this is my proposal. Let me know what you think.

Thanks,
GAP

ISI 002561
Confidential Treatment
Requested

**Turner Exhibit 5**

| | |
|---|---|
| **From:** | Gary Prince <prince@integ.com> |
| **Sent:** | Tuesday, October 29, 2002 11:16 AM |
| **To:** | Elaine Parfitt <elaine@integ.com> |
| **Subject:** | RE: Closing Financial Statements |

ok.

-----Original Message-----
**From:** Elaine Parfitt [SMTP:elaine@integ.com]
**Sent:** Tuesday, October 29, 2002 10:18 AM
**To:** Gary Prince
**Subject:** RE: Closing Financial Statements

I'm assuming we'll receive the revised financial either today or tomorrow.
I'll await your review before paying out the excess purchase price to former
RT shareholders. If you review/approve them while at RT, please let me know
so I can start processing the payments. Otherwise, I'll wait until Friday
or next week.

Thanks,
Elaine

-----Original Message-----
From: Gary Prince [mailto:prince@integ.com]
Sent: Monday, October 28, 2002 10:59 AM
To: 'Bryan Clark'; Elaine Parfitt
Cc: 'Randy Culver'
Subject: RE: Closing Financial Statements


Bryan:

Here is my take:

Journal Entry No.:

1. Agree
2. Agree
3. Book Credit to Paid in Capital and not RE
4. Do not book.
5. Agree
6. Not sure I understand what gives rise to this. Please provide more
detail. In any event, if this entry is needed, I believe the credit will
flow thru Paid in Capital and not RE.
7. Debit should flow thru FICA exp. and not RE.

If you'd like, please call to discuss today. Otherwise we can review all
this when we're in the Springs on Wed.

Thanks
GAP


-----Original Message-----
From: Bryan Clark [SMTP:bclark@rtlogic.com]
Sent: Friday, October 25, 2002 2:12 PM
To: Elaine Parfitt; Gary Prince
Subject: RE: Closing Financial Statements

Elaine and Gary,

Take a look at the attached spreadsheet showing the Aug-BS (balance sheet)



EXHIBIT
25
131

ISI107343
CONFIDENTIAL TREATMENT REQUESTED

before the option exercise, exercise entries made, and Aug-BS after the
entries.  Let me know what needs to change.  I'm hoping this will cut down
on the number of versions.

Thanks!

-----Original Message-----
From: Elaine Parfitt [mailto:elaine@integ.com]
Sent: Friday, October 25, 2002 9:52 AM
To: Bryan Clark
Subject: FW: Closing Financial Statements


Bryan,

After you update the financials, please send me schedules supporting the
balance sheet accounts.  Also, please send to me the 9/30 trial balance and
schedules for revenue calculation by job, unbilled revenue and billings in
excess of cost.

Thanks,
Elaine

-----Original Message-----
From: Gary Prince [mailto:prince@integ.com]
Sent: Thursday, October 24, 2002 2:02 PM
To: 'Bryan Clark'
Cc: 'Elaine Parfitt'; 'Randy Culver'
Subject: RE: Closing Financial Statements


Bryan:

I'm not sure what APB25 says, but I am passing on guidance from our
auditors at E&Y.  My understanding is that the stock is to be recorded at
the amounts paid in only.  The IRS receivable then gets set up separately
with a credit entry going to Paid in Capital under the caption "tax benefit
from stock option exercise."  We have made these types of entires on ISI's
books in prior years.

This is ultimately Elaine's call, but I do not think we want to keep using
B&K because we ultimately need to run all this by E&Y anyhow.  Going to B&K
will create duplicate expenses for RT.

Thanks
GAP

-----Original Message-----
From:  Bryan Clark [SMTP:bclark@rtlogic.com]
Sent:  Thursday, October 24, 2002 1:38 PM
To:    Gary Prince
Subject:    RE: Closing Financial Statements

Gary,

I've been looking at APB25 and am not sure how we can get away with not
reporting the compensation.  So, we changed the entry to go directly to
retained earnings vs expense.  This removes it from the income statement
but
leaves it on the balance sheet.  I'm not sure how we can not make an entry
and yet leave the employee receivable and IRS receivable on the books.
These receivable wouldn't happen without the option exercise.  I ran it by
Biggs&Kofford and will talk to them later today after they have had a
chance

ISI107344
CONFIDENTIAL TREATMENT REQUESTED

**Turner Exhibit 5**

to research it. I'll call you right after that conversation and we can go
from there.
Thanks!

----Original Message----
From: Gary Prince [mailto:prince@integ.com]
Sent: Wednesday, October 23, 2002 8:33 AM
To: 'Randy Culver'
Cc: 'Mark McMillen'; Sean Conway; 'Bryan Clark'; 'Elaine Parfitt'
Subject: RE: Closing Financial Statements


Guys:

If we did not book compensation expense associated with the NSO's, then why
are retained earnings negative?  I think something may be amiss, but I
think you'll still make your equity bogey.  I just want to get each account
right before we finalize these numbers.

Thanks
GAP

----Original Message----
From:   Randy Culver [SMTP:randy@rtlogic.com]
Sent:   Monday, October 21, 2002 11:30 AM
To:     Gary Prince
Cc:     'Michele Fagin'; 'Mark McMillen'; Sean Conway
Subject:    Closing Financial Statements


Gary:

I've attached the closing financial statements for RT Logic to be used
in conjunction with the excess equity consideration. The closing
shareholder equity is $10.4M, making the excess shareholder equity equal
to $1M.

These statements reflect the 30 Sep balance sheet and the income
statement/cash flow statement for Apr thru Sep 02. The income statement
does not reflect the compensation expense associated with exercise of
the NSOs. The associated impacts to the balance sheet and cash flow
statement are reflected.


Randy Culver
RT Logic!
719-598-2801


<< File: ATT00096.htm >>  << File: Closing Financial Statements.xls >>


<< File: BS_AUG.xls >>

ISI107345
CONFIDENTIAL TREATMENT REQUESTED

**Turner Exhibit 6**

---

**From:**      Gough, Tom [GOUGH@integ.com]
**Sent:**      Wednesday, November 09, 2005 9:20 AM
**To:**        Prince, Gary; Chamberlain, Steve; Gaffney, Pete; Parfitt, Elaine
**Subject:**   RE: Compensation Committee Comments Regarding Bonuses for 2005

Gary,

I couldn't agree with you more,

Tom

-----Original Message-----
From: Prince, Gary
Sent: Wednesday, November 09, 2005 8:33 AM
To: Gough, Tom; Chamberlain, Steve; Gaffney, Pete; Parfitt, Elaine
Subject: RE: Compensation Committee Comments Regarding Bonuses for 2005


This e-mail was written at home last nite around 8PM.

Pete and Elaine told me a couple of hours ago that my bonus for FY05 that
was recommended to the Board was "dinged" by $10,000.   Although SRC's bonus
was also dinged, I am only going to address my own personal situation here.
To say that I'm pissed is a major understatement.   Believe it or not, I'm
pissed not so much because of the money, but more because of the statements
that are being made or implied by the Board.   As you all well know, I am
capable of losing $10,000 in a casino in a year.

First off, the three outside directors cannot possibly know on a day to
day basis what I do for ISI. To me, their bonus reduction for me is totally
arbitrary and without basis.   From what I have heard, the directors are not
comfortable with me being the second highest paid person in the Company,
especially considering my relatively minor title.   Interestingly, the Board
(or at least Bonnie) is also on record that G-7 should not be paid too
handsomely since most of our earnings are derived from RT.   It seems to
me that of all us in G-7, I was the most active participant in bringing
home the RT deal (which of course is part of my job) - yet again, I am
the one being dinged.

It is further interesting that during the first part of the Compensation
Committee meeting today where management attended, virtually all of the
questions from the directors regarding compensation, forecasts and
performance were directed to me.   It is therefore hard for me to believe
that the directors do not understand my role in this Company, which is
considerably greater than what my title implies.

Anyhow, I had always thought ISI was a great place to work because
titles weren't all that important and because performance was always
recognized and
rewarded.   Apparently that is not entirely the case anymore.   I also had
thought that I reported to SRC - yet his bonus recommendations for me
seem to have no relevance here any more either.

1



Don't get me wrong, I'm sure I wont receive a lot of sympathy for a "mere"
$55K bonus.   I understand that is a lot of money.   Again my beef is about
the message being sent and what the Board seemingly would like the
internal pecking order to be. Although I am not necessarily competing
with this Group, my $55K bonus is now $10K below Pete's, $5K below Elaine's, equal to
Stuart's and $5K above Tom's.   I think if you honestly asked anyone in
management who the number 2 person is in the Company, most would say it is
GAP.   That is also not to say that I don't support Pete as the Heir
Apparent.   I absolutely do and also think that Pete is more deserving of
that position than me even if I didn't have the baggage behind me relating
to my old FNN case.   I honestly think that a high tech company like ISI has
to be run by a high tech person.   On the other hand, SRC is still at the
helm now and with SRC in that position, I think I am the No. 2 person,
just as I would hope to be the No. 2 person once Pete took over.

I am not pissed at you guys; I am pissed at the Board and at this inane
process.   As I also mentioned to Pete and Elaine earlier, this Board that
is so concerned about the particulars of corporate governance really does
not have the right to adjust my bonus or my salary.   After all, I am not a
named officer and technically not under their direct purview.   Be that as
it may, I will review the contributions that I think I have made in FY05
for the Company - (i.e. I am tooting my own horn - sorry, this is personal
therapy)   These are specific accomplishment during the year over and
beyond my day to day contributions of planning, strategy and leadership:

1.   Accounting Disclosures:

Each and every year I write what most consider to be the toughest
disclosures - the MD&A and the financial press releases.   Recall if you
would that we used to pay a financial relations firm a couple hundred
thousand a year to mostly write these same releases.   I am also the
person responsible for our corporate forecasting and therefore the Chief
Architect of the guidance we publish to the Street,

Also please recall that it was I who proposed our current segment
reporting structure used in our disclosures before FY05 began.

2.   FY04 10-K

The Board marveled how ISI was able to accurately and timely file its
Form 10-K for FY04 during the first quarter of FY05 when Elaine was out on
maternity leave.   Certainly Pat and Al stepped up, but I do not believe it
could have been handled so smoothly (without impacting the rest of the
Company) had I not stepped in to lead that effort.   The justification for
the carrying value of Newpoint's goodwill was a particularly touchy
subject last year that I was able to diffuse without help from anyone
else in G-7. Of course, you all knew that I would step in here once
Elaine was out, but again I do not think the Board appreciates any of
this, if they are even aware of these facts.

2

3.   10Q - Q1FY05

Elaine did not fully return to work until this document was well
underway. Again, I think Pat and Al (and Elaine too for that matter)
would tell you that I ran this effort in Elaine's absence.

4.   ATNAGE

Does anyone remember how ATNAGE was headed to be the next DAPS.   We
took it
away from Mack and gave it to Stuart.   However, anyone on the team will
tell you that I almost single-handedly negotiated that contract to
conclusion with a profitable settlement.

5.   LJT Deal

Not my best deal since we are still not out of the business, but I was
the one who found and negotiated that deal, which did limit our Antenna
exposure, especially with respect to the $3.6 million Malaysian contract
where LJT assumed full performance liability.

6.   Contracts

I was the person who found the RAIDRS fee error and most of the
subsequent subcontracting errors (i.e. automatic option renewals).   When
SRC was pissed at the  Govt. Group for all their errors, he announced
that only he and I
could approve future contracts, mods and subcontracts.   This all led to
my
taking over contracts entirely in late summer.

7.   Legal

With SRC, I have also been the defacto head of Legal.   I was a
principal
player in the GBACCS deal (admittedly not the best outcome), but was
also
the person that fired Dick Lieberman and hired Tim Sullivan.   I have
been
leading most of our DAPS contract strategies day to day and I was also
the one that pushed to hire Wallace Christner over Piper and Jay Smith.

8.   Lumistar

Although definitely a team effort, I led the Lumistar negotiations and
transaction from start to finish.

9.   Management Retreat - Atlantis

A joint effort with Pete and to a lesser extent Elaine, I was the main
presenter with "FY05 in Review", "Where Do We Go From Here", and
ironically
our bonus plan that we have recently adopted.   I helped write much of
Elaine's presentation on the new Govt. subsidiary.   Also don't forget
the CEO Jeopardy skit.:)

10.   Current Board Matter

I firmly believe that one reason that the Board is dinging me is because
I
am clearly a leader representing the management view on this matter.
Not
only have I been outspoken against Bonnie, I have personally drafted our
response to Piper, the bonus memo to the Board and a presentation for
senior management and Grant Thornton chronicling this entire issue. I
personally presented this document to GT today, leading our response and
informing GT as to what was going on.

3

Confidential Treatment Requested

11.   Overall Leadership

When there is an issue at ISI (especially in SRC's absence) people come to
me.   That is true for both members of G-7, other senior execs, and rank and
file employees.   Perhaps other than SRC, I am the best known figure
throughout the Company, especially when you include subsidiaries.   This is
not because I am Director of M&A, it's because I am one of the top
leaders in the Company.   When a tutorial needs to be made on business or
finance, it is I who is asked to present, just as I am doing tomorrow at
Pete's Govt. QBR where Pete has asked me to train his group on Corporate
G&A.

I actually do not think I am saying anything here that is surprising and
I certainly do not want to offend anyone by taking credit for things that in
many regards we all have contributed to.   I am a team player first and
foremost and am always willing to stay in the background and let someone
else sign my writing or even take credit for my work.

However, now the rules of compensation have seemingly changed.   Although I
am the one personally affected in this instance, I believe that we must
all take note of the Board plucking me out of the group and adjusting my
bonus despite the fact that my number was not only approved by SRC, but it was
recommended by Pete and Elaine as well.   Who will be next to feel their
wrath?

As I am writing this, I am actually more angry than I was earlier
because this is just bullshit, but it's bullshit that hits me right in
the pocketbook and also right in the heart.

I am not sure if this is over, but I do want to thank Pete and Elaine today
for trying to help fight for me.   I'm sure you know I would do the same for
you.   Just for the record, even though the Board may control my pay, it is
actually much more important to me to be viewed favorably in this
group's eyes than in the eyes of the directors.

Rambling over for now.

Thanks
GAP


-----Original Message-----
From: Gough, Tom [mailto:GOUGH@integ.com]
Sent: Tuesday, November 08, 2005 4:39 PM
To: Chamberlain, Steve; Gaffney, Pete; Parfitt, Elaine; Prince, Gary
Cc: Gough, Tom
Subject: Compensation Committee Comments Regarding Bonuses for 2005


Folks:

We convened a conference call with Bonnie, Doss & Dominic to discuss the
recommended 2005 bonus recommendations provided by senior management to
the Compensation Committee at 3:00PM today. Dominic informed us that
they had a few questions/comments and then the Committee wanted to meet

4

privately before getting back to me as to there final decisions.

I just received a call from Dominic summarizing the results of their meeting and their decisions regarding the 2005 bonuses for senior management.

They lowered Steve Chamberlain's bonus by $20K to $60K and they lowered Gary Prince's bonus by $10K to $55K; otherwise they left Tom Gough's, Pete Gaffney's and Elaine Parfitt's bonuses as recommended at $50K, $65K and $60K.

Dominic said that they collectively wanted to send Steve a "signal" that they wanted him to keep the Board better informed (his personal situation was mentioned). Dominic explained that Bonnie wanted the signal to be stronger (a lower bonus then the $60K) and wanted it stipulated that she felt his leadership was not as high as expected. Doss and Dominic disagreed about any such stipulation.

Dominic explained that Gary's total compensation made him appear to be contributing more than his title would indicate. I did not receive an explanation why that should cause them to lower the number recommended.

Dominic said that, in general, there was a sense by the Committee that senior management did not regard the Board's need to be informed about Company matters seriously enough. They felt Steve shouldhave been in attendence during the initial call.

Dominic indicated that Bonnie would abstain from signing any resolution so we instructed him to prepare notes of the meeting summarizing the final Committee decision on the bonuses and to note that he and Doss voted for them and that Bonnie did not.

Elaine and Pete have susequently indicated that the Committee's power to approve bonus's extends to "Named Executives" which would exclude Gary and include Pat Woods and Stuart Daughtridge. We are checking on the regulations to determine if the Committee needs to reconvene.

Tom

After discussing

5

000645

## List of Relevant Persons – Integral Systems, Inc.

| | |
|---|---|
| **Steve Chamberlain** | Chief Executive Officer, Chairman of Board of Directors |
| **Tom Gough** | President, Board Member |
| **Elaine Parfitt (Brown)** | Chief Financial Officer, EVP |
| **Pete Gaffney** | Chief Operating Officer, EVP, Government Division |
| **Gary Prince** | Director of M&A, Managing Director of Operations |
| **Pat Woods** | EVP, Business Development |
| **Pat Carey** | Corporate Controller |
| **Al Smith** | Assistant Controller |
| **John Flaherty** | Senior Accountant |
| **Albert Alderete** | Contracts Manager |
| **Dominic Laiti** | Board Member |
| **R. Doss McComas** | Board Member |
| **Bonnie Wachtel** | Board Member |

Source:  ISI Management Team and Accounting / Administrative and Facilities Teams Organizational Chart, September 2005 (Exhibit 334).



**Turner Exhibit 8**

Lynn E. Turner
Managing Director

444 South Flower Street, Suite 2140
Los Angeles, CA 90071
main: 213.222.0870
fax : 888.222.6001
lturner@litinomics.com

**SUMMARY**

Lynn E. Turner is a managing director focusing on forensic accounting at LitiNomics. With more than 35 years of business, regulatory, and academic experience, Mr. Turner is a noted expert on financial reporting and auditing requirements.  At LitiNomics, Mr. Turner focuses on complex investigations regarding financial reporting and misappropriation of assets as well as various aspects of corporate governance, securities litigation, accountant liability, and technical accounting matters.

Mr. Turner served for five years in the Office of the Chief Accountant (OCA) of the Securities Exchange Commission (SEC).  He served as the chief accountant of the SEC from July 1998 to August 2001 and as a professional accounting fellow from May 1989 through July 1991. As chief accountant, Mr. Turner was the principal advisor to the SEC chairman and Commission on auditing and financial reporting and corporate governance matters. The issues that Mr. Turner advised on included the oversight and development of US auditing, accounting, and disclosure standards, as well as matters affecting audit committees of public companies.  Mr. Turner oversaw the development of, and was one of the principal authors of the SEC Staff Accounting Bulletin No. 101 and the accompanying Questions and Answers.  As an accounting fellow in the OCA, Mr. Turner was also assigned oversight of the original development of the Generally Accepted Accounting Principles hierarchy.   In his capacity as the chief accountant of the SEC, Mr. Turner has also worked regularly with Congress, various federal and state government agencies, and international regulators.

Prior to becoming the chief accountant of the SEC, Mr. Turner was the chief financial officer of a high technology semiconductor and storage systems manufacturing company from July 1996 to June 1998.  He oversaw and managed the financial reporting by the company, including the financial reporting of the company for product returns and distributor sales agreements.  This included internal controls used to monitor distribution agreements and inventory in the sales channel.

Prior to becoming a CFO, Mr. Turner spent 20 years with Coopers & Lybrand (now PriceWaterhouseCoopers) in positions of increasing responsibility, including as an audit partner.  He joined the firm in July of 1976 upon graduation from college.  He did a two year rotation in the firm's National technical office, was a national SEC review partner and leader of its national high technology audit practice.  While a partner, Mr. Turner was one of the principal authors of his firm's publications, *Revenue Recognition and Other Financial Issues Affecting Software Companies*, and *Financial Reporting Practices in the Software Industry.*  He also participated in his firm's quality control reviews.

Mr. Turner also was a professor of accounting and auditing classes at Colorado State University from August 2001 to June 2003.  In 2003, he left CSU to help start up and become vice president and the managing director of research of what was the internationally known financial and proxy research



**Turner Exhibit 8**

firm, Glass Lewis.  Mr. Turner oversaw the research Glass Lewis provided its customers who were large institutional asset managers and investors.

Mr. Turner has sat on the board of trustees and investment committees of two institutional investors. He has also served on the board of directors and chaired the audit committees of two public companies.

Mr. Turner holds an MA in accounting from the University of Nebraska and a BA in business administration, with a concentration in accounting, from Colorado State University.



**Turner Exhibit 8**

**POSITIONS HELD**
- Internationally Recognized Proxy and Financial Research Firm, Managing Director of Research and Officer, July 2003–June 2007
- Forensic Accounting Firms, Senior Advisor, 2003–Present
- Colorado State University, Professor of Accounting, 2001–2003
- Securities and Exchange Commission (SEC), Chief Accountant, July 1998–August 2001
- Symbios, Inc, Chief Financial Officer and Vice President, From June of 1996–June of 1998
- PricewaterhouseCoopers (PWC- formerly Coopers & Lybrand), Audit and SEC Reviewing Partner
- FASB Emerging Issues Task Force and Financial Accounting Standards Advisory Council, SEC Observer
- FASB Investor Technical Advisory Committee
- Member of boards of directors and chair of audit committees, Sun Micro Systems, Guidance Software and AARP Mutual Funds.  Also member of the AARP mutual funds investment committee.  Member of board, and investment and audit committees of the Colorado Public Employees Retirement Association.

**MEMBERSHIPS & AFFILIATIONS**
- Standards Advisory Group of the Public Companies Accounting Oversight Board (PCAOB)
- Investors Advisory Group of the PCAOB
- Colorado Public Employees Retirement Association (COPERA) Board and Audit Committee
- Colorado Society of Certified Public Accountants (CSCPA)
- American Institute of Certified Public Accountants
- Financial Executives International

**AWARDS**
- Honorary Doctorates in Business Administration, Central Michigan University and Grand Valley State University
- Two time recipient of the SEC Chairman's Award for Excellence
- Top 100 Accountants in the US
- Directorship 100
- National award for Business Information (Accountant) Professional of the Year, Beta Alpha Psi American Accounting Association Exemplar award
- Max Block Distinguished Article Award, New York Society of CPAs
- Colorado State University College of Business Alumni of the Year

**TESTIMONY**
Mr. Turner has served as an expert witness before Congress and California State Court.  He has testified before Congress on numerous occasions.

**SPEAKING ENGAGEMENTS**
Mr. Turner is a frequent speaker at national and regional conferences, and he has appeared on National Public Radio and all the major television networks including NBC, ABC, CBS, Fox, CNN, CNBC, CNNfn, Bloomberg TV, and MSNBC.

**EDUCATION**
- MA in Accounting, University of Nebraska
- BA, Business Administration, Concentration in Accounting, Colorado State University

**Publications**

- Turner, Lynn E. "Audit Committees, A Call to Action" *Director's Monthly, Newsletter of the National Association of Corporate Directors,* February 2001.
- Turner, Lynn E. "Disclosure and Accounting in a Global Market: Looking to the Future" *Research in Accounting Regulation, Volume 15,* 2001.
- Turner, Lynn E. "Should the Government Establish a New Federal Agency to Oversee Accountants?" *CQ Researcher, Congressional Quarterly Inc.,* March 22, 2002.
- Turner, Lynn E. "From Enron, Chance to Save Capitalism" *Rocky Mountain News,* April 27, 2002.
- Turner, Lynn E. "Just a Few Rotten Apples?  Better Audit Those Books" *Washington Post,* July 14, 2002.
- Turner, Lynn E., Williams, Jason P., and Weirich, Thomas R. "An Inside Look at Auditor Changes" *The CPA Journal,* November 2005.
- Turner, Lynn E. "Learning from Accounting History: Will We Get It Right This Time?"  *Issues in Accounting Education*. *Volume 21 Issue 4. AAA*, 2006.
- "In the Public Interest, Regulating With a Customer Focus" *The CPA Journal*, March 2006.
- Turner, Lynn E. and Weirich, Thomas R. "A Closer Look at Financial Statement Restatements: Analyzing the Reasons Behind the Trend" *The CPA Journal,* December 2006.
- Levitt, Jr., Arthur and Turner, Lynn E. "Yes: Financial reforms must continue" *The San Diego Union Tribune*, May 30, 2008.
- Levitt, Jr., Arthur and Turner, Lynn E. "How to Restore Trust in Wall Street" *The Wall Street Journal*, September 26, 2008.
- Turner, Lynn E. "Banks Want to Shoot the Messenger Over Fair Value Rules" *Financial Times*, October 2, 2008.
- Turner, Lynn E. "Financial Crisis to Reform: Change or Just High Hopes" *LECG* 2009.
- Turner, Lynn E. "Changing Times, Present Challenges" *Financial Executive*, January/February 2011.
- Turner, Lynn E. "Congress and the Next market Meltdown" *CPA Trendlines*, February 21, 2011.

**Books and Monographs**

*Revenue Recognition and Other Financial Issues Affecting Software Companies*, a monograph, edited and published by the Coopers & Lybrand National High Technology Group, 1994.

*Software Industry Accounting*, Co-Authored with Joseph M. Morris, Richard P. Graff, Francis O'Brien, Edward S. Wittman, John Wiley & Sons, Inc., 1993.

**Case Studies**

*RUN, Inc.*, Lynn Turner and Robert Sack with the American Accounting Association SEC Committee, American Institute of Certified Public Accountants Professor/Practitioner Case Development Program, 1991.

*Fibreboard Corporation Case*, Lynn Turner and Thomas Weirich, American Institute of Certified Public Accountants Professor/Practitioner Case Development Program, 1992.  A case study on accounting and reporting of environmental costs.

*Transcontinental Case*, Lynn Turner and Thomas Weirich,  American Institute of Certified Public Accountants Professor/Practitioner Case Development Program, 1993.  A case study on off-balance sheet financing.

**Turner Exhibit 10**

### Documents and Information Considered

The following information was reviewed and/or considered in the preparation of my report.

### Bates Numbered Documents

- 000621 - 000621
- 000647 - 000719
- 000725 - 001052
- 001065 - 001066
- 001107 - 001117
- 001188 - 001196
- 001203 - 001204
- 001337 - 001410
- 001457 - 001458
- 001501 - 001540
- 001544 - 001548
- EMB 001521 - EMB 001526
- EMB 001529 - EMB 001529
- EMB 001595 - EMB 001634
- EMB 001653 - EMB 001710
- EMB 001845 - EMB 001864
- EMB 001868 - EMB 001894
- EMB 001910 - EMB 001910
- EMB 001937 - EMB 001937
- EMB 001942 - EMB 001943
- EMB 001946 - EMB 001952
- EMB 001954 - EMB 001986
- EMB 002057 - EMB 002081
- EMB 002084 - EMB 002085
- EMB 002135 - EMB 002141
- EMB 002162 - EMB 002164
- EMB 002198 - EMB 002210
- EMB 002443 - EMB 002473
- EMB 002477 - EMB 002483
- EMB 002785 - EMB 002785
- EMB 002800 - EMB 002802
- EMB 002807 - EMB 002807
- EMB 002880 - EMB 002891
- EMB 003194 - EMB 003194
- EMB 003226 - EMB 003226
- EMB 003265 - EMB 003265
- EMB 003273 - EMB 003273
- EMB 003275 - EMB 003275
- EMB 003285 - EMB 003285
- EMB 003322 - EMB 003322
- EMB 003355 - EMB 003355
- EMB 01530 - EMB 01536
- EMB 01895 - EMB 01907
- EPB024192 - EPB024192
- EPB024196 - EPB024196
- EPB035700 - EPB035700
- EPB035702 - EPB035702
- GAF000136 - GAF000171
- GAF000173 - GAF000192
- GAP119676 - GAP119676
- GAP121774 - GAP121774
- GAP135545 - GAP135545
- ISI 002509 - ISI 002512
- ISI007027 - ISI007028
- ISI050001 - ISI050003
- ISI050005 - ISI050037
- ISI050157 - ISI050177
- ISI050206 - ISI050207
- ISI050231 - ISI050311
- ISI100045 - ISI100045
- ISI100200 - ISI100200
- ISI100253 - ISI100309
- ISI100319 - ISI100334
- ISI100417 - ISI100420
- ISI100457 - ISI100464
- ISI100466 - ISI100469
- ISI100472 - ISI100472
- ISI100686 - ISI100753
- ISI100763 - ISI100766
- ISI100768 - ISI100768

**Turner Exhibit 10**

- ISI100900 - ISI100900
- ISI100916 - ISI100916
- ISI100931 - ISI100931
- ISI100980 - ISI100980
- ISI100986 - ISI100989
- ISI101068 - ISI101073
- ISI101212 - ISI101213
- ISI101225 - ISI101225
- ISI101226 - ISI101247
- ISI101248 - ISI101249
- ISI101271 - ISI101277
- ISI101329 - ISI101329
- ISI101346 - ISI101351
- ISI101390 - ISI101390
- ISI101411 - ISI101411
- ISI101452 - ISI101455
- ISI101590 - ISI101595
- ISI101603 - ISI101620
- ISI101634 - ISI101634
- ISI101642 - ISI101642
- ISI101657 - ISI101657
- ISI101721 - ISI101721
- ISI101730 - ISI101732
- ISI101736 - ISI101738
- ISI101747 - ISI101747
- ISI101756 - ISI101756
- ISI101781 - ISI101784
- ISI101811 - ISI101811
- ISI101817 - ISI101817
- ISI101825 - ISI101825
- ISI101899 - ISI101899
- ISI101934 - ISI101935
- ISI101937 - ISI101938
- ISI102010 - ISI102010
- ISI102216 - ISI102216
- ISI102224 - ISI102227
- ISI102373 - ISI102381
- ISI102387 - ISI102392
- ISI102408 - ISI102415
- ISI102427 - ISI102428
- ISI102430 - ISI102434
- ISI102438 - ISI102438

- ISI102513 - ISI102521
- ISI102537 - ISI102537
- ISI102780 - ISI102780
- ISI102826 - ISI102882
- ISI102911 - ISI102911
- ISI102945 - ISI102952
- ISI102999 - ISI103000
- ISI103038 - ISI103039
- ISI103217 - ISI103217
- ISI103267 - ISI103272
- ISI103667 - ISI103667
- ISI103680 - ISI103680
- ISI103702 - ISI103702
- ISI103705 - ISI103706
- ISI103752 - ISI103752
- ISI104661 - ISI104663
- ISI104858 - ISI104884
- ISI104940 - ISI104944
- ISI104958 - ISI104959
- ISI104975 - ISI104976
- ISI104983 - ISI104983
- ISI105040 - ISI105040
- ISI105066 - ISI105066
- ISI105216 - ISI105217
- ISI105302 - ISI105308
- ISI105355 - ISI105356
- ISI105587 - ISI105588
- ISI106013 - ISI106013
- ISI106080 - ISI106081
- ISI106084 - ISI106085
- ISI106097 - ISI106098
- ISI106099 - ISI106107
- ISI106159 - ISI106159
- ISI106222 - ISI106222
- ISI106789 - ISI106789
- ISI106799 - ISI106800
- ISI107220 - ISI107221
- ISI107249 - ISI107250
- ISI107526 - ISI107528
- ISI107552 - ISI107552
- ISI107567 - ISI107567
- ISI107575 - ISI107575

**Turner Exhibit 10**

- ISI107580 - ISI107584
- ISI107597 - ISI107597
- ISI107811 - ISI107814
- ISI107821 - ISI107822
- ISI107852 - ISI107853
- ISI108050 - ISI108050
- ISI108147 - ISI108147
- ISI108822 - ISI108823
- ISI108826 - ISI108826
- ISI108907 - ISI108908
- ISI109178 - ISI109178
- ISI109354 - ISI109354
- ISI109634 - ISI109634
- ISI109758 - ISI109759
- ISI109766 - ISI109777
- ISI109779 - ISI109780
- ISI109817 - ISI109817
- ISI110010 - ISI110013
- ISI110017 - ISI110017
- ISI110398 - ISI110398
- ISI110470 - ISI110470
- ISI111135 - ISI111135
- ISI111160 - ISI111160
- ISI111205 - ISI111237
- ISI111247 - ISI111253
- ISI111289 - ISI111295
- ISI111304 - ISI111304
- ISI111409 - ISI111409
- ISI112250 - ISI112250
- ISI113456 - ISI113458
- ISI114345 - ISI114345
- ISI114390 - ISI114424
- ISI114739 - ISI114739
- ISI115161 - ISI115162
- ISI115171 - ISI115171
- ISI116952 - ISI116960
- ISI117145 - ISI117146
- ISI117401 - ISI117401
- ISI117439 - ISI117439
- ISI117493 - ISI117493
- ISI117541 - ISI117544
- ISI117990 - ISI117990

- ISI117992 - ISI117994
- ISI117999 - ISI118004
- ISI118110 - ISI118111
- ISI118177 - ISI118177
- ISI118185 - ISI118190
- ISI118328 - ISI118329
- ISI118347 - ISI118347
- ISI118352 - ISI118356
- ISI118369 - ISI118374
- ISI119439 - ISI119470
- ISI119664 - ISI119664
- ISI119690 - ISI119713
- ISI119716 - ISI119720
- ISI119891 - ISI119891
- ISI122459 - ISI122472
- ISI122562 - ISI122576
- ISI122749 - ISI122752
- ISI122760 - ISI122764
- ISI122782 - ISI122785
- ISI123223 - ISI123223
- ISI123352 - ISI123352
- ISI123546 - ISI123546
- ISI126093 - ISI126124
- ISI126142 - ISI126142
- ISI126223 - ISI126223
- ISI126225 - ISI126258
- ISI126347 - ISI126347
- ISI126685 - ISI126685
- ISI126963 - ISI126963
- ISI127010 - ISI127010
- ISI127041 - ISI127041
- ISI127047 - ISI127047
- ISI127353 - ISI127354
- ISI127841 - ISI127920
- ISI127989 - ISI127992
- ISI128043 - ISI128121
- ISI128136 - ISI128243
- ISI128246 - ISI128270
- ISI128521 - ISI128525
- ISI128844 - ISI128844
- ISI129822 - ISI129833
- ISI129869 - ISI129869

- ISI129941 - ISI129948
- ISI130033 - ISI130034
- ISI130231 - ISI130231
- ISI130983 - ISI131017
- ISI131001 - ISI131001
- ISI131265 - ISI131266
- ISI131327 - ISI131327
- ISI131417 - ISI131417
- ISI131520 - ISI131521
- ISI131560 - ISI131563
- ISI132021 - ISI132024
- ISI132102 - ISI132118
- ISI132167 - ISI132167
- ISI133222 - ISI133243
- ISI133428 - ISI133429
- ISI134082 - ISI134085
- ISI134103 - ISI134124
- ISI136488 - ISI136488
- ISI136997 - ISI137016
- ISI137127 - ISI137127
- ISI137133 - ISI137134
- ISI137449 - ISI137450
- ISI137666 - ISI137666
- ISI137968 - ISI137968
- ISI138182 - ISI138183
- ISI138193 - ISI138193
- ISI138309 - ISI138309
- ISI138506 - ISI138507
- ISI138931 - ISI138931
- ISI138933 - ISI138933
- ISI139129 - ISI139130
- ISI139596 - ISI139596
- ISI140490 - ISI140510
- ISI140550 - ISI140550
- ISI140789 - ISI140833
- ISI140970 - ISI140970
- ISI141042 - ISI141042
- ISI141079 - ISI141105
- ISI143692 - ISI143695
- ISI144706 - ISI144706
- ISI144874 - ISI144874
- ISI144995 - ISI144996
- ISI145010 - ISI145011
- ISI145386 - ISI145386
- ISI145407 - ISI145407
- ISI145763 - ISI145765
- ISI146285 - ISI146290
- ISI146401 - ISI146401
- ISI146425 - ISI146425
- ISI146442 - ISI146442
- ISI146481 - ISI146482
- ISI146572 - ISI146578
- ISI146635 - ISI146635
- ISI146642 - ISI146642
- ISI146842 - ISI146842
- ISI147016 - ISI147016
- ISI147190 - ISI147190
- ISI147548 - ISI147551
- ISI147600 - ISI147600
- ISI148301 - ISI148301
- ISI148347 - ISI148347
- ISI149330 - ISI149331
- ISI149857 - ISI149857
- ISI151026 - ISI151027
- ISI151072 - ISI151072
- ISI151881 - ISI151881
- ISI151922 - ISI151923
- ISI152332 - ISI152335
- ISI152412 - ISI152412
- ISI152580 - ISI152580
- ISI154299 - ISI154299
- ISI154960 - ISI154964
- ISI155057 - ISI155059
- ISI155368 - ISI155368
- ISI155460 - ISI155461
- ISI155850 - ISI155850
- ISI156801 - ISI156801
- ISI157509 - ISI157514
- ISI157522 - ISI157525
- ISI157617 - ISI157617
- ISI158500 - ISI158503
- ISI159890 - ISI159918
- ISI160149 - ISI160149
- ISI160259 - ISI160259

- ISI160946 - ISI160946
- ISI161141 - ISI161146
- ISI162944 - ISI162944
- ISI163275 - ISI163278
- ISI163849 - ISI163849
- ISI163851 - ISI163927
- ISI164070 - ISI164070
- ISI164077 - ISI164080
- ISI164496 - ISI164499
- ISI164717 - ISI164720
- ISI165059 - ISI165059
- ISI165091 - ISI165091
- ISI165444 - ISI165444
- ISI166897 - ISI166910
- ISI168053 - ISI168054
- ISI168079 - ISI168079
- ISI168478 - ISI168478

- ISI168669 - ISI168670
- ISI168919 - ISI168919
- ISI171531 - ISI171531
- ISI172320 - ISI172320
- IS-SUB_E067042 - IS-SUB_E067050
- SEC-ISI 0001777 - SEC-ISI 0001781
- SEC-ISI 0002051 - SEC-ISI 0002055
- SEC-ISI 0006604 - SEC-ISI 0006609
- SEC-ISI CORR 000638 - SEC-ISI CORR 000638
- SEC-ISI CORR 016639 - SEC-ISI CORR 016646
- SEC-ISI CORR 017942 - SEC-ISI CORR 017950
- SEC-ISI CORR 018014 - SEC-ISI CORR 018022
- SEC-ISI CORR 019512 - SEC-ISI CORR 019513
- SRC 0548 - SRC 0548
- SRC 0550 - SRC 0551
- SRC 0807 - SRC 0813

## Other Documents

- Deposition of Albert Alderete, August 4, 2011 and Exhibits 333-343
- Deposition of Wallace E. Christner, Esq., July 19, 2011 and Exhibits 299-320
- Deposition of Brian Dunn, July 21, 2010 and Exhibits 95-106
- Deposition of James P. Dvorak, Jr., June 27, 2011 and Exhibits 191-224
- Deposition of John Flaherty, August 3, 2011 and Exhibits 321-332
- Deposition of Peter J. Gaffney, July 8, 2011 and Exhibits 284-298
- Deposition of Geoffrey R. Garinther, Esq., April 26, 2011 and Exhibits 107 - 140
- Deposition of Thomas L. Gough, July 7, 2011 and Exhibits 225-283
- Deposition of Treazure Johnson, May 18, 2011 and Exhibits 154-168
- Deposition of Dominic Laiti, May 6, 2010 and Exhibits 28-36
- Deposition of William Leimkuhler, May 11, 2010 and Exhibits 37-70
- Deposition of Doss McComas, May 5, 2010 and Exhibits 1-27
- Deposition of Herbert G. Smith, II, Esq., May 11, 2011 and Exhibits 141-153
- Deposition of John Sullivan, May 25, 2011 and Exhibits 169-190
- Deposition of Bonnie Wachtel, May 25, 2010 and Exhibits 71-94
- Investigative Exhibits 1-160
- *In the Matter of Integral Systems, Inc.*, United States Securities and Exchange Commission, HO-10383, "Wells" Memorandum on Behalf of Gary A. Prince, dated August 15, 2008 & Exhibits [Exhibit A: "Documents Reflecting Venable LLP Legal Advice"; Exhibit B: "Documents Reflecting Venable LLP Legal Advice"; Exhibit C: "Gary A. Prince's SEC Deposition Transcript" (May 30, 2007; May 31, 2007; June 13, 2007); Exhibit D: "Elaine Parfitt Brown's SEC Deposition Transcript" (May 20, 2007; September 13, 2007; September 14, 2007; October 2,

2007; October 3, 2007); Exhibit E: "Steven R. chamberlain's SEC Deposition Transcript" (July 11, 2007; August 8, 2007)]

- EPB023417.pdf
- GAP122448.pdf
- GAP124606.pdf
- ISI130999.pdf
- Integral Systems, Inc. Form 10-K for fiscal year ended September 30 (2000-2005)
- Integral Systems, Inc. Form 8-K, filed January 10, 2002
- Integral Systems, Inc. Form 8-K, filed January 6, 2004


**Websites**

- www.aicpa.org
- www.aicpa.org/About/Pages/About.aspx
- www.calcpa.org
- www.sec.gov
- www.sec.gov/about/whatwedo.shtml
- www.sec.gov/about/laws.shtml
- www.macpa.org


**Reference Materials**

- *Touche Ross & Co. v. SEC*, 609 F.2d 570 (2d Cir. 1979)
- *United States Securities Exchange Commission v. Steven R. Chamberlain, et al.*, Case Number: 1:09-cv-01423, complaint, July 30, 2009.
- *In the Matter of Robert W. Armstrong, III*, Administrative Proceeding File No. 3-9793, Accounting and Auditing Enforcement Release No. 2264, June 24, 2005
- *In the Matter of GARY A. PRINCE, CPA*, Administrative Proceeding File No. 3-9338, Accounting and Auditing Enforcement, Release No. 927, June 24, 1997
- *In the Matter of ROBERT McCLERNON, C.P.A*, Administrative Proceeding File No. 3-9094, Accounting and Auditing Enforcement Release No. 820, September 24, 1996
- *In the Matter of DANIEL C. LANGFORD, CPA, DANIEL C. LANGFORD, JR., CPA, STEPHANUS A. de KOCK, CPA, and PETER P. IRBY, CPA*, Administrative Proceeding File No. 3-9238, Release No. 877, February 6, 1997
- *In the Matter of ROBERT J. GLUCK*, Administrative Proceeding File No. 3-11019, Accounting and Auditing Enforcement Release No. 1705, January 27, 2003
- *In the Matter of MICHAEL R. DROGIN, CPA*, Administrative proceeding File No. 3-10762, Accounting and Auditing Enforcement Release No. 3227, January 11, 2011
- *In the Matter of JAMES A. TERRANO, LYNN R. MICHL, CPA*, Administrative Proceeding File No. 3-9516, Accounting and Auditing Enforcement Release No. 999, December 23, 1997
- *In the Matter of JERRY M. WALKER, CPA*, Administrative Proceeding File No. 3-10078, Accounting and Auditing Enforcement Release No. 1191, October 18, 1999

- *In the Matter of SULCUS COMPUTER CORPORATION, JEFFREY S. RATNER, and John PICARDI, CPA*, Administrative Proceeding File No. 3-8996, Accounting and Auditing Enforcement, Release No. 778, May 2, 1996
- *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Securities and Exchange Commission, Release Nos. 33-8350, 34-48960, FR-72
- *SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, Securities and Exchange Commission, Release Nos. 33-6835; 34-26831; IC-16961; FR-36
- *Final Rule: Amendment to Rule 102(e) of the Commission's Rules of Practice*, Securities and Exchange Commission, Release Nos. 33-7593; 34-40567; 35-26929; 39-2369; IA-1771; IC-23489; File No. S7-16-98
- Securities Exchange Act of 1933
- Securities Exchange Act of 1934
- 17 C.F.R. §201.102
- 17 C.F.R. §201.2 (As of 1984)
- 17 C.F.R. §205.2
- 17 C.F.R. §229.303 (Item 303 of Regulation S-K)
- Robert Libby, Patricia A. Libby, Daniel G. Short, *Financial Accounting*, third edition, The McGraw-Hill Companies, Inc., (2001)
- Ray H. Garrison, Eric W. Noreen, Peter C. Brewer, *Managerial Accounting*, eleventh edition, The McGraw-Hill Companies (2006)
- Ronald Duska, Brenda Shay Duska, Julie Anne Ragatz, *Accounting Ethics*, second edition, John Wiley & Sons (2011)