**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

**SECURITIES AND EXCHANGE**     :
**COMMISSION,**     :
    :
       **Plaintiff,**     :
    :
     **v.**     :    **Civil Action No. 09-1423 (GK)**
    :
**GARY A. PRINCE,**     :
    :
       **Defendant.**     :
_____:

**<ins>MEMORANDUM OPINION</ins>**

Plaintiff United States Securities and Exchange Commission ("SEC" or "the Commission") brings this civil action against Defendant Gary A. Prince ("Prince") alleging violations of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77a <ins>et seq.</ins>, the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a <ins>et seq.</ins>, and various Rules promulgated under the Exchange Act. On December 10, 2012 through January 4, 2013, the Court held a bench trial in which fifteen witnesses testified. Based on the testimony presented by those witnesses, the voluminous number of exhibits admitted into evidence, the parties' representations of what facts were not in dispute, and the applicable caselaw, the Court makes the following findings of fact and conclusions of law.

TABLE OF CONTENTS

I.  FINDINGS OF FACT ........................................... 5

A.  Creation of Integral Systems, Inc. ...................... 5

B.  Prince's Duties and Activities Between 1982 and 1998 ..... 5

C.  Prince's Duties and Activities Between December 1998 and
    August 2006 ............................................. 8

    1.  Prince Becomes a Full-Time Employee at Integral ........ 8

    2.  Mergers and Acquisitions Program ..................... 11

    3.  Prince's Compensation ................................ 13

    4.  Prince's Stock Options ............................... 13

    5.  Executive Management Salaries/Bonuses ................ 14

    6.  The "Gang of Six"/"Gang of Seven" .................... 14

    7.  Advisor to Chamberlain ............................... 15

    8.  Prince's Responsibility for the Contracts Department .. 17

    9.  Drafting the MD&A Section of Public Filings .......... 19

    10. Reviewing and Commenting on Drafts of Public Filings .. 20

    11. Prince's Role During Brown's Maternity Leave ......... 21

    12. Financial Press Releases ............................. 23

    13. Financial Forecasting ................................ 23

    14. Financial Presentations .............................. 23

    15. Attendance at Board of Directors Meetings ............ 24

    16. Prince's Involvement with the Accounting Department ... 24

D.  Integral's Knowledge and Actions from December 1998 to
    August 2006 ............................................ 26

E.  Role and Involvement of Counsel ........................ 28

    1.  Venable Becomes Corporate Counsel .................... 28

    2.  The Relationship Between Venable and Integral ........ 29

    3.  Consultation with Venable Regarding Prince's Hiring ... 30

    4.  Venable's Knowledge of Prince's Duties and Activities . 32

    5.  Integral's Conversations with Venable about Prince's
        Possible Officer Status .............................. 34

        a.  Fall of 1999 .................................... 34

        b.  January 2001 .................................... 37

c.    Spring and Summer of 2002 ........................... 38

6.    Venable's Termination as Corporate Counsel ............ 39

7.    Venable's Rehiring by the Board of Directors Audit Committee............................................... 40

8.    DLA Piper's Resignation as Corporate Counsel and Venable's Rehire........................................ 42

9.    In December 2005, Venable Again Researched Whether Prince Needed to Be Disclosed in Public Filings.................... 42

10.   Integral's Filing of a Form 8-K Disclosing Wachtel's Allegations............................................. 44

11.   NASDAQ and SEC Investigations ........................ 45

12.   In August 2006, Prince Is Named an Executive Officer and Disclosed to the SEC...................................... 51

13.   Advice from Venable to Integral ....................... 53

F.   Post-2006 Activities and Procedural History ............. 54

II.   CONCLUSIONS OF LAW ..................................... 56

A.   Legal Framework ......................................... 56

B.   Prince's De Facto Officer Status ........................ 62

1.    Prince's Duties, Functions, and Responsibilities Did Not Involve Performing Policy Making Functions................. 66

C.   Count VI: Liability under Section 16(a) and Rule 16a-3 of the Exchange Act ........................................... 73

D.   Count II: Liability Under Section 10(b) and Rule 10b-5 of the Exchange Act ........................................... 74

1.    Prince Did Not Act With Scienter When He Did Not File Section 16(a) Reports...................................... 76

a.    Integral Requested and Received Venable's Advice After Making Complete Disclosure ............................. 77

b.    Integral Relied on Venable's Advice in Good Faith ... 81

c.    In Subsequent Years, Venable Reiterated its Conclusion That Prince Could Work at Integral Without Disclosure .... 82

2.    The SEC Did Not Establish That a "Scheme to Defraud" Existed ................................................. 91

E.   Count III: Liability under Section 13(a) and Rules 13a-1 and 12b-20 of the Exchange Act ............................. 92

1.    Scienter .............................................. 93

F.   Count V: Liability Under Section 14(a) and Rule 14a-9 of the Exchange Act .......................................... 94

G.   Count VII: Practicing Accounting Before the Commission .. 95

1.   Prince Violated the Commission Rule 102(e) Order Barring Him from Appearing or Practicing Before the Commission as an Accountant ................................................. 95

2.   Prince Did Not Obtain or Rely on Advice of Counsel Regarding Practicing Accounting Before the Commission..... 109

H.   Relief ............................................. 112

III.  CONCLUSION ........................................... 118

I.    **FINDINGS OF FACT**

    **A.    Creation of Integral Systems, Inc.**

1.    Integral Systems, Inc. ("Integral") is incorporated and headquartered in Maryland. It makes and sells satellite ground systems, including satellite communications systems and software products for satellite command and control.

2.    Integral was founded in 1982. One of the founders was Steven R. Chamberlain, who served as Integral's Chairman and Chief Executive Officer ("CEO") from 1982 until 2006.

3.    Integral became a public company in 1988. At all times relevant to this action, Integral was an issuer of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78l.

    **B.    Prince's Duties and Activities Between 1982 and 1998**

4.    In 1982, Prince was retained as a consultant by Integral to help set up its financial books and record systems. He also served as a Director on Integral's Board.

5.    In 1992, Prince became Vice President and Chief Financial Officer ("CFO") of Integral during which he had the "final call"

on accounting matters. He was not a full-time employee and performed his duties as a part-time consultant.

6.   In June 1993, as a consequence of Prince's conduct as CFO of the public company Financial News Network, the SEC filed suit against Prince for violation of the federal securities laws.

7.   On July 9, 1993, Integral issued a Form 8-K (a filing that a company is required to make disclosing any material event important to shareholders or the SEC) disclosing that Prince had been charged by the SEC.

8.   On August 18, 1994, Judge Charles R. Richey of the U.S. District Court for the District of Columbia entered an Order of Final Judgment of Permanent Injunction against Prince. S.E.C. v. Gary A. Prince, Civ. No. 93-1331 (D.D.C. 1994). That Judgment prohibited Prince from violating the securities laws in the future, including Section 10(b) and Rule 10b-5 of the Exchange Act.

9.   On March 31, 1995, Prince resigned as a Director and CFO of Integral.

10.  On May 10, 1995, Integral filed a Form 10-Q (a quarterly financial report filed with the SEC) disclosing that Prince had resigned his Director and Officer positions at Integral and noting that Integral would continue to use his services as a consultant.

11.  After Prince's resignation, Prince continued to act as a consultant to Integral from April 1995 until he joined the company on a full-time basis in December 1998. In this capacity, Prince reported directly to Chamberlain. His work included performing financial analyses, evaluating companies for purposes of acquisition and/or merger, drafting the "Management Discussion and Analysis" ("MD&A") section of the Form S-1 (a registration statement filed with the SEC to register a company's securities), making revenue forecasts, drafting press releases, offering bonus suggestions for members of executive management, and helping to prepare public filings. Prince ceased to be responsible for day-to-day accounting decisions and no longer had the "final call" on accounting matters.

12.  On September 5, 1995, Prince entered a plea of guilty to two felony counts in the District Court for the Central District of California charging him with conspiracy under 18 U.S.C. § 371

and making a false statement to the SEC in violation of 18 U.S.C. § 1001. The charges also arose from Prince's conduct as CFO of Financial News Network. He was sentenced in late 1995 to two months' incarceration, two months of home detention, a $50,000 fine, and three years of probation.

13.  On June 24, 1997, the Commission issued an Order pursuant to Commission Rule 102(e), 17 C.F.R. § 201.102(e), permanently prohibiting Prince from exercising "the privilege of appearing or practicing before the Commission as an accountant." ("Accounting Bar"). Pl.'s Ex. 2. The Commission provided no further guidance to Prince on what the Accounting Bar permitted him to do and not do.

### C.  Prince's Duties and Activities Between December 1998 and August 2006

#### 1.  Prince Becomes a Full-Time Employee at Integral

14.  In December 1998, Prince and Chamberlain began discussing how to structure a role for Prince as a full-time employee at Integral.

15.  Chamberlain wanted to create a position for Prince that would not require Integral to disclose Prince's legal history in its public filings. Since Chamberlain knew that officers had to

be disclosed in a public company's filings, Prince could not serve as an officer. Chamberlain also wanted to create procedures ensuring that Prince would not be involved with the accounting department and the accounting data.

16.  Moreover, Chamberlain was clear that he did not want Prince to become an officer because the bylaws gave all officers the ability to sign contracts and bind the company. Chamberlain did not want Prince to have that sort of unchecked authority because Chamberlain, though very appreciative of Prince's skills and experience, also believed that Prince had an inflated sense of his own worth and a propensity to meddle in areas beyond his responsibilities.

17.  A series of "carveouts" were created to "fence in" Prince's roles and duties. Prince was not allowed to sign contracts or checks or bind the company in any way; he was not allowed to hire or fire staff without permission; and he was not allowed to hold himself out to be a vice president or officer of Integral.

18.  Prince was not allowed to participate in accounting staff meetings and was not allowed to work on preparation of Integral's financial statements. In general, he was also denied "write" privileges to the network drives where the accounting

numbers were stored, and at times he was denied "read" access to the interim numbers.

19.  Around the time Prince was hired as a full-time employee, Chamberlain communicated these "carveouts" in person to Elaine Brown,[1] the company's Chief Financial Officer, and Thomas Gough, the company's President and Chief Operations Officer. Although these "carveouts" were never put in writing, they were well-known and understood throughout the company, and were monitored by Chamberlain.

20.  Prince's primary responsibility was development of a mergers and acquisitions program. Prince would also continue the work he had been doing as a consultant including drafting the MD&A, making revenue forecasts, drafting press releases, offering bonus suggestions for members of executive management, and helping to review and prepare public filings. Finally, Prince would also function as a general advisor and staff member to Chamberlain, as well as to other members of management.

21.  As part of his general advisory role, Prince would regularly share his opinion on a variety of subjects beyond

---

[1] Elaine Brown is Elaine Parfitt's married name. Test. of Elaine Brown, Trial Tr. Dec. 14, 2012, A.M. Session 68. This opinion will refer to her as "Brown," which she used professionally.

those directly related to his financial background and experience. This activity was consistent with the broader culture established by Chamberlain, who encouraged all employees to share their opinions on any subject. Prince, a bit of a gadfly, was particularly likely to share his opinions, except on technical details to which he admitted total lack of knowledge. His considerable business acumen and experience and his close relationship to Chamberlain meant that he had a significant amount of influence. However, the other employees regularly disagreed with and disregarded his opinions, if and when they thought necessary. Moreover, Chamberlain retained control over all final decisions.

22. On December 30, 1998, Prince was hired as a full-time employee and given the title "Director of Mergers and Acquisitions."

### 2.   Mergers and Acquisitions Program

23. As the Director of Mergers and Acquisitions, Prince investigated possible acquisitions of other companies for Integral and reported his findings directly to Chamberlain. Chamberlain would then negotiate the price and the contract details based on Prince's information.

24. Once a subsidiary was acquired, Prince's primary responsibility was to assess the financial health of the business and effectiveness of its existing management. After acquisition or merger, Prince was in charge of overseeing the operations of the subsidiaries. After acquisition, he also supervised the activities of those companies who were acquired and in some cases later shut down.

25. Prince served as Board Chairman and/or a Director for the corporations created to acquire various subsidiaries.

26. Prince also played a role in assessing officer compensation for the subsidiaries and recommended whether certain subsidiaries' officers should be promoted, demoted, or terminated. The ultimate decision on those issues, however, remained with Chamberlain.

27. As part of his assessment of the financial health of newly-acquired subsidiaries, Prince interacted with their accounting staffs. He investigated their financial statements, made suggestions on how they should record certain transactions, and consulted with Integral's accounting staff on how the subsidiaries' financial statements would be consolidated with

Integral's statements. Prince also consulted with outside auditors about financial questions related to subsidiaries.

28. While Prince "wouldn't hesitate to ask questions and review [a subsidiary's] financial results," the accounting itself was done by the subsidiary's accountants, who were supervised by and reported to Brown as Integral's CFO. Test. of Elaine Brown, Trial Tr. Dec. 14, 2012, P.M. Session 24-25.

29. Prince regularly made presentations to Integral's Board of Directors regarding potential acquisitions and issues regarding subsidiaries.

### 3.  Prince's Compensation

30. Between December 1998 and August 2006, Prince was consistently one of the five highest paid individuals at Integral.

### 4.  Prince's Stock Options

31. Prince was granted Integral stock options in 2000, 2001, 2002, 2003, and 2004.

32. Prince did not file a Form 3 (an initial statement to the SEC regarding beneficial ownership of securities), Form 4 (a

statement to the SEC of changes in beneficial ownership of securities), or Form 5 (an annual statement to the SEC of changes in beneficial ownership of securities) between December 1998 and July 2006.

### 5.   Executive Management Salaries/Bonuses

33. At various times, Prince proposed what bonus amounts members of executive management should receive. This was done in collaboration with others. The bonuses recommended by the group would then go to Chamberlain for final approval. After he approved, Brown or Gough would present the recommendations to the independent Directors for approval.

34. Prince also collaborated with members of executive management in recommending salary increases for Chamberlain.

### 6.   The "Gang of Six"/"Gang of Seven"

35. Chamberlain, Gough, Brown, and Prince, as well as two or three additional executive-level employees, were referred to as the "Gang of Six" or "Gang of Seven," or "G6" or "G7" ("G6/G7").

36. The group was formed by Chamberlain in order to discuss companywide policies on a variety of issues, including human resource decisions, benefits, personnel, and mergers and

acquisitions. Prince participated in G6/G7 meetings as an equal member.

37. Brown, Gough, Peter Gaffney,[2] Prince, and Chamberlain all testified[3] consistently and credibly that G6/G7 served as an advisory vehicle to assist Chamberlain in making policy for the company, and that Prince did not have authority to make policy as a member of G6/G7.

### 7.  Advisor to Chamberlain

38. In addition to advising Chamberlain in his capacity as a member of G6/G7, Prince also served as a general advisor to Chamberlain. His office was located immediately next to Chamberlain's office.

---

[2] Gaffney held various positions in the company over the years. When Prince started working at Integral as a full-time employee in 1998, Gaffney was Vice President of the Commercial Division. In 2000, he became Vice President of Product Development. In 2004, he became Vice President of the Government Division and Chief Operating Officer. In the late spring of 2006, he became Chief Executive Officer of Integral after Chamberlain stepped down.

[3] Although the Court refers to Chamberlain's "testimony," he died before trial and thus was unavailable to testify in open court. For ease, the Court refers to the contents of the two investigative depositions taken by the SEC in 2007 and submitted in Joint Exhibit 3 as Chamberlain's "testimony."

39.   Prince could not and did not make policies or rules or standards within the company. Until the summer of 2005, <u>see</u> <u>infra</u> ¶¶ 41-49 (describing Prince's authority over Contracts Department), he did not have a Group[4] that reported to him and therefore had no staff to direct, hire, or fire. Generally, Prince would advise and make recommendations to Chamberlain, who would then accept or reject them. Once Chamberlain made a decision, Prince or the relevant Group head would then implement it.

40.   Prince's influence with Chamberlain was well-recognized throughout the company. For example, because of Prince's relationship with Chamberlain, people would often consult him to get a sense of how Chamberlain might react to a particular idea or suggestion. However, despite his significant influence, the Integral employees testified consistently that they felt free to disagree with Prince and regularly did disagree with him.

---

[4] The Integral employees referred to the various divisions of the company as "groups" or "operating groups."

### 8. Prince's Responsibility for the Contracts Department

41. Prior to July 2005, Brown was head of the Contracts Department at Integral.[5]

42. In the first half of 2005, at least two contracts were signed by Group heads containing significant errors which injured Integral financially. Chamberlain concluded that further review of contracts was needed before any contracts were finalized.

43. On July 6, 2005, Brown emailed the staff of Integral, telling them that only officers, including Prince, had the authority to sign contracts. She testified that she did not mean to suggest that Prince was an officer, and that after this email was sent she spoke to Prince and confirmed he was not in fact an officer and did not have authority to sign off on contracts. No formal correction was ever disseminated.

---

[5] When Brown began at Integral in 1983 as a receptionist/administrative assistant, she did not have a college degree. She was promoted quickly within Integral and worked as a staff accountant while she pursued her college degree. Eventually, she obtained her degree and then pursued and obtained a Certified Public Accountant (C.P.A.) license, all while working full-time as Integral's CFO.

44.  In the same email, Brown stated that Prince had been
"designated by [executive management] to review/approve
contracts and subcontracts" relating to specific business areas,
and that individuals must "obtain and retain proof that [Prince]
ha[d] reviewed/approved" a contract before it could be
finalized. Pl.'s Ex. 95. The contracts that Prince had to
approve were the "high value" or "primary" contracts.

45.  Even after this email was sent, Prince did not execute or
sign any contracts on behalf of Integral.

46.  On August 1, 2005, Chamberlain sent an email to Integral
managers stating that "effective immediately and until further
notice, no contract with our customers, nor any subcontract with
our teammates, is to be executed until approved by either Gary
Prince or myself." Pl.'s Ex. 96; Def.'s Ex. 109. Thus, the
system that emerged was that all major contracts were reviewed
by Prince and required either Prince or Chamberlain's approval.

47.  Albert Alderete, a contracts administrator at Integral,
Gaffney, Brown, Gough, Chamberlain, and Prince all testified
consistently that, while Prince reviewed contracts, the final
decisions remained with the heads of the various Groups. Prince
was never given the authority to sign off on contracts. Rather,

—18—

he performed a screening role to ensure that contracts were properly drawn and, in particular, that all financial calculations were correct.

48. On August 12, 2005, the Contracts Department was notified that it was to be placed under Prince's direction. Prince began to supervise the two employees in the Contracts Department, including exercising hiring and firing power. He also made salary decisions and did performance reviews.

49. In this time period, Prince was named "Managing Director of Operations."

### 9. Drafting the MD&A Section of Public Filings

50. One of Prince's responsibilities included writing a first draft of the MD&A section of Integral's Form 10-Q and 10-K (an annual financial report filed with the SEC) filings.

51. The MD&A is a business discussion which attempts to explain the financial results for a particular period of time. It may include comparisons to prior periods and/or forecasts or projections for future periods. Before Prince took responsibility for the MD&A, Chamberlain, Steve Carchedi,

Gaffney, and Gough all contributed to writing it. None of these individuals was an accountant.

52.   Prince would update the prior filing's MD&A only after the accounting department had closed its books "for all intents and purposes." Test. of Elaine Brown, Trial Tr. Dec. 14, 2012, P.M. Session 22-23. His narratives were edited, and ultimately, it was Chamberlain who approved the final version of the MD&A that was filed.

### 10.   Reviewing and Commenting on Drafts of Public Filings

53.   When a reporting period ended, the accounting department would close its books, and then, using the prior reporting period's filing as a template, would update the numbers and language. Brown would then circulate this draft "among the management team, among the outside directors, and just solicit comments and feedback." Test. of Elaine Brown, Trial Tr. Dec. 14, 2012, P.M. Session 18. Brown served as the "gatekeeper" of the various comments she received from these individuals, and would incorporate the comments she believed were appropriate and ignore the ones she believed were not appropriate. Id. at 18-19.

54.  Prince regularly reviewed and commented on these draft filings. Prince's comments included asking questions, asking for backup related to particular figures, pointing out internal inconsistencies, suggesting additional language, deletions, or rephrasings, adding information or correcting information related to mergers and acquisitions, and changing numbers related to future forecasts. In addition to reviewing and commenting on the drafts themselves, he occasionally raised questions about the accuracy of materials related to the public filings and made suggestions in email exchanges with Brown and others while the company was preparing its filing.

55.  Prince's comments were not always accepted, and even when his suggestions were good ones, they were not always incorporated verbatim. Brown testified credibly that she did not feel any particular pressure to accept or reject suggestions made by Prince.

### 11.  Prince's Role During Brown's Maternity Leave

56.  Brown was on maternity leave in the fall of 2004 and early 2005 when Integral prepared its Form 10-K for fiscal year 2004 and its Form 10-Q for the first quarter of fiscal year 2005.

57. On October 27, 2004, Prince sent an email asking questions about the fourth quarter of fiscal year 2004 to Pat Carey, Integral's Controller, and Al Smith, Integral's Assistant Controller.[6] Prince copied Brown on this email. The email began, "Now that I'm running the Accounting Dept., :) . . ." Pl.'s Ex. 79.[7]

58. Brown and Prince both testified that they understood this phrase to be a joke. As Prince observed, "if I was making a coup of the accounting department, I probably wouldn't have copied Ms. [Brown] on it." Test. of Gary A. Prince, Trial Tr. Jan. 3, 2013, P.M. Session 83. Brown and Prince concurred, as did Chamberlain, that Prince was not running the accounting department during this period. Brown testified that she continued to be involved from home, and delegated ultimate responsibility to Carey, her second in command.

59. While Prince was more involved than usual in the preparation of these filings, he testified, as did Chamberlain, that his role was, primarily, to coordinate the gathering of all

---

[6] This term was used in the company's official documents, not the more commonly used term "comptroller."
[7] As can be seen from a large number of exhibits in the record, Prince not only had a very high opinion of himself, but also liked to poke his views into everyone else's work. He also had a penchant for writing emails he would later come to regret.

the required information from various subsidiaries for preparation of the Form 10-K and Form 10-Q.

### 12.   Financial Press Releases

60.   Another of Prince's responsibilities was drafting financial press releases, particularly pre-earnings press releases. A pre-earnings press release discusses a company's financials before the actual numbers are released. Press releases are incorporated into Form 8-K filings.

61.   Prince wrote the press releases after the numbers had been finalized by the accounting department. He was not engaged in the actual calculation of the numbers.

### 13.   Financial Forecasting

62.   Prince regularly engaged in financial forecasting, which were projections of future earnings. Although Prince would circulate internal emails which would predict earnings per share, the official number released to the street was generated by the operating Groups and the accounting department.

### 14.   Financial Presentations

63.   Prince gave two presentations to the Board of Directors focusing on financial forecasts. He also gave a presentation to

the Board of Directors on the "core business" at the request of
an independent Director. Def.'s Ex. 133.

64.  Brown testified that it was her responsibility to make
reports to the Board of Directors on overall company financial
performance. She gave numerous such presentations.

65.  Prince also gave financial presentations and tutorials to
fellow staff members.

### 15.  Attendance at Board of Directors Meetings

66.  Prince regularly attended Board meetings, even when he was
not making a presentation. Other non-Board members and non-
officers were periodically invited to and did attend Board
meetings.

### 16.  Prince's Involvement with the Accounting Department

67.  Prince occasionally interacted with the accounting
department in various ways. This included commenting on payroll
analyses, discussing incentives, comparing results to forecasts,
assessing Integral's core profitability, analyzing general and
administrative costs, reviewing Defense Contract Audit Agency
("DCAA") submissions, evaluating legal costs, investigating how
capital losses had been booked, creating a software development

amortization plan, assessing how the company should adopt new financial accounting standards, proposing and evaluating segment reporting structure, and assessing whether any particular operating group was spending in an unusual or inappropriate fashion.

68. All of these activities were part of Prince's role as Chamberlain's "watchdog." Test. of Peter Gaffney, Trial Tr. Dec. 10, 2012, P.M. Session 41-42; Test. of Gary A. Prince, Trial Tr. Jan. 2, 2013, P.M. Session 13-14. Again, this was part of the culture established by Chamberlain that encouraged everyone to participate and voice their opinions in areas outside their assigned duties and responsibilities. Prince, in particular, was known for "not [being] shy about giving his opinions, or thoughts, or ideas, or advice." Test. of Elaine Brown, Trial Tr. Dec. 14, 2012, A.M. Session 90.

69. Prince's suggestions were not always followed, and the final call on virtually all decisions was made by Chamberlain. As Prince summarized, referring to Chamberlain's ultimate decisionmaking authority, "Integral was not a democracy; it was a dictatorship." Test. of Gary A. Prince, Trial Tr. Jan. 2, 2013, P.M. Session 16-17.

**D.    Integral's Knowledge and Actions from December 1998 to August 2006**

70.  The fact that Prince was convicted of a felony in 1995 was well-known among Integral staff members and the Board of Directors.

71.  The fact that Prince was barred from practicing accounting before the Commission was also known by many individuals within Integral.

72.  The duties and activities discussed above, <u>infra</u>, ¶¶ 23-69, were also widely known throughout Integral.

73.  There was never any effort to keep Prince's legal problems or his actions, duties, or responsibilities from the Board of Directors, the company's lawyers, or the SEC.

74.  Gaffney, Gough, Brown, and Prince all testified that Prince was not named an officer because Chamberlain strongly preferred not to disclose his biography and past legal troubles. Chamberlain, however, testified that he was not concerned with disclosure <u>per se</u>, noting that Integral had disclosed Prince's conviction in its public filings in 1995.[8] Chamberlain testified

---

[8]  The Form 8-K filing in 1995 predated Prince's criminal conviction for securities fraud and Prince's Accounting Bar.

that his primary concern regarding disclosure was the possibility of shareholder lawsuits.

75. When Integral named its executive officers in February 2000, Prince was not named an executive officer.

76. Between December 1998 and August 2006, Integral filed six Form 10-Ks with the SEC. None of these Form 10-Ks identified Prince as an officer.

77. Between December 1998 and August 2006, Integral filed seven proxy statements prior to annual meetings. These proxy statements did not identify Prince as an executive officer.

78. John Flaherty, a member of the accounting department, Gaffney, Brown, Gough, and Prince all testified credibly that Brown was firmly in control of the accounting department and the financial statements between December 1998 and August 2006. This was also acknowledged by outside auditors in 2002.

---

However, the 1995 filing did note that Prince had been charged with serious securities fraud violations.

### E.    Role and Involvement of Counsel

#### 1.    Venable Becomes Corporate Counsel

79.  In the spring of 1998, John Sullivan, a corporate partner at the law firm of Venable LLP ("Venable"), and Wallace Christner, a senior associate at Venable, "made a pitch" to Integral to serve as corporate counsel in connection with a securities offering. Test. of John Sullivan, Trial Tr. Dec. 17, 2012, A.M. Session 12-13.

80.  After that discussion, Gough informed Sullivan and Christner that Integral had a part-time consultant, namely Prince, with a criminal background.

81.  Chamberlain decided to hire Venable and the firm began working on the Form S-1 filing in early June 1998.

82.  At that point, Sullivan was the senior member of a four-person team at Venable handling Integral's business, and served as the relationship partner with Integral. Christner was the "second-in-command." Test. of Thomas Gough, Trial Tr. Dec. 20, 2012, A.M. Session 81. The third was an associate, Andrea Kaufman, and the fourth was another associate, James Dvorak. W. Craig Dubishar, a government contracts associate at Venable, also worked on Integral issues in 1998.

83. Between December 1998 and August 2006, at least eight additional Venable lawyers worked on Integral matters: Treazure Johnson, a former SEC attorney; Anita Finkelstein, a partner in the DC office who specialized in SEC matters; David Levenson, a senior partner in the securities group; Brian Dunn, an associate in the litigation group; Geoffrey Garinther, a partner; Ron Ben-Menachem; Herbert Smith; and Philip Harvey, a litigator who specialized in investigations.

84. When Sullivan left Venable in May 2001, Christner became the relationship partner and served in that role until at least October of 2006.

### 2. The Relationship Between Venable and Integral

85. To reduce legal costs, Chamberlain decided that Brown would be the conduit between Integral and Venable, and that she would contact Dvorak with any questions or problems Integral had. Dvorak would then consult the more senior members of the Venable team if needed.

86. Venable advised Integral on public filings, securities law compliance, financing matters, mergers and acquisitions, and government contracts.

87. The Venable attorneys understood themselves to be Integral's general corporate counsel, including on disclosure issues, and Integral's Board of Directors understood that Venable was their general corporate counsel on those issues.

88. There was no formal or informal protocol in place by which the Venable lawyers gathered information from Integral about its activities or problems. There was also no system or protocol whereby Venable lawyers who represented Integral later in time became familiar with the work that had been performed for Integral in the past by other Venable attorneys.

89. There was no evidence presented that any employee at Integral ever failed to provide information requested by a Venable lawyer.

### 3. Consultation with Venable Regarding Prince's Hiring

90. Chamberlain, who had no legal training, testified that he spoke to Sullivan at some point before Prince was hired and discussed Prince's legal background and Accounting Bar. Chamberlain insisted that he had given the SEC's Order containing the Accounting Bar to Venable to review in an attempt

to try to figure out what the meaning of "practicing accounting before the Commission" was and what activities it covered.

91.  Brown, Gough, and Prince all testified credibly that they understood that Chamberlain had spoken to Venable about Prince's employment, and that, as a result of that conversation, the "carveouts" and "fencing in" discussed above at ¶¶ 14-19 were put in place.

92.  Sullivan, however, testified that he never discussed hiring Prince with Chamberlain, that Chamberlain never told him about Prince's criminal conviction or Accounting Bar, and that he never provided advice about how to structure Prince's role.

93.  The Court finds that the consistent testimony of Brown, Gough, and Prince was accurate, and that Sullivan, who admitted to not having a clear memory of many of the events which occurred over fourteen years ago, was not accurate.

94.  Venable never prepared any written document describing what Prince could or could not do. Any legal advice given by Venable attorneys was generally transmitted informally to Brown, who then transmitted it to other members of management.

### 4.  Venable's Knowledge of Prince's Duties and Activities

95.  Venable was corporate counsel for Integral for several months in 1998 before Prince became a full-time employee. During that time, Venable lawyers knew that Prince was drafting the MD&A portion of the fiscal year 1998 Form S-1, participating in the preparation of the fiscal year 1998 Form 10-KSB (an abbreviated version of the annual financial 10-K report for small businesses), and that Prince was working on mergers and acquisitions issues.

96.  Between December 1998 and August 2006, Venable lawyers regularly worked with Prince on issues related to mergers and acquisitions. They knew that, in that capacity, Prince was drafting offer letters, reviewing consulting agreements with employees of subsidiaries, asking questions about financial issues pertaining to the subsidiaries, serving as a Board Chairman and/or Director for corporations created to acquire subsidiaries, drafting press releases, and making presentations to Integral's Board of Directors.

97.  Christner and Dvorak knew that Prince interacted with outside auditors on behalf of Integral in his role as Director of Mergers and Acquisitions.

98.  Christner  knew  that  Prince  worked  on  drafting  the  MD&A section of public filings.

99.  Sullivan,  Christner,  and  Dvorak  knew  that  Prince  drafted press releases.

100. Christner  and  Dvorak  knew  that  Prince  reviewed  and commented on drafts of public filings.

101. On  April  12,  2000,  reports  by  two  financial  analysts  were issued  which  contained  lower  projections  for  Integral's  revenues than  previously-issued  reports.  The  price  of  Integral's  common stock  dropped  significantly  and  Integral  issued  a  press  release in  response  to  the  release  of  those  reports.  On  November  1, 2000,  the  SEC  wrote  an  inquiry  letter  to  Integral  asking  for information  regarding  the  events  that  led  up  to  the  press release.

102. On  December  8,  2000,  Venable  sent  a  letter  to  the  SEC  on behalf  of  Integral  in  response  to  its  inquiry  of  November  1, 2000.  The  letter  stated  that  Prince  had  interacted  with  outside financial  analysts  on  behalf  of  Integral,  generated  financial projections,  and  drafted  the  press  release  in  question.

Sullivan, the relationship partner at the time, reviewed this letter before it was sent to the SEC.

103. The SEC never responded to Venable's December 8, 2000, letter. Nor did anyone at the SEC ever contact anyone at Integral or Venable to inform them that Prince's activities, as described in Venable's letter, required him to be disclosed as an executive officer or violated his Accounting Bar.

### 5. Integral's Conversations with Venable About Prince's Possible Officer Status

104. Integral and Venable interacted on three separate occasions between 1999 and 2002 regarding Prince's desire to become an Integral officer.

### a. Fall of 1999

105. In October of 1999, Flaherty and Brown consulted Dvorak and Sullivan about whether to include Prince's compensation and biographical information in the Form 10-KSB for fiscal year 1999. Brown faxed Dvorak various provisions from the Code of Federal Regulations referencing "significant employee" disclosure requirements and excerpts from Integral's public filings related to Prince. Dvorak did not recall following up on this fax with Brown or with Sullivan.

106. A month later, Flaherty asked Brown "about the verdict from [her] discussions with Venable regarding Gary Prince and whether or not he [would] be included" as a highly-paid employee in the executive compensation table in the Form 10-K for fiscal year 1999. Pl.'s Ex. 11. Brown responded to Flaherty and told him not to include Prince in the table.

107. The next day, Dvorak and Flaherty spoke about "16(A) disclosure issues." Def.'s Ex. 46. Section 16(a) of the Securities Exchange Act, 15 U.S.C. § 78p(a), requires certain officers and directors to file beneficial ownership reports with the SEC, including Forms 3, 4, and 5. See supra ¶ 32.

108. A few days later, on December 3, 1999, Brown faxed Dvorak Prince's biography and asked him how she could "avoid including" the biography in the Form 10-KSB for fiscal year 1999, as this was Chamberlain's preference. She referenced a previous discussion she had had with Dvorak where Dvorak suggested removing the word "strategic" from Prince's title and having Chamberlain write a memorandum stating that Prince did not play a key role in the decisionmaking of the company. In addition, she stated in her fax that she did not "intend to include

[Prince] in the Compensation Table since he is not an executive officer." Pl.'s Ex. 13; Def.'s Ex. 23.

109. Dvorak understood Brown's fax to imply that she saw the publication of Prince's biography and his inclusion in the compensation table as separate issues.

110. That same day, Brown sent Dvorak a draft of the Form 10-KSB for fiscal year 1999, and asked to speak to him about the fax she had sent him that morning. Again, there was no record of how, when, and if Dvorak followed up with Brown.

111. When Chamberlain discovered that Brown and Flaherty had been consulting Dvorak about disclosing Prince in the public filings, he was upset that legal costs had been wasted on something Chamberlain believed had been addressed the previous year in his initial consultation with Sullivan. Brown apologized to Chamberlain and Prince for the additional legal costs incurred, and Prince responded, noting that he "believe[d] that changing [his] title [would] do absolutely nothing in terms of protecting the Company in the unlikely event of shareholder litigation." Pl.'s Ex. 15; Pl.'s Ex. 16.

112. Sullivan testified that at or around this time, he spoke with Chamberlain and Gough about Prince's role in the company and Prince's high level of compensation. Sullivan said that they told him that Prince could not make policy and did not have staff reporting to him. On the basis of this information, Venable concluded that Prince did not need to be disclosed as an executive officer.

### b.   January 2001

113. In early 2001, Prince raised the issue of becoming a named executive officer. He set up a meeting with Sullivan and Dvorak, noting that Chamberlain was "amenable to allow [sic] me to reclaim my VP title provided I can do so without any adverse public disclosures in our filings. I plan to present all of this to Venable to ensure that this would be the case." Def.'s Ex. 55.

114. On January 23, 2001, Chamberlain, Prince, Sullivan, and Dvorak met to discuss this issue. At that point, Prince was under the impression that, after five years had passed, he would no longer need to disclose his legal background. Thus, the question put to Venable was when the five years would expire.

115. Sullivan testified that he spoke with Chamberlain about why the issue was being raised. He advised Chamberlain that giving Prince the title of Vice President would indicate that he was an executive officer.

116. Venable concluded that the five-year limit had not yet expired, because the latest triggering event, the issuing of the Accounting Bar, took place in June of 1997. Prince decided that he would re-raise the issue when the five years expired in the summer of 2002.

### c.    Spring and Summer of 2002

117. In March and April of 2002, Prince again raised the issue of becoming a named officer.

118. At the end of April, Venable began researching the officer disclosure question and discussing it with Brown and Prince. Christner asked Anita Finkelstein, a partner who specialized in SEC matters, to research the issue.

119. On April 30, 2002, Finkelstein emailed Christner, suggesting that Prince's conviction might require disclosure beyond the five-year period.

120. On May 1, 2002, Finkelstein emailed Christner again, concluding that Prince's conviction and Accounting Bar would have to be disclosed if he was named an executive officer. She stated: "My bottom line is that if Prince is an executive officer his history needs to be disclosed and will need to be disclosed for the foreseeable future. If one wants to be really compulsive, he or she should also keep in mind that the Rule 405 definition of 'executive officer' includes any folks who perform 'policy making functions' for the registrant. This means that Integral is open to the complaint that, no matter what his title, Integral should have made disclosure about Prince due to the nature of his activities at Integral." Def.'s Ex. 75. No one at Integral received a copy of this email, nor was the second sentence of this email ever conveyed to anyone at Integral.

121. On May 10, 2002, Christner emailed Prince informing him that his conviction would have to be disclosed in the foreseeable future.

### 6. Venable's Termination as Corporate Counsel

122. Sometime between June 2003 and mid-2004, Chamberlain became upset at the fee Venable charged in a particular matter and

decided to fire the firm as corporate counsel. Venable was replaced by the law firm DLA Piper.

### 7. Venable's Rehiring by the Board of Directors Audit Committee

123. In October of 2005, Bonnie Wachtel, an independent Director, raised various corporate governance concerns to the other members of the Board's Audit Committee, Doss McComas and Dominic Laiti. In particular, Wachtel was deeply concerned about Chamberlain's failure to disclose to the Board a recent criminal investigation into his alleged sexual misconduct with an underage female.

124. On November 2, 2005, a Subcommittee, consisting of McComas and Laiti, was created to conduct an internal review of the allegations raised in Wachtel's October 2005 letter. Laiti proposed retaining Venable to conduct an investigation into Chamberlain's actions. Wachtel objected to hiring Venable, alleging that the firm was not independent. Laiti responded by stating that Venable would not risk its reputation by being involved in a "cover-up." Def.'s Ex. 116.

125. The motion to hire Venable was passed by the Board of Directors, and Laiti stated that he would coordinate the review

with Garinther of Venable. The firm was given a $40,000 budget, but no other restrictions were placed upon it.

126. Venable lawyers interviewed Prince and Gough. While the focus of the investigation was on Chamberlain's activities, the lawyers obtained information regarding Prince's duties and activities. In particular, they discovered and/or confirmed that Prince was a member of the G6/G7, that he worked on mergers and acquisitions, and that he reviewed company press releases and portions of SEC filings. See supra ¶¶ 95-100.

127. On November 30, 2005, the results of the independent investigation were presented to the Board of Directors.[9] McComas proposed implementing recommended changes and not pursuing any further investigation. The Board adopted that proposal.

128. Despite having definitive evidence of the range of Prince's responsibilities, including his participation in G6/G7, Venable did not tell Integral at this time that Prince's duties and activities required him to be disclosed as an executive officer or violated his Accounting Bar.

---

[9] No evidence was presented about the specifics of the recommendations.

## 8. DLA Piper's Resignation as Corporate Counsel and Venable's Rehire

129. Sometime between November 2, 2005 and December 5, 2005, DLA Piper resigned as Integral's corporate counsel, at least in part because of frustration over not receiving "full communication about events that may be material to the Company and that require disclosure considerations under the federal securities laws," presumably in reference to Chamberlain's silence about the criminal investigation and charges pending against him. Def.'s Ex. 144. Venable was rehired as corporate counsel in late November or December of 2005, either during the independent investigation or shortly after it was completed.

## 9. In December 2005, Venable Again Researched Whether Prince Needed to Be Disclosed in Public Filings

130. On December 5, 2005, Wachtel sent Brown comments on the draft Form 10-K for fiscal year 2005, and suggested that Prince's biography be included.

131. Executive management decided to confirm with Venable that Prince's biography did not need to be disclosed. Brown then forwarded Wachtel's email to Dvorak and asked him to "guide us on how best to respond." Pl.'s Ex. 112; Def.'s Ex. 136.

132. On December 7, 2005, Dvorak and Brown had a conversation in which Dvorak asked Brown whether Prince had policy making authority, what his title was, whether he could bind the company, and whether his position had evolved or changed. Brown described Prince as an advisor to Chamberlain.

133. On December 8, 2005, Brown emailed Dvorak "as a follow-up to our conversation yesterday." She noted that Prince could not sign contracts and did not have check signing or wire transfer authority. She described Prince as "a staff person reporting to Steve and fill[ing] an advisory role, advising Steve, Tom, Pete and me on company policy and PMs and division heads on contracts." Brown concluded that Prince did not need to be disclosed, but asked to speak with Dvorak to "make sure Venable agrees with our position" before she responded to Wachtel. Pl.'s Ex. 112; Def.'s Ex. 140.

134. There is no evidence that Venable ever responded to Brown's concern.

135. On December 9, 2005, Brown emailed Wachtel, telling her that Prince "is not a named executive officer and does not meet the criteria to be a named exec. officer." Def.'s Ex. 142; Def.'s Ex. 144. Wachtel responded on December 12, 2005,

−43−

reiterating her "preference" that Prince be disclosed. Pl.'s Ex. 104.

136. Executive management forwarded the entire exchange between Brown and Wachtel to McComas and Laiti, the independent Directors. McComas responded, disagreeing with Wachtel's preference. He observed, "We have followed legal and accounting advice on so many issues because of the complexity and need to be up to date expertise [sic] that only they can provide in the 10K as a whole. The specific issues that Bonnie raises are her personal preferences on issues which have previously been covered with our advisors and the 10K has been approved by them so I suggest we move forward with its release." Pl.'s Ex. 104; Def.'s Ex. 143. Laiti emailed the next day indicating that he agreed with McComas. Def.'s Ex. 148.

137. Venable did not tell Integral at this time that Prince should be disclosed, and Integral did not disclose Prince's employment or background in the Form 10-K for fiscal year 2005.

### 10. Integral's Filing of a Form 8-K Disclosing Wachtel's Allegations

138. Wachtel declined to stand for reelection to the Integral Board of Directors. A Form 8-K was filed with the SEC to

disclose this fact. See Hewlett-Packard Co., Exchange Act Release No. 55,801, 90 S.E.C. Docket 1865 (May 23, 2007) (noting that Exchange Act requires public companies to file a Form 8-K when a director resigns because of a disagreement with the company relating to its "operations, policies, or practices").

139. Integral filed its Form 8-K on January 9, 2006, but did not address Wachtel's corporate governance concerns. Instead, at Chamberlain's request, the Form 8-K attached Wachtel's correspondence and summarily stated that Integral disagreed with the content of her letters.

### 11.  NASDAQ and SEC Investigations

140. Two days later, on January 11, 2006, officials from NASDAQ contacted Gough seeking a meeting to discuss "issues raised in the Company's Form 8K." Def.'s Ex. 152.

141. At some point in early 2006, the SEC contacted Integral indicating that it also was going to investigate the events surrounding the filing of the Form 8-K. Christner asked Treazure Johnson, a Venable partner who had previously worked at the SEC, to work on the case.

142. On February 15, 2006, Prince attended an interview with NASDAQ, accompanied by Garinther of Venable.

143. NASDAQ requested any emails between Prince and the Audit Committee. On March 29, 2006, Garinther responded to NASDAQ, on behalf of Integral, noting that Venable had "not seen any communications . . . between Mr. Prince and Integral's outside auditors." Def.'s Ex. 175. The firm made this claim despite knowing that such communications existed. See supra ¶¶ 97, 102.

144. On February 3, 2006, Integral staff emailed Venable lawyers an organizational chart which showed Prince on the same level with the other executive managers, identified him as the "Managing Director of Operations," and showed that he supervised employees in the Contracts Department.

145. On April 7, 2006, Dunn of Venable prepared a memorandum that was circulated internally within the firm addressing whether Prince was a de facto officer of Integral. The memorandum concluded that, "[g]iven Prince's role at the Company, the SEC could reasonably take the position that he was a de facto officer and should have been disclosed as such in the company's SEC filings." Def.'s Ex. 183; Def.'s Ex. 184.

146. Neither this conclusion nor this email was ever conveyed to anyone at Integral.

147. Later in April, Chamberlain retired as CEO, at least in part because of the criminal charges pending against him. Gaffney eventually replaced him as CEO.

148. On April 23, 2006, McComas wrote to Christner on behalf of the independent Directors, asking "some questions regarding the NASDAQ/SEC discussions" about Prince.

149. Christner drafted, and Garinther and Johnson approved, a response to the independent Directors noting that "whether or not he has been acting as an officer seems to be in a gray area," and informing them that the best strategy was to emphasize Prince's "no-officer attributes" and "hope that in light of the company's current status," the SEC would "essentially lose interest in the matter." In addition, Christner noted that the firm "ha[d] not seen any evidence so far that would lead us to believe he has practiced accounting before SEC." Def.'s Ex. 189; Def.'s Ex. 204.

150. Integral's employees were never told directly that whether Prince was an officer was "in a gray area."

151. In June of 2006, Venable began to prepare a letter to the SEC addressing Prince's position in the company.

152. Venable directed Prince to put together a memorandum that described his roles and functions in the company. Christner wanted the memorandum to focus on what Prince was "not doing, not signing contracts, not VP on bus. cards." Def.'s Ex. 198 (emphasis in original); Test. of Elaine Brown, Dec. 14, 2012, A.M. Session 52-55; Test. of Elaine Brown, Dec. 18, 2012, P.M. Session 52-53.

153. Prince's memorandum to Venable indicated that he occasionally had individuals reporting to him directly, participated in G6/G7, made proposals and suggestions related to corporate organization and financial spending and controls, led the Contracts Department, and had been given the added title Managing Director of Operations.

154. On June 21, 2006, Smith, yet another Venable lawyer, emailed Johnson a draft of the proposed letter to the SEC. In his cover email, Smith made several observations. First, he noted that he took an approach in drafting the letter that highlighted "what Prince couldn't/didn't do at ISI." Second, he noted the similarities between Integral's issues and a legal

—48—

case where a company had been held liable for not disclosing as a de facto officer a significant management figure. Third, he raised the possibility that Prince might be a "significant employee" under item 401(c) of Regulation S-K. Def.'s Ex. 211.

155. No one at Venable ever shared any of these observations with Integral.

156. On June 29, 2006, a special Board of Directors meeting was held in which Christner participated by teleconference. Gough suggested naming Prince an executive officer "in light of the recent changes within the Company." Def.'s Ex. 219. The Board took the matter under consideration and decided to put it to vote at a later date.

157. On July 25, 2006, McComas wrote to Christner on behalf of the independent Directors, noting that they had sought advice and a written statement from Venable regarding possible liability, if any, as to the naming of new executive officers.

158. That same day, Christner asked Johnson to research whether Prince's Accounting Bar prevented him from being an officer. Johnson responded, observing that she didn't "see anything to prevent Prince from serving as an officer," noting that the

Accounting Bar was not an officer or director bar. Def.'s Ex.
229. She then noted that the "company will have to [sic] special
care, however, to ensure that he has nothing to do of an
accounting nature and particularly that he has no involvement in
the preparation of the company's financial statements." Id.
Johnson then sent another email, this time to both Garinther and
Christner, wherein she reiterated that she had told Christner
"that the company has to be very careful that he has no
responsibility at all for any accounting functions at Integral
and nothing to do with the preparation of the financials, other
than provide information when asked." Def.'s Ex. 226.

159. No one at Venable ever sent either of these emails or
conveyed the substance of Johnson's conclusions to Integral.

160. Later that day, Christner emailed McComas, informing him
that Venable "[c]oncluded that while the order does prohibit
Gary from practicing accounting before the SEC, it does not
prohibit him from becoming a director or officer of a registrant
such as Integral System [sic]. If Gary does become an executive
officer, however, Integral should take appropriate actions to
insure that his work for the company does not constitute
practicing accounting before the SEC." Def.'s Ex. 232.

161. On July 31, 2006, McComas responded to Christner's email, asking him for a definition of "practicing accounting before the SEC" that the Board could use as guidance to "make sure that the appropriate action is taken to not allow this to occur." Def.'s Ex. 235.

162. The same day, Christner responded to McComas's email, noting that "there is not a clear and useful definition" of practicing accounting before the Commission. He forwarded his response to Johnson and asked for "any further insight." Again, Johnson reiterated that if Prince "stays away from the financials he should be fine." Def.'s Ex. 235. There was no evidence presented that Venable ever passed that information on to Integral management or in any other way provided more guidance to the independent Directors after their email request for a clear and useful definition of practicing accounting before the Commission.

### 12. In August 2006, Prince Is Named an Executive Officer and Disclosed to the SEC

163. On August 2, 2006, the Board of Directors named Prince an executive officer, after agreeing that his "duties and role in the Company" did not include practicing accounting before the

SEC. Def.'s Ex. 237. Venable began preparing a Form 8-K to disclose this fact.

164. On August 4, 2006, Prince filed a Form 3 with the SEC, reporting his ownership of Integral stock options. On August 16, 2006, Prince filed another Form 3 with the SEC, reporting additional Integral stock options.

165. On August 8, 2006, Integral filed a Form 8-K with the SEC identifying Prince as "Executive Vice President and Managing Director of Operations" and disclosing his legal history.

166. On August 14, 2006, Venable sent a letter to the SEC in response to the SEC's inquiry about the January 9, 2006, Form 8-K, stating that it "strongly believe[d]" that Prince was not an executive officer between December 1998 and March 17, 2006. Pl.'s Ex. 129; Def.'s Ex. 241.

167. In September of 2006, SEC lawyers called Johnson and said they had reviewed Venable's submission and were still of the opinion that Prince's employment should have been disclosed. The SEC indicated that they were going to recommend filing an enforcement action. They also told Johnson to let them know if

there were any additional facts they should consider before they made their recommendation.

168. Johnson spoke with Brown to assess whether there were any additional relevant facts to disclose to the SEC.

169. On October 2, 2006, Johnson faxed another letter to the SEC, stating that she had no additional facts to report.

### 13.  Advice from Venable to Integral

170. At no point between December 1998 and August 2006 did anyone at Venable ever advise anyone at Integral that Prince needed to be disclosed to the SEC regardless of his title.

171. At no point between December 1998 and August 2006 did anyone at Venable advise anyone at Integral that any of the activities that Prince was engaging in were activities that might trigger a disclosure obligation.

172. At no point between December 1998 and August 2006 did anyone at Venable advise anyone at Integral that any of the activities that Prince was engaging in were activities that might violate his Accounting Bar.

**F.   Post-2006 Activities and Procedural History**

173. On March 28, 2007, Prince filed a Form 4 with the SEC disclosing changes in his beneficial ownership of Integral securities.

174. On March 30, 2007, Integral terminated Prince's employment.

175. Since his termination, Prince has worked for two private companies and served as executor of Chamberlain's estate. He has also done some consulting work for non-public companies. Brown and Gough testified credibly that they knew of nothing that Prince was currently doing or intended to do which would violate his Accounting Bar now or in the future.

176. On July 30, 2009, the SEC issued an Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing a Cease-and-Desist Order in In the Matter of Integral Systems, Inc., Respondent (Admin. Proceeding File No. 3-13566).

177. On the same day, the SEC filed its Complaint in this Court against Chamberlain, Brown, and Prince. [Dkt. No. 1]

178. On February 18, 2010, Chamberlain was dismissed as a party because of his death. [Dkt. No. 28]

179. On November 26, 2012, Final Judgment as to Brown was entered in this case. Without admitting or denying any allegations against her, Brown paid a civil penalty of $25,000 to the SEC pursuant to Section 21(d)(3) of the Exchange Act of 1934, 15 U.S.C. § 78u(d)(3), in resolution of the claims asserted against her in this civil proceeding. [Dkt. No. 130]

## II.  CONCLUSIONS OF LAW

### A. Legal Framework

The SEC brought several claims against Prince under the securities laws, four of which are still pending. All of those claims are based on the allegation that Prince was a de facto officer of Integral, and that Integral and Prince violated their obligations under the securities laws to disclose his officer status, as well as his troubled legal history.

The Securities Act of 1933 and Securities Exchange Act of 1934 impose a number of obligations on public companies and the individuals who serve as officers and directors of those companies. One of those obligations requires companies such as Integral[10] to file annual reports with the SEC that contain information that would be relevant to the investing public. See Exchange Act Rule 13(a)(2), 15 U.S.C. § 78m(a)(2). In addition, such companies must ensure that their proxy statements contain similar information. See Exchange Act Rule 14(a), 15 U.S.C. § 78n(a).

The Regulations establish what must be included in annual reports and proxy statements to ensure that they are accurate

---

[10] It is undisputed that Integral issued securities registered under Section 12 of the Exchange Act, 15 U.S.C. § 78l, and was thus subject to the Exchange Act's disclosure obligations. See Findings of Fact ¶ 3.

and not misleading. 17 C.F.R. § 229.10(a)(2) (setting out the "requirements applicable to the content of the non-financial statement portions" of certain documents, including annual reports and proxy statements). Among other things, companies must identify all "executive officers" and describe their business experience. Id. § 229.401(b), (e)(1). They must also disclose certain legal proceedings that are "material to an evaluation of the ability or integrity" of any executive officer. Id. § 229.401(f).

The securities laws also require that officers identified in a company's filings make disclosures to the SEC. Among other things, officers are required under Section 16 of the Exchange Act to periodically report any ownership of or transactions in the equity securities of their company. 15 U.S.C. § 78p(a)(1), (3).

In this case, the SEC's claims under the securities laws allege that Integral and Prince failed to comply with their disclosure obligations. Count VI focuses on Prince's failure to file stock ownership disclosure statements and alleges that that failure violated Section 16(a) and Rule 16a-3. See 15 U.S.C. § 78p(a); 17 C.F.R. § 240.16a-3(a) (setting out various forms for use in fulfilling Section 16(a) reporting requirements).

–57–

To establish this claim, the SEC need only show that Prince was a de facto officer, that he owned Integral securities during the relevant time period, and that he failed to file Section 16(a) disclosure reports. See infra n.14 (noting that the SEC has consistently held that no scienter need be established to prove a violation of Section 16(a)).

Count II builds on that claim by alleging that Prince's failure to file Section 16(a) reports with the SEC was part of a "scheme to defraud" the public in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. The SEC argues that the purpose of the scheme was to conceal Prince's role as a de facto executive officer at Integral, and thus conceal from the public Prince's legal history.

Section 10(b) of the Exchange Act forbids anyone to use a "manipulative or deceptive device or contrivance in contravention" of the SEC's rules and regulations. 15 U.S.C. § 78j(b). The primary rule that implements Section 10(b) is Rule 10b-5, which makes it unlawful "to employ any device, scheme or artifice to defraud, . . . or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Exchange Act Rule 10b-5(a), (c); 17 C.F.R.

§ 240.10b-5(a), (c). Violations of Rule 10b-5(a) and/or (c) are referred to as "scheme liability." See Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP, 603 F.3d 144, 158 (2d Cir. 2010).

In order to establish Count II, the SEC must begin by proving what it must prove to establish Count VI: that Prince was a de facto executive officer of Integral, was therefore obligated to file Section 16(a) disclosure reports, and failed to do so.

To establish scheme liability under Section 10(b), the SEC must also prove by a preponderance of the evidence that: 1) Prince did not file Section 16(a) reports in order to perpetuate a "scheme to defraud" that had the principal purpose and effect of not disclosing his history of securities fraud violations to the public; 2) his legal history was a material fact; 3) the scheme was made in connection with the purchase or sale of securities; and 4) Prince had the requisite scienter. See S.E.C. v. Goble, 682 F.3d 934, 942-43 (11th Cir. 2012) (citation omitted) (noting that in an SEC civil enforcement action, the SEC must establish that a misrepresentation or omission was material, made with scienter, and made "in connection with the purchase or sale of securities") (citation omitted); S.E.C. v. Brown, 740 F. Supp. 2d 148 (D.D.C. 2010) (noting that an individual's participation in a scheme to

defraud may result in primary liability only if the individual "engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme") (quotation and citation omitted).

The SEC also brings two claims against Prince for aiding and abetting Integral's alleged failure to fulfill its disclosure obligations. Section 20(e) of the Exchange Act creates aiding-and-abetting liability for "any person that knowingly or recklessly provides substantial assistance to another person" in violation of the securities laws and the rules and regulations issued under those laws. 15 U.S.C. § 78t(e).

Count III alleges that Prince aided and abetted Integral's failure to file accurate and non-misleading annual reports with the SEC. The SEC argues that Integral failed to identify Prince as a de facto officer in its annual reports, making such reports materially false or misleading in violation of Section 13(a) of the Exchange Act and Rules 13a-1 and Rule 12b-29. See 15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.13a-1 and 240.12b-20. The SEC also alleges that Prince provided "knowing and substantial assistance" to Integral's violation by participating in Integral's decision not to disclose him or his violations in those reports. See Graham v. S.E.C., 222 F.3d 994, 1000 (D.C.

Cir. 2000) (noting that to establish aiding and abetting claim under Section 20(e) SEC must show that a principal has committed a primary violation, the aider and abettor provided substantial assistance to the primary violator, and the aider and abettor acted with the requisite scienter).

Thus, to establish Count III, the SEC must show that: 1) Prince was a de facto officer of Integral; 2) Prince's officer status made his legal history material information that Integral was required to disclose in its annual reports; 3) Integral failed to disclose Prince's history, and thus failed to submit complete and accurate annual reports; 4) Prince provided substantial assistance to Integral in its violation; and 5) Prince acted with the requisite scienter.

Similarly, Count V alleges that Prince aided and abetted Integral's distribution of false and misleading proxy statements. The SEC argues that Integral failed to identify Prince as a de facto officer in its proxy solicitations, making those solicitations false or misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9. See 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9. It alleges that Prince aided and abetted that violation by participating in the decision not to disclose his officer status and legal history in those solicitations.

Therefore, to establish Count V, the SEC must show that: 1) Prince was a _de facto_ officer of Integral; 2) Prince's officer status made his legal history material information that Integral was required to disclose in its proxy statements; 3) Integral failed to disclose Prince's history, and thus distributed false and misleading proxy statements; 4) Prince provided substantial assistance to Integral in its violation; and 5) Prince acted with the requisite scienter.

Because all four of these counts require the SEC to establish by a preponderance of the evidence that Prince was a _de facto_ officer of Integral, the Court addresses that issue first.

### B.  **Prince's _De Facto_ Officer Status**

Counts II and VI allege that Prince was an officer under Section 16 of the Exchange Act and therefore was required to file beneficial ownership reports, which he failed to do. Counts III and V allege that, because Prince was an officer, Integral was required to disclose him and his legal history in its annual reports and proxy statements, which it failed to do. Thus, the SEC must establish by a preponderance of the evidence that Prince was a _de facto_ officer of Integral as a necessary prerequisite to prove any of these claims.

Exchange Act Rule 3b-7 defines an "executive officer" to include a company's "president, any vice president . . . in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the registrant." 17 C.F.R. § 240.3b-7.

Exchange Act Rule 16a-1 defines an "officer" to include a company's "president, principal financial officer, principal accounting officer (or, if there is no such accounting officer, the controller), any vice-president of the issuer in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy-making function, or any other person who performs similar policy-making functions for the issuer." Id. § 240.16a-1(f). Neither the Regulations nor caselaw provide any additional description or definition of "policy-making functions."

The Second Circuit has interpreted the broad language of the Regulations to require a court to reject reliance on an employee's title and instead to perform a fact-intensive analysis of the employee's duties and responsibilities to determine if they are a de facto officer. See Colby v. Klune, 178 F.2d 872, 873 (2d Cir. 1949) (addressing whether an

–63–

individual is an officer under Section 16(b) of the Exchange Act, which prevents officers from using private information for short-swing profits).

Versions of this functional approach, mentioned favorably by the Supreme Court,[11] have been adopted by the Fourth, Sixth, and Ninth Circuits. See Winston v. Fed. Exp. Corp., 853 F.2d 455, 456-57 (6th Cir. 1988) (evaluating whether individual who had been vice-president still had access to confidential information after his resignation); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Livingston, 566 F.2d 1119, 1122 (9th Cir. 1978) (noting that "court must look behind the title . . . to ascertain [a] person's real duties"); Gold v. Sloan, 486 F.2d 340, 351 (4th Cir. 1973) (rejecting "objective test" and evaluating facts to determine if particular officer actually received insider information).

This mode of analysis has also been applied outside of the Section 16(b) context. See S.E.C. v. Solucorp Industries, Ltd., 274 F. Supp. 2d 379, 382-87 (S.D.N.Y. 2003) (using functional approach to determine liability under Section 10(b) and rule

---

[11] Wolf v. Weinstein, 372 U.S. 633, 652 n.19 (1963) (citing Colby, 178 F.2d at 875) (observing that in the context of Section 16(b), "it is clear that a determination of who is a corporate 'officer' within the meaning of the statute requires a flexible assessment of particular powers and responsibilities rather than a rigid rule of thumb").

10b-5); S.E.C. v. Enterprises Solutions, Inc., 142 F. Supp. 2d 561, 574 (S.D.N.Y. 2001) (using functional approach to determine if individual was an "officer" for Section 16(a) purposes).

The rationale relied upon in these cases focuses on ensuring that a company not be allowed to "hide a significant figure in the management of a company" behind a vague title, such as "consultant." See Enterprises Solutions, Inc., 142 F. Supp. 2d at 574; see also US Diagnostic Inc., S.E.C. Release No. 7928, 2000 WL 1920604, at *4 (Dec. 20, 2000) (citing C.R.A. Realty Corp. v. Crotty, 878 F.2d 562, 563 (2d Cir. 1989)(noting that company "cannot avoid liability by characterizing [defendant] as a 'consultant' while allowing him to function as an officer").[12]

While our Court of Appeals has not addressed this issue, the functional, fact-intensive analysis of an alleged officer's duties and responsibilities, adopted by the Second, Fourth, Sixth, and Ninth Circuits, is a fair and reasonable approach which is consistent with the SEC's overriding obligation to protect the investing public. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 (1976) (noting that investor protection was a primary purpose behind passage of the Securities Act of 1933 and

---

[12] Although no court seems to have definitely addressed this issue, no court has developed an alternative approach.

Securities Exchange Act of 1934). Therefore, this Court will apply the functional analysis to evaluate whether Prince was a de facto officer at Integral.

### 1. Prince's Activities Did Not Include Performing Policy Making Functions

As discussed above, the Regulations set out several categories of individuals who qualify as "officers," including any person who performs "similar policy making functions" to a "president," a "vice president . . . in charge of a principal business unit, division or function," or "any other officer who performs a policy making function." 17 C.F.R. §§ 240.3b-7; 240.16a-1(f).

The few cases that have found an employee to be a de facto officer because of their ability to make policy involved alleged "consultants" who were actually in total control of a company. Solucorp, 274 F. Supp. 2d at 383 (noting testimony that no one could do anything that alleged "consultant" did not "direct or approve"); Enterprises Solutions, 142 F. Supp. 2d at 568 (finding that alleged officer was "running the company," and that company had been created as "a corporate shell with no employees, no facilities and no chief executive"); Weeks, S.E.C. Release No. 8313, 2004 WL 828 (Oct. 23, 2003) (determining that named officers "exercised neither authority nor influence in the

management and operations of DACO" and that Weeks was actually running company). The SEC has never alleged that Prince was "running the company" and thus none of these cases involve factual situations similar to the present one.

Instead, the SEC argues that, because of his membership in G6/G7, Prince "proposed and formulated policy" for Integral. See SEC's Post-Trial Mem. 5. It is undisputed that G6/G7 was a body that met to discuss important policy decisions and make recommendations to Chamberlain and that Prince participated fully as an equal member of that group. See Findings of Fact ¶ 36. Indeed, Gaffney testified that Prince was a particularly influential member of G6/G7, second only to Chamberlain. Test. of Peter Gaffney, Trial Tr. Dec. 10, 2012, P.M. Session 52.

However, as this Court has found in its Findings of Fact, G6/G7 members gave their opinions and advice to Chamberlain because he requested them to and because he fostered an office culture in which all employees were encouraged to share their opinions. See ¶¶ 21, 36, 68.

However, at the end of the day, Chamberlain was the only person who had authority to make company policy for Integral. See id. ¶¶ 37, 69; Test. of Elaine Brown, Trial Tr. Dec. 18, 2012, P.M. Session 49 (" . . . Steve Chamberlain is the one that set policy in the company."); Test. of Thomas Gough, Trial Tr.

Dec. 20, 2012, P.M. Session 93 ("I don't think any decisions were made unless Chamberlain was present."); Test. of Gary A. Prince, Trial Tr. Jan. 2, 2013, P.M Session 16-17 ("The people [Chamberlain] chose for membership in G-6 were the people he thought had the overall interests of the company at heart, and that's why he was interested in our recommendations and advice. But certainly the decisions and policies were set and made by Mr. Chamberlain."). Thus, Prince's participation in G6/G7 does not, in and of itself, establish that he performed a "policy making function" at Integral.

Moreover, the testimony was consistent that Prince did not and could not make policy for Integral in any capacity. See Findings of Fact ¶¶ 37, 39. Each of the former Integral employees testified that Prince did not have the authority to make policy. See Test. of Peter Gaffney, Trial Tr. Dec. 10, 2012, P.M. Session 55 (specifying that there was no policy Prince could have instituted on his own without the approval of G6/G7); Test. of Thomas Gough, Trial Tr. Dec. 20, 2012, A.M. Session 80 (testifying that Prince "did not have authority to make decisions"); Test. of Elaine Brown, Trial Tr. Dec. 18, 2012, P.M. Session 49 (" . . . Steve Chamberlain is the one that set policy in the company."); Joint Ex. 3, SEC Dep. of Steven R.

Chamberlain 83, Aug. 8, 2007 (noting that Prince could not make or implement policy).

The testimony of Gaffney and Gough that Prince did not have any authority to make policy is particularly significant. No evidence was presented that either of them had any continuing relationship of any kind with Integral or Prince, or had any particular reason to protect Integral, Chamberlain, or Prince. There was nothing in their testimony that suggested in word or tone that they had anything other than professional respect for Prince. Their testimony, which supports the testimony of Prince, Brown, and Chamberlain, and which the Court credits, compels the finding that Prince did not and could not make policy at Integral.

The SEC also argues that various other facts indicate that Prince had policy-making authority. See SEC's Post-Trial Mem. 6-7. The Court finds that none of these facts, independently or taken together, establish that Prince performed a policy making function at Integral.

The strongest argument proffered by the SEC points to Prince's influence over the Mergers and Acquisitions program which he headed at Integral. The SEC established that Prince supervised all day-to-day details regarding the potential acquisition of subsidiaries as well as the operations of those

which had been acquired. See Findings of Fact ¶¶ 24, 26-27. However, as the Court has already found, the ultimate decision on all significant mergers and acquisitions issues remained with Chamberlain. Id. ¶ 26. Thus, while Prince had substantial influence and involvement with regard to mergers and acquisitions issues, he did not have final, policy making authority over that program.[13]

Prince also did not have policy making authority over the Contracts Department, which he began to supervise in August 2005. Id. ¶ 48. At that time, Chamberlain changed the company protocol to require that all significant contracts be reviewed and approved by either Prince or Chamberlain before they could be signed off on by the head of the particular Group involved. Id. ¶ 46. The testimony of the Integral employees was consistent that this new level of review was not a substantive one, but merely an opportunity to screen for major errors, especially those that might affect Integral's finances. Id. ¶ 47. Moreover, the restriction placed on Prince when he was hired that

---

[13] The Court notes that the SEC could have argued that the "policy making functions" of a "vice president . . . in charge of a principal business unit, division or function (such as sales, administration or finance)," 17 C.F.R. §§ 240.3b-7; 240.16a-1(f), encompass the type of influence and authority that Prince had over the mergers and acquisitions program, even if he did not have the final say over particular issues. Because the parties did not raise or address this argument and no court has addressed this issue, the Court will not consider it.

prevented him from signing off on contracts remained in place, and no evidence was presented that Prince ever signed any contract. Id. ¶¶ 17, 43, 45.

Although Prince supervised a few employees, including exercising hiring and firing power, see id. ¶ 48, the SEC did not present any evidence indicating that such supervision of employees constituted an ability to make policy.

The other arguments proffered by the SEC are also insufficient to establish that Prince was a de facto officer. The SEC points to the fact that Prince was one of the most highly paid employees at Integral, see id. ¶ 30, and that his office was next to Chamberlain's office, see id. ¶ 38. Such facts indicate nothing more than the fact that Prince was a highly valued employee who worked closely with Chamberlain. See id. ¶¶ 38, 40.

The SEC also argues that Prince's involvement in recommending compensation and bonuses for members of executive management is relevant. See id. ¶¶ 33-34. However, the significance of that fact is minimized by the consistent testimony offered by the Integral employees that a number of people were involved in the recommendation process. See id. ¶ 33; Test. of Thomas Gough, Dec. 20, 2012, A.M. Session 74. Again, this was part of the general office culture established

by Chamberlain that encouraged everyone to participate and share their opinions. <u>See</u> Findings of Fact ¶¶ 21, 68. In sum, these facts, without more, do not support a finding that Prince had policy-making authority.

The record is clear that, while Prince exercised significant influence at Integral and was very close to Chamberlain, he did not have the authority to make or implement any policy decisions. Such authority lay with Chamberlain and the heads of the various Groups. To decide that the Regulations reach individuals involved in discussing company strategy and policy, but who do not have the authority to actually implement such policy, would expand the scope of <u>de facto</u> officer status far beyond what any court has to date recognized as policy making authority.

Thus, the Court concludes that the SEC did not prove by a preponderance of the evidence that Prince's responsibilities were such that he was a <u>de facto</u> officer under 17 C.F.R. § 240.3b-7 or 17 C.F.R. § 240.16a-1(f). The SEC has therefore failed to establish an essential element of Claims II, III, V, and VI. The Court will now briefly address the other elements of the various counts.

### C.  Count VI: Liability Under Section 16(a) and Rule 16a-3 of the Exchange Act

Count VI alleges that Prince is liable under Section 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and Rule 16a-3 thereunder, 17 C.F.R. § 240.16a-3, for his failure to file disclosure statements identifying his ownership of Integral stock and changes in such ownership during the period from 1998 until 2006. Section 16(a) requires anyone "who is a director or an officer of the issuer of [any equity] security" to file a statement concerning any holdings and transactions of the issuer's securities. 15 U.S.C. § 78p(a); 17 C.F.R. § 240.16a-3(a) (establishing various forms for use in fulfilling Section 16(a) reporting requirements). As discussed above, the Court finds that Prince was not a director or an officer, and was thus not required to file Section 16(a) reports. Therefore, Prince is not liable under Section 16(a) of the Exchange Act and Rule 16a-3 thereunder.[14]

---

[14] Our Court of Appeals has not addressed the issue of whether scienter is required to establish a violation of Section 16(a), but the SEC has consistently held that no scienter is required. Lexington Resources, Inc., S.E.C. Release No. 379, 2009 WL 1684743, at *18 (June 5, 2009) (citations omitted); Weeks, 2002 WL 169185, at *50; cf. S.E.C. v. Savoy Indus., 587 F.2d 1149, 1167 (D.C. Cir. 1978) (holding that Section 13(d)(1) of the Exchange Act was a reporting provision as compared to an antifraud provision, and, therefore, no intentional conduct need be proven).

**D.   Count II: Liability Under Section 10(b) and Rule 10b-5 of the Exchange Act**

Count II alleges that Prince violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by participating in a "scheme to defraud."

The SEC argues that Prince participated in a scheme to defraud, established by Chamberlain, where Prince would function as an officer for Integral, but his officer status would not be disclosed to the public in order to avoid disclosing his negative regulatory and criminal history. SEC's Post-Trial Mem. 9-10. The SEC asserts that Prince understood his obligation to file Section 16 ownership reports, but that such filings "would be tantamount to an admission that he was, in fact, an officer" and therefore that Prince chose not to file them to avoid disclosing his background. Id. at 10-11.

The Court has already concluded that the SEC failed to establish that Prince was acting as a de facto officer. Thus, Prince was not required to file beneficial stock ownership reports under Section 16(a). See supra II.B-C. However, the Court finds that, even if Prince was a de facto officer required to file Section 16(a) reports, the SEC has not established important other elements of its "scheme to defraud" claim.

–74–

As discussed above, see supra II.A., to establish its claim under Section 10(b) and Rule 10b-5, the SEC would have to prove by a preponderance of the evidence that (1) Prince was a de facto executive officer at Integral; (2) Prince was thus required to file Section 16(a) reports with the SEC; (3) Prince did not file such reports in order to perpetuate a "scheme to defraud" that had the principal purpose and effect of not disclosing his history of securities fraud violations to the public; (4) Prince's legal history was a material fact; (5) the scheme was made in connection with the purchase and sale of securities; and (6) Prince had the requisite scienter. The Court now addresses the two elements disputed by the parties – whether or not the SEC has proven by a preponderance of the evidence scienter and a "scheme to defraud."[15]

---

[15] This Court has already observed that if Prince was a de facto officer and had to disclose his past legal troubles, an omission of those facts might be material because it "could have affected the total mix of information in Integral's filings, rendering them misleading . . . ." Brown, 740 F. Supp. 2d at 160 (citation omitted); Dolphin & Bradbury, Inc. v. S.E.C., 512 F.3d 634, 638-39 (D.C. Cir. 2008) (noting that omitted fact is material "if a reasonable investor would have viewed it as significantly altering the total mix of information made available").

Neither party raised or addressed the issue of materiality or the issue of whether an alleged "scheme to defraud" involving Prince's failure to file Section 16(a) reports would be a fraud made "in connection with the purchase or sale of securities." Goble, 682 F.3d at 943. Thus, the Court assumes without deciding

**1.   Prince Did Not Act With Scienter When He Did Not File Section 16(a) Reports**

The SEC must establish scienter to prove a violation of Section 10(b) and Rule 10b-5. <u>See</u> <u>Aaron v. S.E.C.</u>, 446 U.S. 680, 691 (1980). To act with scienter means to act with "an intent to deceive, manipulate, or defraud." <u>Dolphin & Bradbury</u>, 512 F.3d at 639. Extreme recklessness may satisfy this intent requirement. <u>Id.</u> (citing <u>S.E.C. v. Steadman</u>, 967 F.2d 636, 641 (D.C. Cir. 1992)). Such recklessness is not merely a heightened form of negligence, but is an "extreme departure from the standards of ordinary care." <u>Id.</u> (citing <u>Steadman</u>, 967 F.2d at 641-42). Moreover, whether a defendant "acted with scienter . . . is a factual determination." <u>Id.</u> (citing <u>Steadman</u>, 967 F.2d at 641).

Prince argues that he reasonably relied on the advice provided by attorneys at Venable, Integral's corporate counsel, that he was not an officer at Integral who needed to be disclosed in Integral's public filings. It is an open question in this Circuit "whether reliance on the advice of counsel is a good defense to a securities violation." <u>Zacharias v S.E.C.</u>, 569 F.3d 458, 467 (D.C. Cir. 2009). Generally, in a civil securities action, reliance on the advice of counsel "does not operate as

---

that the SEC has met is burden with respect to those elements of its claim.

an automatic defense, but is only one factor to be considered." S.E.C. v. Savoy Industries, 665 F.2d 1310, 1314 n.28 (D.C. Cir. 1981). However, reliance on the advice of counsel "need not be a formal defense; it is simply evidence of good faith, a relevant consideration in evaluating a defendant's scienter." Howard v. S.E.C., 376 F.3d 1136, 1147 (D.C. Cir. 2004).

For the reasons discussed below, the Court finds that the SEC has not established Prince's scienter by a preponderance of the evidence. Because proof of such scienter is necessary to establish a violation under Section 10(b) and Rule 10b-5, the Court does not need to resolve the open question of whether advice-of-counsel is an independent defense to such a violation.

### a. Integral Requested and Received Venable's Advice After Making Complete Disclosure

The advice-of-counsel defense requires the defendant to establish four elements: he must have "(1) made complete disclosure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice." Zacharias, 569 F.3d at 467. While the Court does not need to address whether Prince established an advice-of-counsel defense per se, all of its elements are directly relevant to Prince's scienter. Thus, the Court addresses each in turn.

–77–

The first relevant factor as to whether Prince relied on counsel is whether he requested counsel's advice as to the legality of the contemplated action. Id. Chamberlain approached Venable in 1998 regarding Prince's possible employment.[16] See Findings of Fact ¶¶ 90-93. At this point, Venable was Integral's general corporate counsel and advised Integral on public filings, securities law compliance, financing matters, mergers and acquisitions, and government contracts. See id. ¶¶ 81, 86-87.

Chamberlain spoke with John Sullivan, the senior partner in charge of Venable's account, and asked Sullivan how he could structure Prince's role so that Integral would not have to disclose Prince's legal history in its public filings. Id. ¶¶ 15, 74, 90-91; Joint Ex. 3, SEC Dep. of Steven R. Chamberlain 83, July 11, 2007, p. 47. As our Court of Appeals has observed, it is a "common attorney-client interaction" for a client to "come[] to his lawyer with a plan and ask[] him to find a way to implement it in a legal manner." United States v. DeFries, 129 F.3d 1293, 1309 (D.C. Cir. 1997).

---

[16] To the extent that the SEC argues that Prince himself did not request the advice of counsel, that argument has been rejected by our Court of Appeals. See Howard, 376 F.3d at 1148-49 (noting that it "would be impractical and highly inefficient" if lower-level employees were not allowed to rely on the communications of their superiors with outside counsel).

Thus, it is clear that Chamberlain "actively sought" advice on the very question at issue in this case – whether Prince could legally perform certain functions at Integral without being disclosed to the SEC in Integral's public filings. Thus, this case is not one in which the defendant did not actively seek the opinion of counsel or did not present the entire question to counsel for consideration. See Zacharias, 569 F.3d at 467 (noting that "lawyer must opine on the legality of the entire issue" in question); S.E.C. v. Scott, 565 F. Supp. 1513, 1535 (S.D.N.Y. 1983) (noting that defendant's "complacent attitude" and failure to "actively" seek the advice of counsel was insufficient to establish the defense). In sum, Prince has established that Integral "requested counsel's advice as to the legality of the contemplated action." See Zacharias, 569 F.3d at 467.

The second relevant factor as to whether Prince relied on counsel is whether, after requesting the advice of counsel as to the legality of a particular action, he received advice from counsel that such action was legal. Zacharias, 569 F.3d at 467. Sullivan and Chamberlain agreed that Prince could be hired as a full-time employee so long as certain "carveouts" were put in place to ensure that he would not function as an officer at Integral. See Findings of Fact ¶¶ 90-91, 93. Chamberlain

–79–

understood that hiring Prince, provided those "carveouts" were in place, meant that Prince would not have to be disclosed in Integral's public filings. Id. ¶¶ 15, 17, 90-91. In other words, Chamberlain received advice that Prince could be hired as a full-time employee under certain conditions and that, so long as those conditions were satisfied, it would be legal not to disclose his employment to the SEC. Therefore, Prince has established that Integral "received advice that [the contemplated action] was legal." See Zacharias, 569 F.3d at 467.

The third relevant factor as to whether Prince reasonably relied on counsel is whether he disclosed to counsel all relevant information that would bear on the legality of the proposed action. See id. The SEC does not identify any relevant information that Chamberlain failed to disclose to Sullivan in their initial meeting. Chamberlain indicated that Prince would be working on mergers and acquisitions issues as well as continuing the work he had been doing as a consultant, which included drafting press releases, making bonus suggestions for members of executive management, and functioning as a general advisor to Chamberlain and other members of senior management. See Findings of Fact ¶ 20.

Moreover, Venable had served as corporate counsel for Integral for several months before this conversation and Venable

–80–

lawyers knew that Prince had been participating in the preparation of financial statements and working on mergers and acquisitions issues. Id. ¶ 95. Thus, Venable lawyers were aware of the major responsibilities that Prince would have as a full-time employee at Integral.

Because Chamberlain and Integral disclosed all relevant facts to Venable, they "made complete disclosure to counsel," which is relevant to whether they reasonably relied on the advice of counsel. See Zacharias, 569 F.3d at 467; see also Dolphin & Bradbury, 512 F.3d at 642 (determining that defendant cannot establish reliance on advice of counsel unless all relevant facts are disclosed to attorney).

### b. Integral Relied on Venable's Advice in Good Faith

The fourth factor relevant to whether Prince reasonably relied on advice of counsel is whether, after receiving advice that the proposed action was legal, he relied on that advice in good faith. See Zacharias, 569 F.3d at 467. There was absolutely no evidence proffered by the SEC to suggest that Prince or anyone at Integral did not believe that Venable's advice was accurate or legal. See Steadman, 967 F. 2d at 638 (noting that evidence did not support finding that anyone knew advice of counsel was wrong or recklessly relied on it).

The evidence demonstrates that Chamberlain relied on Venable's advice when he hired Prince and structured his role at Integral to reflect the "carveouts" discussed with Sullivan. See Findings of Fact ¶¶ 17, 91; Joint Ex. 3, SEC Dep. of Steven R. Chamberlain 83, July 11, 2007, p. 47. These "carveouts" were communicated to Integral's senior management, and were recognized and complied with throughout Prince's tenure. See Findings of Fact ¶¶ 17, 19, 91. Not only were these "carveouts" communicated internally, the evidence showed that there was never any effort to keep Prince's regulatory and criminal history or his actions, duties or responsibilities from anyone, inside or outside of Integral.[17] See id. ¶¶ 70-73. Thus, Prince has successfully established that Integral requested and received advice from Venable after disclosing all relevant information and then relied on that advice in good faith when concluding that there was no need to file various reports with the SEC, including Section 16(a) reports.

> **c.   In Subsequent Years, Venable Reiterated its Conclusion That Prince Could Work at Integral Without Disclosure**

Integral and Venable had a number of discussions regarding Prince's officer status in subsequent years, and at no point did

---

[17]   The Court notes that Integral issued a Form 8K in 1993 disclosing the charges of securities fraud filed by the SEC against Prince. See id. ¶ 7.

anyone at Venable ever advise anyone at Integral that Prince's employment needed to be disclosed to the SEC in public filings. See Findings of Fact ¶¶ 170-71.

In 1999, Integral employees asked Venable lawyers whether Prince's compensation required that he be disclosed in the Form 10-KSB for fiscal year 1999. Id. ¶¶ 105-10. Sullivan spoke with Chamberlain and Gough about Prince's roles in the company and level of compensation, and concluded that, because Prince did not make policy and did not have staff reporting to him, he did not have to be disclosed. Id. ¶ 112. Based on that advice, Integral did not disclose Prince as a highly-paid employee in the executive compensation table in its Form 10-KSB for fiscal year 1999. Id.

In 2001, Prince set up a meeting with Venable attorneys, including Sullivan and Dvorak, to discuss whether or not he could become a named executive officer without being disclosed in Integral's public filings. Id. ¶ 113. The attorneys and Prince were under the (mistaken) impression that, after five years had passed, Prince's earlier legal troubles would no longer need to be disclosed. Id. ¶¶ 114, 116. Venable attorneys informed Prince that the five-year limit would not expire until the summer of 2002 and they decided to revisit the issue at that time. Id. ¶ 116.

In the spring of 2002, Prince again raised the question of his officer status and the firm researched the issue. Id. ¶¶ 117-118. It concluded that, if Prince was named an executive officer, his legal history would have to be disclosed for the foreseeable future. Id. ¶ 121. Venable partner Anita Finkelstein explicitly noted in an email to Wallace Christner, who was the relationship partner at that time, that, "Integral is open to the complaint that, no matter what his title, Integral should have made disclosure about Prince due to the nature of his activities at Integral." Def.'s Ex. 75. No one at Integral received a copy of this email, nor was this information ever conveyed to anyone at Integral. See Findings of Fact ¶¶ 120-21.[18]

Finally, in December 2005, Bonnie Wachtel, a member of the Integral Board of Directors, suggested that Integral include Prince's biography and legal history in its Form 10-K for fiscal year 2005, regardless of his title. Id. ¶¶ 130, 135. Integral

---

[18] The SEC argues that Integral's investigation into whether Prince would have to be disclosed if he was named an executive officer was irrelevant because that is a distinct question from the question at issue here, which is whether Prince's compensation and roles required his disclosure regardless of his title. SEC's Post-Trial Mem. 17-18. The SEC fails to realize that the latter question is a logical antecedent of the first question. The question of whether providing Prince with an additional title would require disclosure is based on an assumption that Prince's current job functions did not require disclosure. Finkelstein's memorandum underscores that Venable lawyers understood the relationship between these two inquiries. See Def.'s Ex. 75.

employees consulted with Venable lawyers and decided not to disclose Prince in that filing. Id. ¶¶ 131-34, 137.

Over the years, Venable lawyers worked intimately with Prince on a number of issues. They worked with Prince on mergers and acquisitions issues, and were well aware that he was drafting offer letters, Def.'s Ex. 40, reviewing consulting agreements with employees of subsidiaries, Def.'s Ex. 46, drafting press releases, Def.'s Exs. 82, 85, serving on the Board of Directors for corporations created to acquire subsidiaries, Def.'s Exs. 64, 69, 87, and interacting with outside auditors in his capacity as Director of Mergers and Acquisitions, Def.'s Exs. 80, 82. See Findings of Fact ¶¶ 96-97. They also knew that Prince was interacting with outside financial analysts, drafting press releases, and participating in the preparation of Integral's public filings. See id. ¶¶ 98-100, 102. The evidence shows that Venable understood the breadth of Prince's duties, activities, and responsibilities at Integral.

Thus, with full awareness of Prince's activities at Integral, Integral employees and Venable attorneys discussed Prince's officer status five times between December 1998, when Prince became a full-time employee at Integral, and August 2006, when Prince was named an executive officer. At no point in this

period did <u>anyone</u> at Venable ever advise <u>anyone</u> at Integral that Prince needed to be disclosed to the SEC. <u>Id.</u> ¶¶ 170-71.

The SEC argues that during this time, Prince "affirmatively misrepresented his role as a member" of G6/G7 to Venable. SEC's Post-Trial Mem. 17-18, 22. However, there was no evidence produced at trial indicating that Prince or anyone at Integral actively hid Prince's membership on that committee from Venable.

The SEC then argues that Prince's and Integral's failure to disclose Prince's "involvement and influence" on G6/G7 was an omission of a material fact that would have affected the advice Venable provided. SEC's Post-Trial Mem. 17, 22. While there was no evidence that Venable lawyers knew about G6/G7 or Prince's participation in the group until 2005, <u>see</u> Findings of Fact ¶ 126, the fact is, as discussed <u>supra</u>, Prince did not have policy-making authority at Integral, even though he was a member of G6/G7. <u>See</u> <u>supra</u> II.B.1. Moreover, Venable lawyers were fully apprised of the scope of Prince's duties and responsibilities. And even after Venable lawyers definitely knew of Prince's participation in G6/G7, they continued to advise Integral that Prince was not an executive officer. <u>See</u> <u>Findings of Fact</u> ¶¶ 137, 149.

Moreover, there was no evidence that at any time any employee of Integral failed to provide information requested by

a Venable lawyer. See id. ¶ 89. Our Court of Appeals has cautioned against finding that a defendant, particularly a non-lawyer defendant, did not rely on counsel because they did not disclose all possibly relevant facts. In DeFries, the Court of Appeals observed:

> No client ever tells his or her lawyer every single fact that a good lawyer probes before giving advice. Indeed, clients do not typically even know which facts a lawyer might think relevant. (That is, in part, why they consult lawyers.) So long as the primary facts which a lawyer would think pertinent are disclosed, or the client knows the lawyer is aware of them, the predicate for an advice-of-counsel defense is laid.

129 F.3d at 1308-09. The record shows that Integral's employees asked for Venable's advice, believed they had disclosed the relevant facts to Venable, and that the Venable lawyers were aware of those facts.

The Court also notes that the firm put no formal or informal protocol in place by which its many lawyers (at least twelve different ones worked on the Integral account) could gather and compile information from Integral, nor did it have any system by which it could track earlier work that had been done by Venable lawyers on Integral issues.[19] See Findings of

---

[19] At least one Court of Appeals has observed that "part and parcel of effectively protecting a client, and thus discharging the attorney's duty of care, is to protect the client from the liability which may flow from promulgating a false or misleading offering to investors." F.D.I.C. v. O'Melveny & Myers, 969 F.2d

Fact ¶ 88. This systemic failure had consequences. For example, a Venable lawyer wrote to NASDAQ officials asserting that Venable knew of no communications between Prince and outside auditors despite the fact that Venable lawyers had been copied on such communications and represented to the SEC in 2000 that Prince had had such communications. Id. ¶ 143. Although the issue of Prince's disclosure was raised multiple times by Venable over the years, Venable attorneys never prepared any written document setting out what Prince could or could not do. Id. ¶ 94.

This is particularly troubling in light of several exhibits which show that Venable lawyers repeatedly raised concerns amongst themselves regarding the inherent risk involved in Integral's choice to not disclose Prince. See Def.'s Ex. 75 (internal email noting that "Integral is open to the complaint that, no matter what his title, Integral should have made disclosure about Prince due to the nature of his activities at Integral"); Def.'s Exs. 183-84 (memorandum prepared by Venable

---

744, 749 (9th Cir. 1992), rev'd on other grounds O'Melveny & Myers v. F.D.I.C., 512 U.S. 79 (1994). The Ninth Circuit concluded that "attorneys, in rendering opinions relating to the securities laws, are not justified in assuming facts as represented to them by the client and in basing their opinion on the assumption that such facts are correct. Rather . . . the attorney must make a reasonable effort to independently verify the facts on which the opinion is based." Id. (quotation omitted).

attorney Brian Dunn concluding that, "[g]iven Prince's role at
the Company, the SEC could reasonably take the position that he
was a <u>de facto</u> officer and should have been disclosed as such in
the company's SEC filings"); Def.'s Ex. 211 (internal email
noting troubling similarities between Integral's issues and a
legal case where a company had been held liable for not
disclosing as a <u>de facto</u> officer a significant management
figure). Venable lawyers never shared these documents or the
concerns they raised with anyone at Integral. <u>See</u> Findings of
Fact ¶¶ 121, 146, 155.

The record shows that the Integral employees repeatedly
sought Venable's advice and did everything they were asked to do
to assist their attorneys in formulating such advice. <u>See, e.g.,</u>
Def.'s Ex. 21 (fax from Brown to Dvorak with portions of the
Code of Federal Register asking questions about "significant
employee" disclosure requirements); Def.'s Ex. 24 (email from
Brown to Dvorak asking him to follow-up regarding her earlier
fax); Test. of James Dvorak, Trial Tr. Dec. 21, 2012, P.M.
Session 15-17 (testimony of Dvorak that he does not remember
ever following up as requested).

Based on these facts, the Court concludes that Integral's
employees, including Prince, acted in an entirely reasonable and
transparent fashion when they repeatedly sought advice from

their attorneys about Prince's officer status and relied on that advice accordingly. Moreover, this factual scenario demonstrates the good faith of Integral employees in attempting to get legal advice from their lawyers to avoid problems with the SEC.

The record shows that Integral requested and received nothing but "green flags" from Venable regarding its choice to hire Prince as a full-time employee and structure his position in a way that was supposed to avoid disclosure of his legal history. See Howard, 376 F.3d at 1147 (noting that court found no scienter existed when Howard relied on counsel and only encountered "green flags" not "red flags"). As our Court of Appeals has observed, such approval of its actions by counsel "constitutes powerful evidence that [the] actions did not amount to an extreme departure from the standards of ordinary care so obvious that the actor must have been aware of it." Id. at 1148 (internal quotation marks omitted) (citation omitted).

Thus, the Court concludes that, even if Prince had been a de facto officer required to file Section 16(a) reports, he did not fail to file such reports with the requisite scienter because, in reasonable and good faith reliance on Venable's advice, he believed he was not required to file them. Because such scienter is required to establish the SEC's claim that Prince participated in a scheme to defraud that violated Section

–90–

10(b) and Rule 10b-5 of the Exchange Act, the SEC has failed to establish an essential element of that claim.

### 2. The SEC Did Not Establish That a "Scheme to Defraud" Existed

Even if Prince had acted with scienter in failing to file Section 16(a) reports, the SEC failed to show that he did so as part of a "scheme to defraud." The SEC argued that Chamberlain "was the chief architect of the scheme to defraud and Prince was a willing and active participant." SEC's Post-Trial Mem. 9.

However, the evidence shows that Chamberlain intended to and believed he could legally employ Prince without disclosing him to the SEC. See supra II.D.1. Prince understood that Chamberlain had received legal approval for this action, and reasonably relied on that advice. Id. Prince did not believe he was obligated to file Section 16(a) reports, and there was no indication that he, Chamberlain, Brown, or anyone else decided he should not file such reports in order to defraud the public or the SEC. Thus, even if Prince was extremely reckless in relying on counsel's advice that he did not need to file Section 16(a) reports, the Court finds there was no "scheme to defraud" at Integral.

The SEC has failed to establish by a preponderance of the evidence several elements of its claim that Prince participated

in a "scheme to defraud" that violated Section 10(b) and Rule
10b-5 of the Exchange Act and, thus, has failed to establish
liability under Claim II of the Complaint.

### E. Count III: Liability Under Section 13(a) and Rules 13a-1 and 12b-20 of the Exchange Act

Count III alleges that Integral violated Section 13(a) and
Rules 13a-1 and 12b-20 of the Exchange Act when it failed to
identify Prince as an executive officer in its annual reports,
making such reports materially false or misleading. See 15
U.S.C. § 78m(a); 17 C.F.R. §§ 240.13a-1, 240.12b-20; see also
SEC's Proposed Findings of Fact & Conclusions of Law 27 [Dkt.
No. 138-9]. The SEC also argues that Prince aided and abetted
that violation by "engaging in conduct the purpose and effect of
which was to conceal his status as an officer from investors,"
which constituted "knowing and substantial assistance" to
Integral's violations. Id.

Because the Court has concluded that Prince was not a de
facto executive officer who Integral was required to disclose in
its annual reports, there was no primary violation for Prince to
aid and abet. However, even if Prince was a de facto officer,
the SEC has failed to prove by a preponderance of the evidence

that Prince had the requisite scienter to establish its aiding and abetting claim under Section 20(e) of the Exchange Act.[20]

### 1.  Scienter

Section 20(e) was amended recently to specifically cover anyone who "knowingly or recklessly" (emphasis added) provides substantial assistance to a securities fraud violator. See S.E.C. v. Apuzzo, 689 F.3d 204, 211 n.6 (noting that Dodd-Frank Act of 2010 amended Section 20(e) to include recklessness). Thus, the level of scienter that the SEC must prove for its aiding and abetting claims is the same as for its claims under Section 10(b) and Rule 10b-5 of the Exchange Act. For the reasons discussed above, Prince and Integral's reasonable reliance on counsel compels this Court to conclude that Prince did not act with "extreme recklessness" in participating in Integral's decision to not disclose Prince in its public filings. See supra II.D.1.

Therefore, the SEC has failed to prove by a preponderance of the evidence that, even if Integral violated Section 13(a) or Rules 13a-1 or 12b-20 by not disclosing Prince in its annual reports as an officer, Prince aided and abetted that violation

---

[20] The Court notes that the SEC failed to address this claim in its Post-Trial Brief. Because the only issue raised by Prince in his Post-Trial Brief as to this claim specifically was the issue of scienter, that is the only element of this claim the Court will address.

with the requisite scienter. <u>See</u> <u>Howard</u>, 376 F.3d at 1143 (quoting <u>Graham</u>, 222 F.3d at 1004) (finding that Howard was not extremely reckless in aiding and abetting violation of securities laws when he did not encounter "'red flags' or 'suspicious events creating reason for doubt' that should have alerted him to the improper conduct of the primary violator"). Thus, the SEC has failed to establish an essential element of this claim.

**F.  Count V: Liability Under Section 14(a) and Rule 14a-9 of the Exchange Act**

Count V alleges that Integral violated Section 14(a) and Rule 14a-9 of the Exchange Act when it failed to identify Prince as an executive officer in its proxy statements, making such statements false or misleading. <u>See</u> 15 U.S.C. § 79n(a); 17 C.F.R. § 240.14a-9; <u>see</u> <u>also</u> SEC's Proposed Findings of Fact & Conclusions of Law 28. The SEC also argues that Prince aided and abetted that violation by concealing his status as an officer, which constituted "knowing and substantial assistance" to Integral's violations. <u>Id.</u>

Because the Court has concluded that Prince was not a <u>de</u> <u>facto</u> executive officer who Integral was required to disclose in its proxy statements, there was no primary violation for Prince to aid and abet. However, even if Prince was a <u>de facto</u> officer,

the SEC has failed to prove by a preponderance of the evidence that Prince aided and abetted any violation by Integral of Section 14(a) or Rule 14a-9 with the requisite scienter. For the same reasons discussed above, see supra II.D.1, II.E.1, the SEC has thus failed to prove an essential element of this claim.[21]

### G.  Count VII: Practicing Accounting Before the Commission

#### 1.  Prince Violated the Commission Rule 102(e) Order Barring Him from Appearing or Practicing Before the Commission as an Accountant

SEC Rule 102(e) allows the Commission to "deny, temporarily or permanently, the privilege of appearing or practicing before [the Commission] in any way to any person who is found by the Commission . . . to have engaged in unethical or improper professional conduct." 17 C.F.R. § 201.102(e). This rule is "directed at protecting the integrity of the Commission's own processes, as well as the confidence of the investing public in the integrity of the financial reporting process." Marrie v. S.E.C., 374 F.3d 1196, 1200 (D.C. Cir. 2004).

The Commission issued a Rule 102(e) Order against Prince in 1997. See Findings of Fact ¶ 13; Pl.'s Ex. 2. This Order permanently prohibits Prince from exercising "the privilege of

---

[21] The SEC failed to address this claim in its Post-Trial Brief. Again, because the only issue raised by Prince in his Post-Trial Brief as to this count was the issue of scienter, that is the only element of the claim the Court addresses.

appearing or practicing before the Commission as an accountant." See id. For purposes of analysis, violation of this prohibition requires two elements. First, an individual must "appear[] or practice[] . . . as an accountant." Second, such action must have occurred "before the Commission."

The Court addresses the second prong regarding actions taken "before the Commission" first. Rule 102(f) defines "practicing before the Commission" to include "[t]he preparation of any statement, opinion, or other paper" filed with the Commission. 17 C.F.R. § 201.102(f). As discussed above, the securities laws require a public company to file various documents with the SEC. See supra II.A. Primarily, companies are obligated to file annual and quarterly reports. See 15 U.S.C. § 78m(a) (requiring every issuer of registered securities to file annual and quarterly reports with the SEC). These are filed on Form 10-Ks and 10-Qs. 17 C.F.R. §§ 240.13a-1, 240.13a-13 (requiring that annual and quarterly reports be filed on Form 10-Ks and Form 10-Qs, respectively).

In addition, when a public company acquires a significant subsidiary, the financial statements of that subsidiary must be filed with the SEC. See 17 C.F.R. § 210.3-05; Test. of Lynn Turner, Trial Tr. Dec. 12, 2012, A.M. Session 48. Thereafter, the company has to file financial statements that consolidate

their balance sheets and statements of income and cash flow with
those of the subsidiary. See 17 C.F.R. §§ 210.3-01; 210.3-02;
see also 17 C.F.R. § 210.3A-02 (discussing how to present
consolidated financial statements of a registrant and its
subsidiaries).

The evidence was undisputed that Prince reviewed and
commented on drafts of Integral's public filings, including Form
10-Ks and Form 10-Qs. See Findings of Fact ¶ 54. Prince also
wrote the first draft of the MD&A section included in those
filings. See id. ¶¶ 50-52. In addition, Prince engaged in
discussions with members of the Integral accounting staff and
the accounting staff at Integral subsidiaries regarding the
financial statements. See id. ¶¶ 27, 67. These activities
clearly meet the second prong, in that they involve work done on
various types of statements and documents "filed with the
Commission." 17 C.F.R. § 201.102(f)(2).[22] Thus, the question is
whether these activities constitute "practicing accounting"
before the Commission.

---

[22] Several of the SEC's allegations do not constitute filings
with the Commission. The fact that Prince occasionally attended
meetings of the Board of Directors and gave presentations and
tutorials on financial issues to Directors and members of the
Integral staff has no relationship to public filings. See
Findings of Fact ¶¶ 63, 65-66. In addition, neither the
financial forecasts that Prince prepared for internal analysis
nor Defense Contract Auditing Agency submissions were filed with
the Commission. See id. ¶¶ 62, 67.

Rule 102(f) defines "practicing before the Commission" to include "[t]he <u>preparation</u> of any statement, opinion, or other paper by any . . . accountant" if that document is filed with the Commission. 17 C.F.R. § 201.102(f) (emphasis added). The crux of this dispute turns on what the word "preparation" encompasses.

In the leading decision addressing this issue, <u>Robert W. Armstrong III</u>, S.E.C. Release No. 34-51920, 2005 WL 1498425 (June 24, 2005), Armstrong, a vice president and controller of a subsidiary of a public company, prepared financial data and submitted it to the parent company, which included that data in its filings with the SEC. <u>Id.</u> at *2, *4, *11. The SEC administrative law judge found that Armstrong did not "appear or practice" before the Commission because he did not prepare the actual reports filed by the public company with the SEC. <u>Id.</u> at *11.

The Commission disagreed, stating that "[t]he text of the Rule does not specify that a person must sign a document filed with the Commission. Moreover, the term 'preparation' of a document is, we believe, sufficiently broad to encompass the preparation of data to be included in a document filed with the Commission, at least where, as here, the data was prepared for the express purpose of being included in such a document." <u>Id.</u>

Thus, participation in the preparation of data for inclusion in a financial statement filed with the Commission is sufficient.

This Court has already observed that <u>Armstrong</u> "established that an individual may . . . be found to have practiced before the Commission if he or she participated in the preparation of financial statements filed with the Commission by, for example, <u>creating, compiling or editing</u> information or data incorporated into [filings with the Commission] and consenting to their incorporation." <u>S.E.C. v. Brown</u>, 878 F. Supp. 2d 109, 125 (D.D.C. 2012) (emphasis added) (internal quotation marks omitted) (citing <u>Armstrong</u>, 2005 WL 1498425 at *11).[23]

The language in <u>Armstrong</u> rejects the theory put forth by Prince's expert witness, Jonathan Macey, that only accounting department personnel and the executives who have final authority for financial disclosures are "practicing accounting." Macey originally defined "practicing accounting" as "calculating or computing specific numbers for inclusion in public filings; making substantive accounting determinations in connection with

---

[23] The Court also noted that <u>Armstrong</u>'s interpretation of "practicing before the Commission" was consistent with the language of Rule 102(f) and noted that Prince could identify no past practices or rulings that were inconsistent with its interpretation. <u>See Brown</u>, 878 F. Supp. 2d at 125. Thus, the Commission's interpretation of Rule 102(f) in <u>Armstrong</u> was reasonable and entitled to deference. <u>Id.</u> (citing <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410, 414 (1945) and <u>Drake v. F.A.A.</u>, 291 F.3d 59, 67 (D.C. Cir. 2002)).

the preparation of public filings; or making determinations regarding the accuracy or appropriateness of public filings." Def. Gary A. Prince's Post-Trial Br. 43; see also Dkt. No. 110-1, Reply Aff. of Professor Jonathan R. Macey in Further Support of Def. Gary A. Prince's Mot. for Partial Summ. J. 3; Test. of Jonathan Macey, Trial Tr. Dec. 18, 2012, A.M. Session 48-49.

However, Macey's testimony at trial made clear that his definition was far more limited. After extensive cross-examination, it became clear that Macey's definition was really limited to two groups; low-level accounting personnel and individuals who have final authority over exactly what numbers are included in a public filing. See Test. of Jonathan Macey, Trial Tr. Dec. 18, 2012, A.M. Session 43, 46-47, 51, 58-59; Test. of Jonathan Macey, Trial Tr. Dec. 17, 2012, P.M. Session 15, 39-40, 51.

Macey's definition would exclude from legal liability people who review and decide on accounting treatments, even if those actions affect the data included in a financial statement, unless those people have final authority to implement their suggestions. Test. of Jonathan Macey, Trial Tr. Dec. 18, 2012, A.M. Session 52, 58-59, Test. of Jonathan Macey, Trial Tr. Dec. 17, 2012, P.M. Session 46, 51-52.

This cramped definition ignores the language and spirit of Armstrong, which rejected the premise that only those who were "responsible for signing or filing the financial statements" were practicing accounting. Armstrong, 2005 WL 1498425 at *11. Armstrong himself did not make the ultimate determination as to whether the information that he contributed would be included in the filings. Id. at *4. In fact, he "voiced concerns" regarding the substance of the subsidiary's statements, but they were submitted despite his disagreement. Id. at *5. Thus, the fact that Prince did not have final authority over what information was included in Integral's filings with the SEC, see Findings of Fact ¶ 53, is not dispositive.

Macey's definition ignores the fact that accounting is not a mechanistic, quantitative endeavor, but instead requires many non-quantitative decisions on which people can reasonably disagree. See Test. of Lynn Turner, Trial Tr. Dec. 12, 2012, A.M. Session 37, 70 (discussing how preparation of financial disclosures involves quantitative decisions, but also involves numerous non-quantitative decisions about how various accounting principles and treatments should be applied to underlying data).[24] Because these non-quantitative decisions may greatly

---

[24] Lynn Turner, the SEC's expert witness, was extremely qualified to opine on what constitutes accounting. He is a certified

affect what final numbers are included in the financial statements, those who participate in making those decisions are "creating" and "compiling" the relevant information, even if they do not have final authority over the exact numbers that are included.[25]

---

public accountant who practiced at one of the country's largest accounting firms for twenty years, served as chief financial officer of a major technology company, served as Chief Accountant of the Commission from July 1998 to August 2001, and served on the Board of Directors of several major companies. Pl.'s Ex. 132, Ex. 8. Macey, on the other hand, is not now nor ever has been an accountant, C.P.A., or corporate officer. Test. of Jonathan Macey, Trial Tr. Dec. 18, 2012, A.M. Session 32. Moreover, Macey has never been involved in a Rule 102(e) proceeding nor has he ever written about Rule 102 as an academic. See Def.'s Ex. 266, ex. 1 (Macey's resume).

[25] The SEC argues that the definition of "practicing accounting" goes beyond when someone is "creating, compiling, or editing" data or information that is incorporated into financial statements, and includes any editorial review of the statements. For example, it argues that Prince was practicing as an accountant when he suggested using rounded numbers, Pl's Ex. 36 p. 15; Pl.'s Ex. 37 p. 16; Pl.'s Ex. 55 p. 8, noted that a particular sentence was illogical, Pl.'s Ex. 37 p. 43, and suggested consolidating two sentences into one, Pl.'s Ex. 53 p. 9. It also alleges that the various times that Prince pointed out inconsistencies within or among financial filings constituted practicing accounting. Pl.'s Ex. 29, pp. 2, 12; Pl.'s Ex. 30, p. 7; Pl.'s Ex. 37, p. 24; Pl.'s Ex. 53, p. 12; Test. of Gary A. Prince, Trial Tr. Jan. 2, P.M. Session, 56-57, 59-60, 62-63, 69, 71.

The SEC's position is vulnerable to the criticism that it is far too broad because it could arguably encompass anyone, including non-accountant executive officers and directors, who identified typographical errors or engaged in editorial review of public filings. However, the Court need not delve into this challenging question on which the Circuit has not ruled, because

The record contains evidence showing that Prince engaged in such decisionmaking. For example, Prince sent an email to Brown and Pat Carey, Integral's controller, regarding the accrual of bonuses given to employees at SAT, one of Integral's subsidiaries. Pl.'s Ex. 134. He wrote, "I have instructed Paul [SAT's controller] to accrue the bonuses in FY00 and to reverse the FY01 entries. Please make sure the consolidated numbers reflect this change also." Id.; Test. of Gary A. Prince, Trial Tr. Jan. 3, 2013, A.M. Session 53-54. Clearly, Prince was making an accounting determination for SAT, and then directing the Integral accounting staff to make sure that this number was reflected in the consolidated financial statements. Those financial statements were then filed with the SEC. See 17 C.F.R. § 210.3A-02 (discussing how to present consolidated financial statements of a registrant and its subsidiaries).

Prince's actions are similar to the work the SEC deemed "practicing accounting" in Armstrong. Armstrong, 2005 WL 1498425, at *11 (determining that Armstrong "appeared and practiced before the Commission" when he computed the income that needed to be held in reserve, directed that determination be included in the subsidiary's reports, and then reviewed and

there is substantial evidence in the record of Prince "practicing accounting" under the narrower "creating, compiling or editing" standard set forth in Armstrong.

approved its inclusion in the parent company's financial filings).

Similarly, Prince wrote to the controller of another Integral subsidiary, RT Logic, and opined on how the subsidiary should book certain journal entries in its closing financial statements. Pl.'s Ex. 54. He made specific recommendations as to how certain items should be recorded. For example, he stated that a particular credit should be booked to additional paid-in capital rather than retained earnings and noted that a debit should flow through a particular expense. Id.; Test. of Lynn Turner, Trial Tr. Dec. 12, 2012, A.M. Session 45-46. The closing financial statements were then included in a Form 8-K that Integral filed with the SEC. Id. at 45, 48.[26]

---

[26] Although Prince argues that he was merely making a recommendation in this email, Test. of Gary A. Prince, Trial Tr. Jan. 2, 2013, P.M. Session 81, Brown's response indicates that Prince had final review over the financial statement before it was filed. She wrote, "I'm assuming we'll receive the revised financial either today or tomorrow. I'll await your review before paying out the excess purchase price to former RT shareholders. If you review/approve them while at RT, please let me know so I can start processing the payments." Pl.'s Ex. 54. The last sentence indicates that Prince had the authority to review and approve the financial statement containing the disputed transactions without Brown's review or approval. Thus, although Integral's general procedure gave Brown the final say on accounting issues, see Findings of Fact ¶ 53, in this instance Brown is giving Prince the authority and responsibility to be the last Integral employee to review a financial statement eventually filed with the SEC.

Other documents similarly show Prince participating in determining the proper treatment of Integral's financial data. Prince prepared spreadsheets that calculated various scenarios regarding what percentage of total revenue a particular contract would represent. Pl.'s Ex. 135. Brown then evaluated the scenarios and chose one for use in the Form 10-KSB for fiscal year 1999. Id. Prince made a similar calculation for Brown regarding the Form 10-K for fiscal year 2001, and created a spreadsheet with the "back-up for this calculation."[27] Pl.'s Ex. 35. The subject lines and substance of the emails show that Prince was fully aware that these calculations were going to be used in SEC filings.

Prince was also actively involved with the implementation of Financial Accounting Standard 123 for fiscal year 2006. Pl.'s Ex. 93; Test. of Lynn Turner, Trial Tr. Dec. 12, 2012, A.M. Session 63. He sent a long email to Integral's senior management and accounting staff explaining what he called "my plan," which attempted to address "the prospect of [an] adverse [profit and loss] effect]." Pl.'s Ex. 93. The profit and loss statements are financial statements that are included in Integral's filings.

---

[27] While the evidence and testimony was generally consistent that Prince did not have "write" privileges with respect to accounting data, see Findings of Fact ¶ 18, this exhibit shows that, at least at one point, he had such privileges.

Test. of Lynn Turner, Trial Tr. Dec. 12, 2012, A.M. Session 64-67. Thus, Prince's "plan" directly affected the way that stock options were reported to the SEC in Integral's financial statements.

In general, the implementation of Generally Accepted Accounting Principles ("GAAP") and the rules of the Financial Accounting Standards Board ("FASB") require complex decisions involving the exercise of accounting judgment. Test. of Elaine Brown, Dec. 18, 2012, P.M. Session 13; Test. of Lynn Turner, Dec. 12, 2012, A.M. Session 36-37. Thus, part of functioning as an accountant, and "creating, compiling, or editing" the information or data incorporated in a financial statement, is making such decisions. The foregoing exhibits show that Prince was actively engaged in this process.

The SEC also emphasizes the significance of an email Prince sent claiming to be "running the Accounting Dept" while Brown was on maternity leave. See Pl.'s Ex. 79; SEC's Proposed Findings of Fact and Conclusions of Law 66; Test. of Lynn Turner, Dec. 13, 2012, P.M. Session 11-15, 50. The testimony was consistent, and this Court finds, that Prince's statement was intended as a joke and that Brown and her second in command, Pat Carey, remained in control of the Accounting Department during her absence. See Findings of Fact ¶ 58; Test. of Gary A. Prince,

–106–

Trial Tr. Jan. 3, 2013, P.M. Session 83 ("[I]f I was making a coup of the accounting department, I probably wouldn't have copied Ms. [Brown] on it.").

Throughout the course of his employment at Integral, Prince reviewed and commented on draft filings and made a variety of editorial suggestions. See Findings of Fact ¶ 54. His comments, however, were not generally substantive recommendations about how to book particular entries or how to treat financial data. Pl.'s Exs. 18, 29, 30, 36, 37, 52, 53, 61, 64, 69, 119. While Brown was on maternity leave, however, Prince did make accounting judgments that affected the actual numbers that went into the financial statements.

The Court finds that Prince did take on additional responsibilities regarding Integral's filings with the SEC during this time period. See id. ¶ 59. Prince admitted that he assisted the accounting staff in gathering and compiling information while Brown was on maternity leave. Test. of Gary A. Prince, Trial Tr. Jan. 2, 2013, P.M. Session 36, 38; Test. of Gary A. Prince, Trial Tr. Jan. 3, 2013, A.M. Session 42.

Two exhibits demonstrate the type of recommendations Prince was making during Brown's absence. First, he suggested that a particular reserve be taken and noted in the Form 10-K for fiscal year 2004. Pl.'s Ex. 79 ("I'd say take the remaining

—107—

license revenue on ATNAGE but set up a reserve for a similar amt.") In response, Al Smith, the assistant controller, informed Prince that "[t]his change would ripple through the sheets." <u>Id.</u> Second, Prince, in conjunction with others in the accounting department, determined how a particular contract dispute should be booked. Pl.'s Ex. 80 ("The Boys, Stuart and I have discussed the matter and . . . [i]t is our collective judgment that we should reserve $260K of the $460K leaving us with a $200K "exposed" receivable for this job.") These were substantive financial judgments that affected Integral's financial statements and, eventually, its Form 10-K for fiscal year 2004.

The emails demonstrate Prince "practicing accounting" by determining how particular data should be treated in the financial statements of Integral and its subsidiaries. Those statements were then incorporated in filings before the Commission. While there is no need to address the SEC's broader definition of accounting, the Court finds that these particular incidents fall well within <u>Armstrong</u>'s definition of "preparation" as "encompass[ing] the preparation of data to be included in a document filed with the Commission, at least where, as here, the data was prepared for the express purpose of being included in such a document." <u>See</u> <u>Armstrong</u>, 2005 WL 1498425, at *11. Thus, since Prince was practicing accounting by

preparing financial data that was filed with the Commission, he violated the terms of his Accounting Bar.

> ### 2. Prince Did Not Obtain or Rely on Advice of Counsel Regarding Practicing Accounting Before the Commission

Prince notes in his Post-Trial Brief that if he did practice accounting before the Commission, he "did so in good faith reliance upon the advice of counsel." Def. Gary A. Prince's Post-Trial Br. 47. However, Prince did not identify any caselaw requiring scienter to establish a violation of a Rule 102(e) Order. Even if an advice-of-counsel defense was available, Prince has failed to establish the elements of such a defense on this issue.

As discussed above, the elements of an advice-of-counsel defense require the defendant to establish that he: "(1) made complete disclosure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice." <u>Zacharias</u>, 569 F.3d at 467.

There was some indication that Chamberlain and Sullivan discussed Prince's Accounting Bar at their initial meeting in 1998, and that the "carveouts" put in place were intended to prevent Prince from violating that Bar. <u>See</u> Findings of Fact ¶¶ 18, 90. For that reason, Prince was not allowed to

participate in accounting staff meetings and was denied access to accounting data. Id. ¶ 18.

However, there is no evidence in the record that Chamberlain indicated to Sullivan that he intended to have Prince participate in the preparation of financial data to the extent that Prince did. In fact, it is unclear that Chamberlain ever knew that Prince engaged in recommending particular financial determinations as discussed above. See supra II.G.1. Thus, the evidence does not support a finding that Chamberlain and Integral fully disclosed the relevant information and requested the type of specific advice on the issue that would support an advice-of-counsel defense.[28]

Moreover, Prince's testimony contradicts his argument that he relied on the advice of counsel. He testified that, in 1997, he spoke with his then-attorney, Roger Spaeder of Zuckerman Spaeder, regarding the Accounting Bar. Test. of Gary A. Prince, Trial Tr. Jan. 2, 2013, P.M. Session 11. He related that Spaeder

---

[28] The Court notes that Venable did know that Prince interacted with accounting personnel and outside auditors on financial issues, helped draft the MD&A section of public filings, reviewed and commented on drafts of public filings, and generated financial projections as part of his employment at Integral. Id. ¶¶ 96-98, 100, 102. However, because there is such scant evidence to support whether Chamberlain actually asked and received approval for Prince to engage in such actions, Venable's tacit awareness of these tasks is insufficient to allow such a defense.

told him to "stay away from the preparation or participation in the preparation of financial statements that would be filed with the SEC." Id. Prince clearly did not "stay away" from such financial statements, but participated in drafting and reviewing portions of Integral's statements as well as the preparation of the underlying data. See supra II.G.1; see also Findings of Fact ¶¶ 50, 54, 59, 67. He did not ask for any more specific advice from Spaeder or from Venable at any time.[29] Thus, even if our Court of Appeals recognized an advice-of counsel defense as a

---

[29] In the spring of 2006, Christner of Venable advised Integral's independent Directors that the firm had "not seen any evidence" that would lead it to believe Prince had practiced accounting before the Commission. See Findings of Fact ¶ 149. This is the first evidence that this issue was discussed between Integral and Venable after Chamberlain's initial meeting with Sullivan. The advice was given approximately two years after the latest incidents that the Court found were practicing accounting before the Commission. See supra II.G.1.

However, the Court notes that in the spring of 2006, Christner asked Treasure Johnson to research the Accounting Bar, and she concluded that the company should take "special care . . . to ensure that [Prince] has nothing to do of an accounting nature and particularly that he has no involvement in the preparation of the company's financial statements," Def.'s Ex. 229, and that Integral "has to be very careful that he has no responsibility at all for any accounting functions at Integral and nothing to do with the preparation of the financials, other than provide information when asked," Def.'s Ex. 226. In addition, a week later, Johnson again advised Christner that Prince should "stay[] away from the financials." Def.'s Ex. 235. Despite the fact that Integral's Directors had clearly asked for guidance on this issue, no one at Venable sent these emails or conveyed the substance of them to anyone at Integral. See Findings of Fact ¶¶ 159, 162.

complete defense to securities violations, Prince did not adduce enough evidence to establish that he would be entitled to such a defense.

### H.   Relief

The SEC has prevailed only on Count VII of its Complaint, which alleged that Prince practiced accounting before the Commission in violation of his Accounting Bar. The requested relief for this claim is a permanent injunction "restrain[ing] and enjoin[ing]" Prince from violating the Accounting Bar by appearing or practicing before the Commission as an accountant. Compl. 20; SEC's Proposed Findings of Fact & Conclusions of Law 43.

In Savoy Industries, 587 F.2d at 1168, our Court of Appeals stated that "where the SEC seeks an injunction regarding future conduct (rather than to halt an ongoing violation) [which is the situation in this case], its ultimate test is whether the defendant's past conduct indicates . . . there is a reasonable likelihood of further violation(s) in the future." The Court set forth the following factors for assessing whether an injunction is warranted:   (1) whether the violation was "an isolated incident;" (2) whether the defendant has "demonstrated that he understands his conduct to have been wrongful;" (3) whether he gives "sufficient assurances against future violations;" and (4)

whether his "business activities may present him further temptations to violate the law." Id.; see also S.E.C. v. Bilzerian, 29 F.3d 689, 695 (D.C. Cir. 1994) (quoting S.E.C. v. First City Fin. Corp., 890 F.2d 1215, 1228 (D.C. Cir. 1989)).

While it is true that the issuance of a permanent injunction against future securities violations is a "drastic remedy and not a mild prophylactic," S.E.C. v. Yun, 148 F. Supp. 2d 1287, 1293 (M.D. Fla. 2001), vacated on other grounds, 327 F.3d 1263 (11th Cir. 2003), the Court concludes that the SEC has proven, by a preponderance of the evidence, that imposition of an injunction is warranted.

As to the first Savoy factor, there is simply no question that Prince's violation of his Bar against appearing or practicing as an accountant before the Commission was not "an isolated incident." As the Court's lengthy Findings of Fact indicate, from December 1998 when he became a full-time employee at Integral, to 2007 when his employment was terminated, Prince was deeply involved in the preparation of financial statements, in the writing of the MD&A section of Integral's Form 10-Q and 10-K filings with the Commission, in reviewing and commenting in detail on drafts of the financial statements, in questioning the accuracy of data, in adding and/or correcting information, and making suggestions about internal inconsistencies and specific

—113—

language. See Findings of Fact ¶¶ 50, 52, 54, 59, 67. The Court did not specifically conclude that each element of Prince's participation in the preparation of the financial statements was inappropriate in light of his Accounting Bar. However, the Court identified seven specific examples, spanning several years, where Prince clearly violated the Bar. Thus, Prince cannot argue that his violations were "isolated incident(s)."

As to the second Savoy factor, it is unclear from the testimony whether Prince "has demonstrated that he understands his conduct to have been wrongful." While he has given assurances that he will not do any accounting work for any public company, see Test. of Gary A. Prince, Trial Tr. Jan. 3, 2013, P.M. Session 23-24, he has certainly not shown that he considers his past conduct to be a violation of the existing Bar against his practicing accounting before the Commission. The Court understands full well that he is entitled to present a vigorous defense, as his counsel have done, but that does not preclude consideration of Savoy's ruling that the defendant's understanding that his conduct was wrong is a legitimate factor to be considered.

As to the third and fourth factors, Prince has failed to give "sufficient assurances against future violations," and has not demonstrated that his future business activities will not

–114–

"present him with future temptations to violate the law." See Savoy, 587 F.2d at 1168. While Prince testified that he would never commit the kind of conduct he is guilty of in this case, his "assurance" rings hollow.

At this time, Prince holds himself out on the internet as the Founder and CEO of Fiscal Management Associates, LLC. Pl.'s Ex. 187. His website is both instructive and troubling.

In it he emphasizes that he has over thirty years of experience in financial management, that he has been the Chief Financial Officer for at least four public companies which he names, that he has been the Chief Financial Officer for "numerous" private companies, naming four of them, that he has "been involved in the preparation of financial statements for more than 100 companies," and that he has an MBA from the University of Maryland and is a non-practicing C.P.A. To any member of the public reading this material, it would be apparent that Prince is extremely experienced in handling accounting matters for both public and private companies.

Prince testified that Fiscal Management Associates is currently "inactive" and that it existed for the purpose of soliciting business and explaining his areas of expertise. Test. of Gary Prince, Trial Tr. Jan. 3, 2013, P.M. Session 18-20. He also testified that it was now used to buy and sell classic

cars, but that he would consider taking on work for a public company if the opportunity arose. Id. at 20-23.

There is nothing to indicate that Fiscal Management Associates does not still exist for the activities and financial management consulting that it was originally created for. The fact that the contact number is currently "inactive," as Prince testified, id. at 18, would certainly not be apparent to a member of the public scanning the internet for the kinds of financial management services Prince advertised. The bottom line is that whether this company is active or not, Prince has never taken down this advertisement, it does not say a word about trading of classic cars, and no member of the public would know those facts. The fact that this company is now used for purchasing and selling classic cars in no way gives "sufficient assurance against future violations," and certainly does not reassure the Court that no business activities may present him with temptation to violate the law.

In addition to the analysis of Savoy factors justifying imposition of an injunction, the Court takes into consideration -- even though it is not dispositive -- Prince's prior violation of the securities law. As the Findings of Fact indicate, he violated the securities laws before joining Integral as a full time employee in 1998 and served a short jail term. See Findings

of Fact ¶¶ 8, 12. Three years after being released from incarceration, he began violating the Rule 102(e) Order. See Pl.'s Ex. 135 (creating spreadsheets for use in public filings in 1999).

Finally, in 1997, shortly before joining Integral as a full time employee, Prince spoke with his then-attorney, Roger Spaeder of Zuckerman Spaeder, regarding the limitations under the Accounting Bar. He testified that Spaeder told him to "stay away from the preparation or participation in the preparation of financial statements that would be filed with the SEC." Test. of Gary A. Prince, Trial Tr. Jan. 2, 2013, P.M. Session 11.

However, Prince did no such thing. Again, as set forth in detail in the Findings of Fact, Prince participated extensively in the preparation of financial statements, the reviewing of the underlying data supporting those financial statements, and in suggesting how certain accounting decisions should be made. The fact that he failed to follow the explicit advice of his own counsel, the fact that he maintains a website which could mislead the investing public, the fact that analysis of the Savoy factors does not suggest that there will be no future conduct in violation of his Bar Order, and the fact of his prior violation of the Securities Act, convinces the Court that there

is a "reasonable likelihood" of future violations by the Defendant. <u>Savoy</u>, 587 F.2d at 1168.

Therefore, the Court concludes that the SEC has proven by a preponderance of the evidence that an injunction against violating Prince's Bar on practicing accounting before the Commission is necessary in order to protect the investing public.

**III. CONCLUSION**

For the foregoing reasons, the Court grants judgment in favor of the SEC on its claim that Prince practiced accounting before the Commission in violation of his Accounting Bar and grants the SEC's request for injunctive relief. The Court grants judgment in favor of Prince on all other claims. An Order will accompany this Memorandum Opinion.

May 2, 2013

/s/_____
Gladys Kessler
United States District Judge

**Copies to:** attorneys on record via ECF